**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 13-80371-CIV-BLOOM/HUNT**

------------------------------------------------------------------------

ELI LILLY AND COMPANY, by NATIONAL
UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PENNSYLVANIA, as subrogee,

                 Plaintiff,

       -against-

TYCO INTERGRATED SECURITY, LLC f/k/a
ADT SECURITY SERVICES, INC., A SUBSIDIARY
OF TYCO INTERNATIONAL LTD., CO. AMAURY
VILLA AND AMED VILLA,

                 Defendants.

------------------------------------------------------------------------

**PLAINTIFF'S MOTION IN LIMINE TO STRIKE DEFENDANT'S**
**EXPERTS RICHARD MANNING, HOWARD SAFIR AND SERGE JORGENSEN**

COMES NOW Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, as subrogee of Eli Lilly and Company, (hereinafter referred to as "Plaintiff") by and through its undersigned attorneys, and for its Motion to Strike Defendant Tyco Intergrated Security, LLC, f/k/a ADT Security Services, Inc., a Subsidiary of Tyco International Ltd., Co's., (hereinafter "ADT/Tyco") experts Richard Manning, Howard Safir and Serge Jorgensen.

**I.    INTRODUCTION**

Discovery in this matter is closed. This Court issued a Scheduling Order on July 19, 2013 [D.E. 53] which was amended on August 20, 2014 establishing March 27, 2015 as the date for the filing of *Daubert* motions. For the reasons set forth herein, the Plaintiff seeks to strike the testimony of Defendant's experts Richard Manning, Howard Safir and Serge Jorgensen. The specific grounds for striking each witness are set forth separately herein.

**Applicable Legal Standards to Expert Testimony**

Federal Rule of Evidence 702 provides the basic framework for determining the admissibility of expert testimony. Rule 702 provides the following:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

The United States Supreme Court expounded upon Rule 702's requirements in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). In *Daubert,* the U.S. Supreme Court established that the district court must function as a "gatekeeper" which admits expert testimony only if it is both relevant and reliable. *See id.*

> To fulfill their obligation under *Daubert,* district courts must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Abramson v. Walt Disney World Co.,* 370 F.Supp.2d 1221, 1223 (M.D.Fla.2005) (*quoting City of Tuscaloosa v. Harcris Chemicals, Inc.,* 158 F.3d 548, 562 (11th Cir.1998)).  In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) the U.S. Supreme Court established that "[t]he *Daubert* 'gatekeeping' obligation applies not only to 'scientific' testimony, but to all expert testimony." *Id.* at 138.

2

The proponent of the expert testimony carries a substantial burden under Rule 702. *United States v. Masferrer,* 367 F. Supp. 2d 1365, 1371-72 (S.D. Fla. 2005). The party offering the expert testimony has the burden of satisfying each of the above three elements by a preponderance of the evidence. *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir.1999).  In the Eleventh Circuit, the proponent of expert testimony must show that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 563 (11th Cir.1998) (citing *Daubert,* 509 U.S. at 589); *Maiz v. Virani,* 253 F.3d 641, 665 (11th Cir.2001); *Masferrer,* 367 F. Supp. 2d at 1372 (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)).

Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful. *Frazier,* 387 F.3d at 1262.  As a result, the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.  *Kumho Tire,* 526 U.S. at 152.  Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial.  *Frazier,* 387 F.3d at 1262 (citing Fed.R.Evid. 702 advisory committee's note (2000 amends.)("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well reasoned, and not speculative before it can be admitted.")); *see also Masferrer*, 367 F. Supp. 2d at 1373.

**Richard Manning, PhD**

Dr. Manning is an economist designated by Defendant as an expert on Plaintiff's damages.  He has opined that Plaintiff's expert, Daniel Luz Cambal's opinions concerning damages are unreliable in that he chose the incorrect standard for measuring Eli Lilly's economic damages.  Dr. Manning relies on what he incorrectly understands is Mr. Cambal's estimate of the extra manufacturing costs incurred by Eli Lilly, and he opines that this is the correct measure of damages rather than the legally accepted "transfer" value of the stolen goods. The relevant portions of Dr. Manning's deposition transcript are attached hereto as **Exhibit 1** and Dr. Manning's Report has already been filed with the Court **at [D.E. 158], Exhibit 4** and is under seal.  Plaintiff references and incorporates this previous filing and will refer to it herein as **Exhibit 2**.

Dr. Manning's testimony is unreliable.  He performed no independent investigation. He merely adopted as his interpretations the unexplained and inapplicable estimates of another expert, Mr. Cambal. He used no methodology to arrive at his conclusions.  Moreover, Dr. Manning usurps the role of the Court by making legal conclusions about the proper measure of damages.  Dr. Manning fails to satisfy the *Daubert* test.

> **1.      Dr. Manning's opinions are an attempt to usurp the role of Court, are not helpful, and risk confusing the jury**

Rule 702 of the Federal Rules of Evidence authorizes witnesses whose testimony will "assist the trier of *fact* … to determine a *fact* in issue" to provide opinion testimony.  Fed. R. Evid. 702.  Expert testimony is not permitted if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it". *Dubiel v. Columbia Hosp. (Palm Beaches) Ltd. P'ship,* No. 04-80283-CIV, 2005 WL 5955691, at *3 (S.D. Fla. Jan. 11, 2005)(citing *United States v. Bilzerian,* 926 F.2d 1285, 1294

(2d Cir.1991))[1]. Dr. Manning's proposed testimony violates this rule.

A prior decision from this Court has already addressed the legal question of the measure of damages in an identical case where the issue before the Court was the determination of the fair market value for lost pharmaceutical products. *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 602 F. Supp.2d 1260 (S.D. Fla. 2009)(Moore, J.), rev'd on other grds by, 615 F.3d 1305 (11th Cir. 2010). In that case, the defendant (like Defendant ADT here) argued against application of the "transfer price" as the correct measure of damages. Just as it argues now, Eli Lilly argued that the transfer price of the drugs was the proper measure of damages. The "transfer" price of the drugs is the price at which Eli Lilly could sell the drugs to its next affiliate or third party in the supply chain. *Eli Lilly & Co*., 602 F. Supp. 2d at 1278.

There, the court held that the transfer price was the "best measure of damages." *Id.* at 1279. In reaching its decision, the court provided a detailed explanation of Eli Lilly's transfer price system and its relation to fair market value:

> From initial manufacture to final sale, pharmaceuticals within the Lilly supply chain are subject to a number of inter-affiliate transactions. For example, one Lilly affiliate commits resources to research and development for a chemical and manufactures the chemical in bulk. (*Id.* at 29.) The bulk manufacturer Lilly affiliate then sells the chemical to another Lilly affiliate for further processing at a price which reflects the bulk manufacturing costs and costs for research and development and service along with a profit allocation to the bulk manufacturer Lilly affiliate. (*Id.* at 14, 47.) At the next level, the processing Lilly affiliate performs further manufacturing for which it incurs costs. The price to the next Lilly affiliate (the third in the chain in this example) must account for this cost and the appropriate level of profit earned by the processing Lilly affiliate. That is, as the product moves along the supply chain to the end customer, all costs and profit as to each Lilly affiliate in the supply chain must be accounted for in the price of the product.

---

[1] Copies of unreported decisions are attached hereto as **Exhibit 7**.

> The transfer price represents the price at which a Lilly affiliate in the supply chain, that is in possession of a product at a certain point in time, sells the product to another Lilly affiliate or a third-party. The transfer price encompasses all the costs incurred throughout the Lilly supply chain up to a given point and all the profit that is earned in each step of the supply chain up to that point. **The "manufacturing costs" that Defendants seek to set as damages fail to account for all the other costs incurred as the product moves through the supply chain**. Awarding damages based on "manufacturing costs" also fails to account for the profit that the various Lilly affiliates have already built into the transfer price. Thus, in order to make Lilly whole, it is not simply a matter of purchasing more of a commodity from a wholesaler like a coal dealer. The correct measure of damages is the transfer price which represents the real "economic value" that Lilly lost when the insulin was damaged in transit. (*Id.* at 30.)

*Eli Lilly & Co.*, 602 F. Supp. 2d at 1279.

Under indistinguishable circumstances, another Judge of this Court held that the transfer price was the proper measure of damages in a case where pharmaceuticals were lost.[2] Dr. Manning's opinions, report, and proposed testimony are at direct odds with Judge Moore's decision in the prior *Eli Lilly* v. *Air Express* matter. (Transfer price as the measure of damages to be applied in this case is fully briefed in Eli Lilly's Motion for Summary Judgment). However, the holding of the *Eli Lilly v. Air Express* decision is relevant to this Motion insofar as Dr. Manning's testimony usurps the role of this Court in deciding the legal question of the appropriate measure of damages. *See United States v. Hunter*, 373 Fed. Appx. 973, 977 (11th Cir. 2010)(stating that an expert witness cannot testify to legal conclusions because the court must be the jury's only source of law); *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)("[A] witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law.").

---

[2] Although the *Eli Lilly & Co. v. Air Express* decision involved the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999 ("Montreal Convention"), that Court's decision on the issue of damages was not confined to Montreal Convention cases. Rather, the Montreal Convention was assessed in terms of its potential impact on limiting liability on damages..

Should Dr. Manning's opinion that transfer pricing is not an appropriate method of measuring Plaintiffs' damages be admitted, his opinion would be competing with the legal precedent of this Court. It is for this Court to decide the method for measuring the damages here, not Dr. Manning or any expert witness. Regardless of this Court's treatment of the *Eli Lilly v. Air Express* holding, the very fact that the Court decided this question demonstrates that Dr. Manning's opinions are not admissible since they purport to do precisely the same thing that Judge Moore's decision did. Because Dr. Manning's proposed testimony sets forth a method to measure damages that is directly contrary to the prior decision of this Court and would be a legal conclusion, it should not be permitted.

2.     **Dr. Manning only relies upon the calculations of another expert in support of his conclusions.  His methodology is unreliable**

In addition to usurping this Court as the legal authority for determining the proper measure of damages, Dr. Manning's opinions fail the *Daubert* test on two other bases. Dr. Manning is unfamiliar with and incompetent to testify about what constitutes the transfer price. In addition, Dr. Manning did no independent analysis concerning the purported manufacturing costs upon which he relied. Instead, he blindly relied on Mr. Cambal's work product without researching what factors Mr. Cambal included or the basis on which he made his estimates and failed to consider other relevant factors.

a.     **Dr. Manning's "manufacturing cost" opinions are unreliable**

Dr. Manning testified at his deposition that the only source of the cost data upon which he based his opinion was derived from the background materials provided by Mr. Cambal. (**Exhibit 1**, Manning Tr. 34-35, 43, 69-72, 120). Dr. Manning spoke to no one else about this data and conducted no interviews, independent analysis, or investigation into these figures. (Exh. 1, p. 72, 75). Although admitting that tax liability is likely a real cost to Eli Lilly, Manning

testified that he did not take tax implications into account in his report unless such implications were already included in the numbers gleaned from the Cambal report. (Exh. 1, pp. 150-151). Thus, he did not even know whether tax implications were taken into account by Cambal even though Cambal's figures were the only figures upon which he relied.

The standard cost of manufacturing, which is the centerpiece of Dr. Manning's entire opinion on the issue of damages is taken entirely from Mr. Cambal's pre-subrogation review. The purpose of these figures was to explore the value of goods which were not stolen, but were adversely affected by the burglary. Mr. Cambal's preliminary estimates relate to only a small portion of the overall claim, which was subsequently withdrawn. *See generally* Affidavit of Daniel Luz Cambal ("Cambal Aff.") attached hereto as **Exhibit 3**.[3] Those adversely affected goods were declared "compromised," where they shared the same "batch number" as stolen goods but were otherwise unaffected by the burglary. *See* Exh. 3 ¶¶ 4-5. Standard cost figures contained in the background materials to the Cambal report were never intended to be applied to lost, damaged, or stolen product but, rather, were furnished (to the underwriters) for discussion purposes to assess value for "compromised" goods. (Exh. 3 ¶¶ 3-7). Thus, these figures were derived for an entirely different purpose, were untested, and have no relevance to stolen or damaged product. (Exh. 3 ¶ 9). Had Dr. Manning undertaken his own investigation or performed any independent research into these crucial figures, he would have learned this fact and not have based his entire opinion on these figures. Instead, Dr. Manning just assumed that these figures were relevant and correct and incorporated them into his report and opinions.

A court in this Circuit recognized that experts may not simply repeat or adopt the findings of other experts without independently investigating such findings. *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 607 n. 75 (N.D. Fla. 2009). In *Hendrix*, the court cited a Third Circuit

---

[3] Exhibit A to the Cambal Affidavit (Exhibit 3) has been filed under seal.

decision which held that unblinking reliance and a failure to assess the validity of the opinions upon which a proposed expert relies constitutes a violation of the principles set forth in *Daubert* and warrants exclusion.  *In re: TMI Litigation*, 193 F.3d 613, 715-16 (3d Cir. 1999).  The *TMI* court was faced with a proposed expert witness who relied upon other experts' opinions and assumed their correctness.  *Id.* at 714.  He did not assess the validity of the other opinions' upon which he relied and just assumed they were correct as he formulated his own opinions.

In another similar case, Judge Lenard granted a motion to preclude an expert witness from testifying at trial since that proposed expert did not perform an independent investigation or analysis of the material issues in the case.  *Barrueto v. Fernandez Larios*, 2003 WL 25782075, at *7, No. 99-0582-CIV (S.D. Fla. Sep. 18, 2003).  Due to the lack of an independent investigation, the Court held that the proponents of the expert testimony could not show any methodology applied to the case.  Consequently, the Court concluded that the proposed expert testimony would not be helpful to the jurors in deciding the facts of the case.  *Id.* at *7.  The subject of the proposed expert testimony in that case was an international human rights attorney's opinions on the actions of the defendant in a case alleging murder, torture, and crimes against humanity. Because the proposed expert did not conduct any personal investigation into the defendant's participation in said activities, the Court excluded his testimony.

In this case, Dr. Manning selected figures from material contained in Mr. Cambal's working files for the underlying claim submission and without any independent analysis, relied upon them entirely to arrive at his opinion on the damages suffered by Plaintiff.  Notably, the vast majority of Manning's report is devoted to attempting to discredit and attack Cambal's report.  On page 2 of his report, without evaluating Eli Lilly's profit paradigm, allocation of intangible assets or distribution of costs, Manning refers to the Cambal report as "unreliable"

9

since it would provide "excess profits" to the Plaintiffs.  Manning Report, page 2, **Exhibit 4 to D.E. 158**.  Yet, Dr. Manning has no problem selecting figures from the Cambal report and blindly assuming they are applicable and correct without even picking up the phone to independently investigate their validity or verifying their applicability to this case.

This sort of selective, blind reliance on another expert's calculations is not sufficiently reliable to satisfy the *Daubert* test.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2002)(noting that district courts serve a "gatekeeping function to ensure that speculative, unreliable expert testimony does not reach the jury under the mantel of reliability.").  The centerpiece of Rule 702 is that the expert employs the same level of intellectual rigor in the courtroom that he or she would in the relevant field.  *Rider v. Sandoz Pharms Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002).  Dr. Manning employed no intellectual rigor or methodology in formulating the opinions expressed in his report or in providing relevant testimony.

In a case where a party sought to introduce the testimony of an accountant on the issue of lost profit but the proposed witness failed to take proper steps to verify the projections he relied upon by conducting independent research into the industry, his testimony was excluded.  *JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, at * 7, Civ. A. 97–CV–0652 (E.D. Pa. Apr. 15, 1998).  Significantly, since the proposed expert was an accountant but failed to consider expenses and tax ramifications into his damage calculations, the court found further flaws in his methodology and precluded his testimony.  *Id.*  Here, Dr. Manning confirmed that unless the Cambal figures took taxation issues into consideration, then the opinions he plans to offer do not address taxation.  (Exh. 1, pp. 150-51).  While Manning is not a taxation expert, his experience with pharmaceutical pricing with Merck and Pfizer surely impute an awareness that tax issues are an extremely important consideration in pharmaceutical pricing.  The fact that he

does not account for tax or even qualify his opinions that they might be subject to alteration due to applicable tax issues further demonstrates the unreliability and lack of methodology employed by Dr. Manning.  Such a glaring omission from his report and analysis further weakens the reliability of his testimony.

Combing through the other party's expert's report which you characterize as unreliable, plucking out figures from unexplained working papers that appear to be favorable, and blinding accepting these calculations as correct is not the sort of intellectually rigorous exercise contemplated by the *Daubert* framework.  Therefore, Manning's opinions based on the selective figures from the Cambal back up claims file material are unreliable and inadmissible.

### b.      Dr. Manning is not competent to criticize transfer price

Not only did Dr. Manning blindly accept Mr. Cambal's costs of manufacturing estimate, but he is not qualified to opine about "transfer price" despite the fact that he criticizes it.  Dr. Manning was repeatedly asked about the appropriateness of the methodology used by Mr. Cambal and the factors which comprise Eli Lilly's transfer price.  On no less than eight occasions, Dr. Manning testified that he was not an expert on transfer-in pricing and had no expertise in the factors which went into the equation, the tax consequences associated with it, and the tax authority approvals required for its use, etc.  (Exh. 1, pp. 55, 68, 83-84, 96, 117-119, 120).  Not only did Dr. Manning solely rely on Mr. Cambal's estimate of manufacturing costs, he criticized, without any understanding or expertise, Mr. Cambal's opinions concerning transfer price.

In addition, in evaluating the reliability of experience-based testimony, "the Court must ensure the witness has appropriately explained how his experience leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how the experience

is reliably applied to the facts." *Gandhi v. Carnical Corp.,* 2014 WL 7642540 (S.D. Fla. 2014) (citing *United States v. Brown*, 415 F.3d 1257, 1261 (11th Cir. 2005)). "An expert's unexplained assurance that his opinions rest on accepted principles is not enough." *Id.* (citing *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1130 (M.D. Fla. 2007)). "The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *Frazier*, 387 F.3d at 1262 (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)).

Here, Dr. Manning clearly admits that he does not have either the experience or the expertise to opine concerning the factors which constitute the transfer price generally or what factors constitute the transfer price at Eli Lilly. Therefore, he lacks the expertise and his opinions lack the reliability necessary to satisfy the *Daubert* test. He must be precluded from offering expert evidence in this case.

**Mr. Howard Safir**

Defendant initially designated Mr. Safir as an expert witness to testify on two basic topics. Firstly, he asserts that Eli Lilly's inadequate physical security measures failed to deter or prevent intruders from entering its Enfield Warehouse. (As a subpart to this opinion, Mr. Safir counter-intuitively opines that inside information about the Eli Lilly security system would have *added* to the complexity and risk to the burglars and is unlikely and uncommon). Secondly, he offers the opinion that in 2015, Defendant itself had adequate physical security for its own buildings "to deter and frustrate an attempted break-in". (Safir Report at **Exhibit 4**[4]; Safir Tr. 8 (**Exhibit 5**). Defendant has also designated Mr. Safir to offer expert rebuttal opinion testimony that Defendant, its former employee Mario Santana ("Santana"), and/ or other Defendant employees were not the origin of inside information used to accomplish the Enfield Burglary.

---

[4] Exhibit 4 will be filed under seal.

(Safir Rebuttal Report, **Exhibit 6**[5]).

In forming his expert opinions, Mr. Safir relied on the following documents and information:

- Unidentified witness interviews, (Exh. 5, pp. 138, 170)
- A cursory review of personnel records (Exh. 5, pp. 176)
- Undocumented interviews with unidentified Tyco/ADT personnel and undocumented visits to Defendant's facilities conducted both personally and by his "team"; (Exh. 5, pp. 62- 63)
- An Eli Lilly self critical analysis of the burglary in an "after action" report; (Exh. 5, pp. 110, 222, 258, 267)
- Post burglary photographs of the Enfield Warehouse taken by unidentified individuals but described to Safir as being fair and accurate; (Exh. 5, pp. 246)
- Media reports from the Internet about cargo and warehouse thefts; (Exh. 5, p. 36)
- Eli Lilly's General Security Survey; (Exh. 5, pp. 65, 68, 80, 86, 109, 138)
- General ASIS/ANSI reference to the concept that organizations face risk and must balance cost and organizational operational objectives; (Exh. 5, pp. 147- 148)
- Defendant's Security Awareness Memo of July 7, 2008 emphasizing vigilance. (Exh. 5, p. 273)
- Pleadings believed to have been filed in the criminal proceedings "by" Amaury Villa, one of the convicted felons. (Exh. 5, pp. 92-93).

Plaintiff moves to preclude Mr. Safir's expert testimony on the grounds that it will not assist the jury but will mislead it, he lacks significant experience concerning warehouse burglaries, he did not conduct a meaningful investigation of the Enfield Warehouse Burglary, and his opinions are based upon insufficient facts or data and are the product of unreliable principles and methods.

### 1.     Mr. Safir lacks the relevant experience necessary to provide expert opinion testimony in this case

While Mr. Safir may have historic experience in law enforcement, he has no direct experience with, and little knowledge regarding cargo theft and warehouse burglaries.

The entirety of his fifty year work experience in this field involves a single investigation in the 1970s in which one of the groups he supervised investigated a pharmaceutical warehouse

---

[5] Exhibit 6 will be filed under seal.

theft.  He had no personal involvement in the investigation.  (Exh. 5, pp. 23; 25-26).   Moreover, he testified, without equivocation, to being wholly unaware of the Federal, State and Local law enforcement task forces in existence for decades, dedicated to cargo theft originating from the Florida area. (Exh. 5, pp. 22, 25, 27).   Mr. Safir has not attended any law enforcement or physical security trade conference sessions, discussions, or break-out groups that focus on warehouse security (Exh. 5, pp.  34-35, 45-47) and he does not perform security assessments for warehouses (Exh. 5, p. 135).

Accordingly, Mr. Safir is not qualified to offer an opinion with regard to the adequacy or appropriateness of the security measures in place at the Enfield warehouse, nor is he qualified to render an opinion with regard to the behaviors of the burglars that have pled guilty to the Eli Lilly burglary and the other related burglaries.

Further, Mr. Safir intends to opine as to the physical premises security of Defendant's sales offices.  However, Plaintiff has not alleged invasions at these locations.  Moreover, Mr. Safir's foundation for these opinions is fatally flawed.  Not only were the onsite visits he conducted to facilities as they existed in 2015 rather than during the relevant time frame, but in some instances the facilities did not even exist during the relevant time frame.

### 2.      Mr. Safir's opinions lack the proper foundation and a tested methodology

In addition to his lack of qualifications to opine about warehouse cargo theft, Mr. Safir admits that he has performed no proper investigation of the Enfield facility or the burglars in this instance. Mr. Safir testified that a proper "investigation" would require that he visit the locations of the burglaries and study the pattern and practices of the burglars in this and the other burglaries.   In formulating his opinion in this case, Mr. Safir has undertaken none of those necessary steps. (Exh. 5, pp. 17-18, 28-29).

14

Mr. Safir admitted to having never so much as visited Eli Lilly's Enfield facility.  His testimony is based solely on second and third hand so called "evidence" of the physical surroundings of the Enfield facility.  He also has admitted to having no personal knowledge of the physical surroundings of the other burglarized warehouses. (Exh. 5, pp. 129, 130-132).

Further, the scarce information upon which Mr. Safir relies to opine as to the Enfield warehouse in general and the burglars and burglaries consists only of: (i) what defense counsel gave to Vigilant Resource International, LLC ("VRI"), the company with whom Mr. Safir is retained to provide consultant services [6]( Exh. 5, p.  10); (ii) what defense counsel told Mr. Safir; and (iii) relatively few brief interviews and investigative work performed by VRI of Defendant's employees with whom Mr. Safir could not recall and for which he has no notes. (Exh. 5, pp. 35-40).

In the absence of notes, the reliability for Mr. Safir's opinions is entirely based on his failing memory.  Particularly, Mr. Safir could not recall the timing of the preparation of Lilly's *General Security Survey* in relation to the burglary (i.e. before or after the event), a document that Mr. Safir's report highlights as a basis for his opinions. (Exh. 5, pp. 109 -110)  Additionally, Mr. Safir could not recall the name of the individual retained to perform investigative services for the VRI team (Exh. 5, pp. 36-37; 129-132) and could not recall the members of his 'Team' itself (Exh. 5, pp. 40-41).  With regard to his rebuttal opinion, Mr. Safir could not recall who was interviewed to provide a basis for his opinions or by whom (Exh. 5, pp. 179-180) or the basis for his opinion that ADT employees had limited access to customer information (Exh. 5, pp. 169-173).

Significantly, in the absence of interview notes and a flawless memory, reliance on Mr. Safir's undocumented accounts of facts is suspect where two United States District Court judges

---

[6] Vigilant Resource International, LLC is owned by Mr. Safir's son, Adam, and daughter, Jennifer.

have observed Mr. Safir at trial and have found that his testimony is not credible. Further highlighting Mr. Safir's selective or faulty memory, during his examination, although Mr. Safir recalled his testimony and the finding of Judge Sprizzo in *Locurto v. Safir,* 269 F. Supp. 2d 368, n. 14 (S.D.N.Y. 2003), he did ***not*** recall testifying before Judge Hellerstein in *Walton v. Safir,* 122 F. Supp. 2d 466, 479 (S.D.N.Y. 2000), despite the incident having centered on a notorious and highly controversial incident of New York history relating to the 1999 shooting by police of Amadou Diallo.

Neither Mr. Safir nor anyone on his "team" interviewed ADT employees Nancy Colone, Defendant's National Account Manager, formerly responsible for the Lilly account (Exh. 5, p. 238). They also failed to interview Robbie Purnell regarding the security surveys they conducted or the assessment(s) and proposal(s) they prepared dating back to 2004 regarding the Enfield facility, their multiple proposals that include detailed designs and the locations of  information about Lilly's electronic intruder alert devices (*e.g.,* motion detectors and alarms), or notification system that Mr. Purnell and Ms. Colone circulated via unencrypted email. (Exh. 5, p. 238). Contrary to his written report, during his examination, Mr. Safir admitted that although his expert opinion analysis failed to consider it, the Enfield proposal documents furnished inside information about the Eli Lilly security system that would be "useful" to burglars in the commission of a burglary. (Exh. 5, p. 235).

With regard to Mr. Safir's opinions about the conduct of the burglars themselves (presumably in support of their *modus operandi* in the Enfield burglary), Mr. Safir's report relies heavily on two submissions of one of the burglars, co-defendant Amaury Villa, that Mr. Safir claimed to have read and considered credible.  (Exh. 5, p.  93; Safir Expert Report, **Exhibit 4** at p. 5 fn 13).  In formulating his opinion, Mr. Safir failed to perceive that the documents relied

16

upon contained only the contentions and characterizations of Amaury Villa's defense attorney, Maria Elena Perez, statements which Attorney Perez alleged to be representations of statements believed to have been expressed by Amed Villa. Attorney Perez herself is presently facing disciplinary proceedings in the Florida Supreme Court [SC 14-733], and in the District of Connecticut, Judge Arterton found that Attorney "Perez gave evasive and shifting explanations for her conduct" (*U.S. v. Amaury Villa*, 12-cr-40 Doc. 355 p. 11). Mr. Safir appears to have been unaware that these documents were part of a submission where it is alleged that Amaury Villa overheard a telephone conversation that the burglary was a conspiracy between the burglars and Lilly's CEO, to perpetrate an insurance fraud. (Exh. 5, p. 98). Mr. Safir then elected to "cherry pick" the credibility of the assertions to be attributed to the felons (or their counsel) as foundational support for his opinions. Although Mr. Safir conceded that the representation made that Lilly's CEO conspired with the burglars was unreliable, he relied upon the representation in the same submission that the burglars had an inventory list that "came" from Lilly to opine that inside information used by the burglars "came from Lilly." (Exh. 5, p. 98).

Finally, although Mr. Safir identifies publications and standards and guidelines set forth by the American Society for Industrial Security (ASIS) incorporated in ANSI/SAIS PAP.1-2012, he references the 2012 standard for support of his analysis of Lilly's security in 2010, and in neither his report nor his testimony does he illustrate in what way these publications furnish support for the opinions or for the methodology he employed in formulating those opinions.

### 3. Mr. Safir's security opinions do not assist the trier of fact

Under the "helpfulness prong," expert witness testimony is only admissible "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. The expert testimony must "offer[] something beyond the understanding and

experience of the average citizen." *Id.* (quoting *United States v. Rouco,* 765 F.2d 983, 985 (11th Cir. 1985)). (internal quotation marks omitted). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63.

In *Great Northern Ins. Co. v. Ruiz,* the district court held that an expert's deposition testimony as to the adequacy of the security company's response time to a fire did "not assist the trier of fact, through the application of scientific, technical, or specialized expertise" because a "trier of fact just as easily as [the expert] could watch the surveillance video and make his or her own determination regarding when a lay security guard should have noticed the first sign of a fire on the security monitor." 688 F. Supp. 2d 1362, 1374-75 (S.D. Ga. 2010). In *Bethea v. Bristol Lodge Corp.*, the district court held that a security expert's conclusions on the adequacy of security measures were "common sense" and that the testimony did not assist the trier of fact because "[t]he jury here can use its own common sense as juries do daily." 2002 U.S. Dist. LEXIS 24411 (E.D. Pa. Dec. 18, 2002). In *Maguire v. National Railroad Passenger Corp.*, the district court held that "it is within an average juror's comprehension that security personnel and cameras generally improve safety." 2002 U.S. Dist. LEXIS 5226 (N.D. Ill. March 28, 2002).

Generally, whether concerning the Eli Lilly Enfield Warehouse Security "Shortcomings" or the adequacy of the physical security of Defendant's facilities in 2015, Mr. Safir's "expert" opinions are no more than common-sense and *ipse dixit* assertions.

It is Mr. Safir's "expert" opinion that safeguarding against physical intrusions may be accomplished by "layered security" such as perimeter fencing of different types, guards, controlled access to the fenced property, a wall, and electronic security devices. (Exh. 5, p. 138). Mr. Safir agrees that a moat is also "good." (Exh. 5, p. 157). Contending, after an invasion, that

18

more is better and that what existed was not enough to prevent this invasion is not expert analysis nor beyond the ken of any juror.

Mr. Safir opines that Defendant's facilities as they exist in 2015, facilities that are not the ones in operation during the 2010 time period, four years after the burglary at the Enfield warehouse, are "adequately secured to deter and frustrate an attempted break-in" (Exh. 5, p. 50) is without substance and notably, where Plaintiff does not allege a physical invasion at Defendant's premises, this opinion offers little assistance to the trier of fact.  Conversely, Mr. Safir concedes that he cannot opine about insider activity regarding his client's confidential information and has no information concerning Defendant's internal document management, handling and storage procedures. (Exh. 5,  p. 232).  These latter issues are the only ones relevant to this case.  Mr. Safir's "strawman" analysis must be rejected.

### 4. Mr. Safir's rebuttal opinions are equally unreliable, unfounded and do not satisfy the *Daubert* test.

Mr. Safir's proffered rebuttal opinions (**Exhibit 6**) that neither ADT nor its former Miami area commercial manager Mario Santana could be the source of inside information in this case is equally flawed in its foundation and analysis.  At the crux of the foundation for this opinion is Mr. Safir's cursory review of Mario Santana's personnel file and interviews with ADT personnel other than Mr. Santana.  However, once again, Mr. Safir testified that the review of the personnel file was cursory and performed by his son, Adam Safir. (Exh. 5, p. 177).  Moreover, once again, Safir could not recall the identity of Defendant's employees that he and others on his team presumably interviewed and upon whose perceptions of Santana he relied to formulate his opinions. (Exh. 5, p. 176)    Additionally, Mr. Safir was unfamiliar with the most basic information in Mr. Santana's personnel file including his poor high school academic record, his prior employment work history (never lasting more than a year at a prior place of employment),

or that despite having testified to having accepted his position with Protection One three weeks prior, Mr. Santana gave Defendant only two days resignation notice. (Exh. 5, pp. 189-192).  Mr. Safir was also unaware that, despite the direction that references to his employment application should be unrelated, one of the references on his employment application to ADT was his sister, the mother in law of the convicted burglar long haul trucker in the Eli Lilly burglary.

Significantly, Mr. Safir was unaware that Mr. Santana's exit interview documentation reflected that his laptop computer (a mechanism to remotely enter the ADT computer platforms which housed customer specific information) was not among the ADT assets returned on his termination. (Exh. 5, p. 186). Mr. Safir was equally unaware that ADT's network help desk records documented extensive activity under Mr. Santana's employment identification credentials on the network after the time that Santana had accepted his position with Protection One within the month prior to his departure (Exh. 5, pp. 187-188) (or any of the details regarding help desk activity tracked to his credentials that appeared for over a year following his termination).  Moreover, Mr. Safir took at face-value incorrect representations provided by defense counsel that Santana's credentials were denied access to the ADT network "shortly after" his resignation. (Exh. 5, p.  187).

Mr. Safir's final opinions that the burglar's burglary spree of ADT secured warehouses across six states are a statistically random coincidence is also unsupported by any evidence or statistical analysis.  Indeed, Mr. Safir admitted that he is not a statistician and cannot tell you what the frequency is but—" most of the burglaries that I am familiar with do not have co-opted insiders." (Exh. 5, pp. 106-107)

**Serge Jorgensen**

Defendant has designated Mr. Serge Jorgensen as its cyber security expert opining about the security of Defendant's electronic data security practices.  He opined that the Defendant maintained standard and common security controls and systems during the operative period.  In so opining, Mr. Jorgensen failed to consider or even take note of some of the most damning historical computer data available,[7] that former ADT employee, Mario Santana's computer credentials were utilized repeatedly just before his departure from ADT and, more importantly, these same credentials were used up to 18 months **after** Mr. Santana left Defendant's employ.  It is not within the province of an expert to select the evidence which supports his opinion and reject that which doesn't, especially without explanation or even a mention.

Courts in this Circuit have recognized that "[a]n expert must at least consider other factors that could have been the sole cause of the plaintiff's injury" and provide a "reasonable explanation as to why he…concluded that any alternative cause suggested by the defense was not the sole cause of the plaintiff's injury."  *Seamon v. Remington Arms Company, LLC*, 12-CV-895, 2014 WL 4855018, at *14 (M.D. Ala. Sep. 29, 2014); (citing *Borum v. Werner Co.*, No. 5:11cv997, 2012 WL 2047678, at *13 (N.D. Ala. June 6, 2012)( rejecting the expert's causation opinion in a case where the plaintiff alleged a manufacturing defect in a ladder, which collapsed while the plaintiff was on it, proximately caused his injuries, because it failed to "account for other possible, if not probable, causes of the ladder's failure.")).

As explicitly recognized by the *Seamon* court, although this focus on the expert's ability to rule out other causes most often arises in the differential diagnosis context, it has been applied

---

[7] The sufficiency of Defendant's production and spoliation of their network related information is the subject of Plaintiff's motion concerning spoliation.  Nonetheless, while this particular data was at all times in Defendant's possession, it was not produced to Plaintiff until February 2015, after the exchange of expert reports and several motions to compel.

in other contexts dealing with experts. *Seamon*, 2014 WL 4855018, at *14 n.15. Ultimately, the *Seamon* court concluded that the expert did not adequately account for the alternative theory and his expert opinion was therefore speculative and unreliable. *Id.* at *14. This same principle applies to Mr. Jorgensen since it is evident that he failed to consider important factors which are highly relevant to his opinions in this case. His failure to consider the historical computer data available, that former ADT employee, Mario Santana's computer credentials were utilized repeatedly weeks before his departure from ADT (at a point when he had already secured new employment), and that these same credentials were used up to 18 months *after* Mr. Santana left Defendant's employ, render his opinions unreliable. His failure to consider this other evidence and these other factors without explanation is cause for preclusion of his opinions under *Daubert*.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court strike the expert testimony of Dr. Manning, Mr. Safir, and Mr. Jorgensen because they do not satisfy the requirements set forth by *Daubert* and Federal Rule of Evidence 702.

## S.D. FLA.LOCAL RULE 7.1 (a)(3) CERTIFICATION

Counsel for ELI LILLY has conferred telephonically and via e-mail with counsel for ADT who have advised that they do not consent to the relief requested in the instant motion.

Respectfully submitted this 27th day of March, 2015,

ELI LILLY AND COMPANY by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, as subrogee

| | |
|---|---|
| /sRyon Little<br>Ryon L. Little<br>Fla. Bar No. 26402 | Elisa T. Gilbert, Esq. (EG5713 )<br>(pro hac vice)<br>egilbert@gilbert-firm.com |

| | |
|---|---|
| rlittle@dkmaritime.com<br>Damon T. Hartley<br>Fla. Bar No. 41136<br>dhartley@dkmaritime.com<br>Charles G. De Leo<br>Fla. Bar No. 353485<br>cdeleo@dkmaritime.com<br>Jan M. Kuylenstierna<br>Fla. Bar No. 375985<br>jkuylenstierna@dkmaritime.com<br>De Leo & Kuylenstierna P.A.<br>Town Center One<br>8950 SW 74th Court<br>Suite 1710<br>Miami, Florida 33156<br>Local Counsel for Plaintiff | Brendan R. O'Brien, Esq. (BO 9033)<br>(pro hac vice)<br>bobrien@gilbert-firm.com<br>The Gilbert Firm, P.C.<br>325 East 57TH Street<br>New York, New York 10022<br>Counsel for Plaintiff |

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

\s\Ryon L. Little
Ryon Little

## SERVICE LIST
## CASE NO.: 13-80371

| | |
|---|---|
| Aaron K. Kirkland<br>Shook, Hardy, & Bacon, LLP<br>2555 Grand Blvd.<br>Kansas City, MO 64108<br>816-474-6550<br>Email: akirkland@shb.com<br>Attorney for ADTs | Jason R. Scott<br>Shook, Hardy & Bacon, LLP<br>2555 Grand Blvd.<br>Kansas City, MO 64108<br>816-474-6550<br>Email: jscott@shb.com<br>Attorney for ADTs |
| Charles C. Eblen<br>Shook, Hardy & Bacon, LLP<br>2555 Grand Boulevard | William Patrick Geraghty<br>Shook Hardy & Bacon<br>201 S Biscayne Boulevard |

| | |
|---|---|
| Kansas City, MO 64108<br>816-474-6550<br>Email: ceblen@shb.com<br>Attorney for ADTs | Suite 2400<br>Miami, FL 33131-4332<br>305-358-5171<br>Fax: 358-7470<br>Email: wgeraghty@shb.com<br>Attorney for ADTs |
| Jennifer A. McLoone<br>SHOOK, HARDY & BACON LLP<br>MiamiCenter, Ste. 3200<br>201 S. Biscayne Blvd.<br>Miami, FL33131-4332<br>Telephone: 305-358-5171<br>Facsimile: 305-358-7470 | |