UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-80371-CIV-BLOOM/HUNT

---------------------------------------------------------------------------

ELI LILLY AND COMPANY, by NATIONAL
UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PENNSYLVANIA, as subrogee,

                Plaintiff,

       -against-

TYCO INTERGRATED SECURITY, LLC f/k/a
ADT SECURITY SERVICES, INC., A SUBSIDIARY
OF TYCO INTERNATIONAL LTD., CO. AMAURY
VILLA AND AMED VILLA,

                Defendants.

---------------------------------------------------------------------------

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TYCOIS'S MOTION
TO EXCLUDE THE OPINIONS OF MR. CAMBAL, DR. COLE, AND DR. JOHNSON**

Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, as subrogee of Eli Lilly and Company, (hereinafter referred to as "Plaintiff") by and through its undersigned attorneys, submits this Memorandum in Opposition to Defendant TycoIS's Motion to Exclude Plaintiff's experts. [D.E. 175]. As will be discussed more fully herein and in the accompanying affidavits and related transcript excerpts annexed thereto of Daniel Cambal, Dr. Eric Cole and Dr. Roger Johnston,[1] Plaintiff's experts comply with the standards set forth in *Daubert* and in Federal Rule of Evidence 702. Their expert opinions are reliable and will be helpful to the trier of fact. Defendant's motion should be denied.

---

[1] Affidavit of Daniel Cambal, CPA, Exhibit 28 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment is Annexed hereto as **Exhibit 1**; Cambal Tr. Excerpts are Annexed hereto as **Exhibit 2**; Affidavit of Dr. Eric Cole is annexed hereto as **Exhibit 3,** Sachetti Tr. Excerpts annexed hereto as **Exhibit 3a** Sealed Tr. Excerpts of Bruce Sachetti are submitted hereto as **SEALED Exhibit 4;** Affidavit of Dr. Roger Johnston In Opposition to Defendant's Daubert Motion annexed hereto as **Exhibit 5.**

**ARGUMENT**

By ignoring entire sections of Plaintiff's experts' reports and citing to testimony in support of general propositions which was given in response to questions on limited or unrelated issues, TycoIS asks this Court to strike Plaintiff's experts because of their alleged inexperience or incorrect methodology. [D.E. 175, at 2]. Nothing could be further from the truth.

As has been repeatedly held in this Circuit, the qualification standard for expert testimony is "not stringent," and "so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Association, Inc. v. Aspen Specialty Insurance Co.,* 674 F. Supp. 2d 1321, 1325 (S.D. FL. 2009)(internal citations omitted)(quoting *Kilpatrick v. Breg Inc.,* Case No. 08-1005-CV, 2009 WL 2058384 (S.D.Fla. June 25, 2009)(quoting *Hendrix v. Evenflo Co.,* Inc., 255 F.R.D. 568, 585 N.D.Fla. 2009)). "Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically." *Jones v. Otis Elevator Co.,* 861 F.2d 655, 662 (11th Cir. 1988); *Vision I, supra*. The weaknesses in the underpinnings of the expert's opinions go to its weight rather than its admissibility. *Jones,* 861 F.2d at 663 (internal citations omitted). Moreover, "errors in an expert's application of a reliable method generally implicate credibility rather than reliability." *Furmite America, Inc. v. T.D. Williamson, Inc.,* 506 F.Supp. 2d 1126, 1130 (M.D.Fla. 2007)(citing *Quiet Technology DC-8, Inc v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1345-46 (11th Cir. 2003)).

An expert not unqualified simply because his or her expertise does not precisely match the matter at hand. *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001). So long as the expert's testimony rests on "good grounds", it should be tested in the adversary process – competing expert testimony and active cross examination – rather than excluded from jurors'

scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. *Quiet Technologies*, 326 F.3d at 1345 (internal citations omitted)(citing *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co*. 161 F.3d 77, 85 (1st Cir. 1998)). The rejection of an expert's testimony is the exception and not the rule. The trial court's role as gatekeeper "is not intended to serve as replacement for the adversary system." Fed R. Evid. 702 advisory committee notes (2000 amendment)(citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 596 (1993).

Against this standard, Defendant's motion fails.

## I.  DANIEL CAMBAL'S OPINIONS ON DAMAGES ARE WELL FOUNDED, RELEVANT AND BASED ON PROPER METHODOLOGY

As noted in his expert reports and Affidavits, Daniel Cambal was retained by National Union to inventory the lost and damaged inventory and validate the value of that inventory against the books and records of Eli Lilly to confirm the "transfer price" value of the stolen and damaged property. Defendant TycoIS devotes a substantial portion of its motion to arguing that Mr. Cambal utilized an incorrect measure of value to compute Plaintiff's damages. [D.E. 175, pp. 7-10]. In addition, the Defendant argues that Mr. Cambal assessed damages for the wrong legal entity. Both arguments are factually inaccurate and not the proper subject of a motion in limine.

The Defendant does not allege that Mr. Cambal utilized the wrong methodology for calculating the transfer price of the lost and damaged pharmaceuticals. Rather, TycoIS asserts that, by calculating the transfer price, Mr. Cambal used the wrong measure of damages. By so

arguing, TycoIS ignores both the law of this Circuit concerning the proper measure of damages in cases such as this, as well as the law concerning the appropriate use of a motion in limine.

As noted in Plaintiff's Motion for Summary Judgment, the proper measure of damages in the case at bar is "transfer in" price. *See Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 602 F. Supp.2d 1260 (S.D. Fla. 2009)(Moore, J.), rev'd on other grds by, 615 F.3d 1305 (11th Cir. 2010). In that case, which involved the loss of a shipment of pharmaceuticals during air transportation, Judge Moore held that transfer price, and not manufacturing costs, was the proper measure of the damages suffered by the Plaintiff, Eli Lilly & Co. (*See* Plaintiff's Motion for Summary Judgment [D.E. 189 p. 12-13]. To assert as it does that Mr. Cambal has opined about the incorrect measure of damages is to ignore the existing law of this Court. Moreover, a motion in limine is not the appropriate motion by which to raise such an issue or to dispose of theories or claims. *Arrington v. Michigan Bell Telephone Co.*, 2012 WL 4868225, at *2, No. 10-10975 (E.D. Mich. Oct. 15, 2012). Like TycoIS's motion here, in *Arrington*, the defendant sought to exclude evidence regarding the appropriate method of calculating damages. *Id.* The court denied Defendant's motion, declaring that such arguments should be raised in a motion for summary judgment, not by motion in limine, and should be decided based on the evidence in the record. *Id.* Other courts have adopted the same rule. *See Pavone v. Puglisi*, 2013 WL 245745, at *1, 08-C-2389 (MEA) (S.D.N.Y. Jan. 23, 2013)(stating that a motion in limine is not a proper vehicle for a party to ask the court to weigh the sufficiency of the evidence to support a particular claim or defense, because that is the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards); *Witness Systems, Inc. v. Nice Systems, Inc.*, 2008 WL 2047633, at *1, 06-CV-126-TCB (N.D. Ga. May 10, 2008)("[m]otions in limine

address evidentiary questions and are inappropriate devices for resolving substantive issues.")(internal quotations omitted).

Here, TycoIS follows the same flawed path as the movants in the foregoing decisions. In addition, the Defendant has made these same arguments in its Motion for Summary Judgment. [D.E. 176, pp. 17-23]. The Plaintiff has made the counter argument (which unlike the Defendant is supported in law) in its Motion for Summary Judgment [D.E. 189, pp.12-15]. Since TycoIS essentially disagrees with Mr. Cambal's measure of damages in this case at Transfer Value, not his method for analyzing that measure of damages, this disagreement is not the proper subject of this evidentiary motion and should not be considered. Where Defendant's Motion to Exclude is predicated on its preference for the application of manufacturing cost as a measure of calculating Plaintiff's damages, it must be denied.

Even more puzzling is the Defendant's "argument" that Mr. Cambal analyzed the damages suffered by the wrong Eli Lilly entity and thus, his opinions of the damages suffered by the Plaintiff should be excluded. This is just factually inaccurate. There is no doubt that Plaintiff National Union is subrogated to the rights of Eli Lilly and Company. It was Eli Lilly and Company that executed the Sworn Proof of Loss. [**D.E.191-33**]. All of the inventory which was lost or damaged due to the burglary of the Enfield warehouse and which was claimed in the sworn Proof of Loss, was owned by Eli Lilly and Company. All of the records furnished to Mr. Cambal for purposes of validating the value of the stolen or damaged inventory were business records of Eli Lilly and Company. The entity known as "Lilly USA, LLC" had and has no ownership interest in the inventory in question. (See Affidavit of Eli Lilly's Mark A. Saltsgaver, **Sealed at Exhibit 12** to Plaintiff's Opposition to Defendant's Motion for Summary Judgment). The damages evaluated by Mr. Cambal were the damages suffered by the proper party.

[**D.E.191-33**].  Mr. Cambal's report and supporting material as well as his testimony outline in detail the work undertaken to validate the value of the damages suffered as a result of this burglary and the scope of the task assigned to him.  He testified at length about the efforts he made and the data upon which he relied to establish the value of the lost and damaged inventory. He also testified about the methodology that he utilized to make the computation and the reasons why transfer price was used, all of which support the opinions which he drew.  For ease of reference, his methodology is set forth again in his accompanying affidavit (**Exhibit 1**).  Mr. Cambal's report and testimony and Affidavit set forth unequivocally that he validated the valued the loss sustained to Eli Lilly at the Enfield facility at the time of the burglary at its Transfer In value of $44,383,190.He calculated the value of the inventory to the Enfield facility as of the day it was stolen. **Exhibit 2**, Cambal  Tr. at 95:12-18; 100:17-22; 101:25-107:25.

Mr. Cambal made clear that he was uncertain of the specific entity to which the Enfield Facility was titled.  It was, after all, not necessary to perfect an expertise in the organizational structure of Eli Lilly to confirm and validate that the value of the stolen and damaged inventory, which is the work he was tasked to perform. See, **Exhibit 1**, Cambal Affidavit ¶1. When asked about the legal name of the Eli Lilly Enfield facility, Mr. Cambal stated in the first minutes of his deposition, the following:

> Q.    Do you know what the name of the Eli Lilly entity that
>       suffered a loss as a result of the burglary at the Enfield
>       warehouse?
> A.     Eli Lilly USA.
> Q.     It's Eli Lilly USA?
> A.    Well, that's a guess.  I don't know that for sure.

**Exhibit 2**, Cambal  Tr. at 14:4-10.

All of the record evidence demonstrates that Eli Lilly and Company is the owner of the property that was stolen and damaged from its Enfield warehouse: the sworn statements in proof of the

losses [D.E.191-33];  the original source material annexed to Cambal's expert report [D.E.191-36; and Sealed Exhibit 75 per D.E. 207]; Affidavit of Mr. Cambal Exhibit 1 hereto, Mr. Cambal's testimony, Exhibit 2 hereto  at pp100-147; the Affidavit of Eli Lilly's Mark Saltsgaver (Sealed at Exhibit 12 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment). TycoIS ignores this evidence, and chooses instead to misquote the testimony and abuse the purpose and function of a motion in limine.  Significantly, Defendant does not identify what evidence in Cambal's analysis supports the contention that the stolen and damaged pharmaceuticals did not belong to Eli Lilly and Company.

Defendant's challenge of Cambal's validation of Eli Lilly's damages at transfer-in pricing "because he does not know the information necessary to support his valuation of the stolen and damages goods" [D.E.175, pp. 10-11] is belied by volume of source documentation provided in support of the verification analysis for Cambal's report [2] [**Exhibit 75** Sealed Per **D.E. 207**] as well as the analysis set out in the **Exhibit 1**, Cambal Aff.  To validate the value of damages alleged by Eli Lilly and Company against its books and records does not require Cambal to become a specialist in transfer pricing. **Exhibit 1 ¶1.**  Cambal's opinion is based on a confirmation that the Transfer In value as set forth by Eli Lilly and Company for its damages are supported by its books and records **Exhibit 1** *generally*.  Defendant's incorrect assertion is further belied by the fact that the Transfer pricing methodology set out in Cambal's analysis is consistent with the testimony of Eli Lilly's Marty Clemens previously relied upon by this court. Additionally, the same Martin (Marty) Clemens has reviewed the Transfer In valuation in this case and furnished sworn testimony that Cambal's validation of the damages of Eli Lilly and

---

[2] To the contrary, despite the volume of source material and detail appended as part of Cambal's Expert Report [Exhibit 75 Sealed per D.E.207] Defendant did not mark the volume, or any part of it, or ask a single question about the underlying substance of the validation work performed in support of Eli Lilly's Transfer In.

Company are consistent with the methods previously relied upon by the Southern District of Florida as the proper basis of the measure of Eli Lilly's fair market value of loss and damage to its stock inventory.  [Sealed Exhibits 71 and 72, per D.E.207].

Defendant does not identify evidence to cast doubt on Cambal's validation of the value of the damages set forth by Eli Lilly and Company.  But even if we accept the Defendant's assertions as true, which we do not, any alleged flaws in Mr. Cambal's analysis go to the accuracy of his calculations and conclusions, and not to the general scientific or accounting validity of Transfer Pricing as a method of valuing Eli Lilly's inventory for the purpose of calculating damages in this case.  *City of St. Petersburg v. Total Containment, Inc*., 2009 WL 3335013, at \*10,  No. 06-20953-CIV (S.D Fla. Mar. 19, 2009).  The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.  *Quiet Technology DC-8, Inc. v. Hurel Dubois UK Ltd*., 326 F.3d 1333, 1345 (11th Cir. 2003)(citing *Daubert*, 509 U.S. at 596);  *see also In re TMI Litig.,* 193 F.3d 613, 692 (3d Cir.1999)(*supra*).

Defendant has not set out a basis to contest the methodology utilized by Cambal and C. Lewis for validating the value of Eli Lilly's Transfer In Price of the lost and stolen inventory. Rather it disputes the measure of those damages and suggests that fair market value to Eli Lilly should be pure manufacturing costs discarding all the intangible values attributed to research and development and the various stages of the production chain. **Exhibit 2** Cambal Tr at 105:3-107:13.  Indeed, failing to find specific fault in the methodology of Cambal, Defendant merely offers a competing expert on the issue of damages, Dr. Richard Manning, who has not contested the data upon which Cambal has relied to validate Eli Lilly's claimed transfer value, but instead has testified that Cambal's data are "adequate" and "reasonable" and in fact relied upon Cambal's work product to propose "an alternative" measure of cost that might be available and

8

has vigorously criticized Cambal's acceptance of Transfer In value as a measure.  See, **Exhibit 6,** Manning Tr. 176.19-24;  177:19-23;  179:3-10;  180:16-181:3,  182:9-18,  183:7-15**.**   Finally, Cambal's methodology with respect to transfer-in pricing comports with the generally accepted accounting standards ("GAAP").  (**Exhibit 1**, Cambal Aff. ¶ 1).   Mr. Cambal's testimony is not the sort that will likely misdirect the fact-finder by appearing facially authoritative but in reality being substantively unsound and unassailable. *See Quiet Technology*, 326 F. 3d at 1346.  As such, Defendant's Motion should be denied as to Mr. Cambal.

**II.      DR. ERIC COLE'S OPINIONS ARE RELIABLE AND RELATE**
**          TO THE INDUSTRY AT ISSUE**

The Defendant goes to extreme lengths to try to exclude Dr. Cole's expert testimony, including by distorting the bases for Dr. Cole's opinions and the law applicable thereto.  Dr. Cole relied upon numerous security standards which are well tested, published and relied upon by others in the security industry.  (**Exhibit 3** Affidavit of Eric Cole)**.**  These sources, along with his education and vast experience, more than qualify him to render the opinions which he will express at trial which are elaborated on in his reports, affidavit and deposition.

First, Defendant argues that Dr. Cole did not specify an industry standard that is "tailored to TycoIS's industry."  [**D.E.174**, p. 12].  However, nowhere in its brief does the Defendant identify what that industry standard is and whether it is different from the standard Dr. Cole used.  As explained by Dr. Cole, the security standards applicable to a business such as TycoIS's are no different from other corporations which maintain client's sensitive information.  More than sufficient bases have been identified as the standard against which TycoIS's negligence can be measured.

The Defendant claims that Dr. Cole, by comparing TycoIS to other companies which store client sensitive information, is essentially arguing that TycoIS must therefore comply with the Gramm-Leach-Bliley Act 15 U.S.C. §§ 6801-09. Dr. Cole did not apply that standard to the Defendant and he is making no such argument. (**Exhibit 3,** Cole Aff. ¶ 19). In support of its argument that Dr. Cole incorrectly defined the applicable industry standard, Defendant cites to *Lacerte Software Corp. v. Prof'l Tax Servs., LLC*, No. 3:03-CV-1551-H, 2004 WL 180321, at *1 (N.D. Tex. Jan. 6, 2004). [D.E. 175, p. 14]. While *Lacerte* does state that the Gramm-Leach-Bliley Act applies only to financial institutions, that case does not concern a motion in limine. Instead, it involved a situation where a *pro se* defendant moved to dismiss the complaint against him since his personal credit card number was attached to the complaint. *Id.* at *1. The court agreed with the plaintiff's argument that Rule 12 does not provide that a complaint may be dismissed because of a violation of the Gramm-Leach-Bliley Act and that the Act only applies to financial institutions, which the plaintiff was not. The court concluded by noting that "[t]here is also no indication in the Act that it can be used by a private party as a defense to a breach of contract or copyright infringement suit." *Id.* at * 2. Thus, that case did not pertain in any way to admissibility of expert testimony, cyber security standards, or any other significant issue in this case, and it is completely inapplicable to the matter at hand.

Contrary to Defendant's statement that Dr. Cole's comparison of TycoIS to financial institutions is "misleading and unreliable," the standards of foundational cyber security are not unique to a given industry. Rather, the fundamental principles used to protect electronic information are consistent across industries. (**Exhibit 3** Cole Aff. ¶ 10). Dr. Cole applied industry standards which are verifiable, accepted in the community, and directly applicable to TycoIS. (**Exhibit 3** Cole Aff. ¶ 13). In fact, the Defendant's own expert, Mr. Jorgensen,

testified that the standards utilized by Cole are the same as those on which he would rely.  There are no other standards he would recommend or use in this case.  (**Exhibit 3**, Cole Aff at ¶¶ 10-27).    Given the fact that cyber security standards are not unique to a given industry, Dr. Cole's reference to the financial institutions do not render his opinions unreliable.   Rather, as he testified, financial institutions are responsible for protecting confidential information which if disclosed could cause foreseeable harm to their client.  (**Exhibit 3** ¶19 **Exhibit 3a**, Cole Tr. 130:7-18).

In regard to both Dr. Cole and Dr. Johnson, Defendant relies upon *Kaufman v. Pfizer Pharmaceuticals, Inc*., 2011 WL 7659333, 02-CV-22692 (S.D. Fla. Aug. 4, 2011).  *Kaufman* and *Taylor*, discussed later, could not be more inapplicable to the opinions being proffered in this case.  A discussion of the numerous, serious deficiencies with *Kaufman's* expert's proposed testimony coupled with the fact that several other courts had previously excluded that proposed expert demonstrate that case's inapplicability.  In *Kaufman*, the plaintiff brought a product liability claim against the manufacturer of Prempro.  Plaintiff's expert, Dr. Parisian's report referenced an entirely different drug, Provera, with no explanation or connection.  The court offered the Plaintiff's numerous opportunities to cure the disclosure defect, "to salvage her expert", without success.  *Kaufman* at *5.  In setting forth the standard of how a responsible manufacturer introduces and promotes drugs, Dr. Parisian did not reference any applicable FDA regulation or requirement.  *Id.* at * 4.   The court remarked that it was "at a loss" and was unable to even identify the opinions sought to be offered.  *Id.*  Both of Dr. Parisian's expert reports failed to comply with the requirements of Federal Rule of Civil Procedure 26(a)(2).  *Id.* at *5.  The only basis offered for the expert's opinions was her personal beliefs.  *Id.*  at *6.  Finally, Judge Ungaro noted that the court could not locate a single instance where the expert applied her

own experience or education to the facts of the case. *Id.* at *7. In fact, other courts had previously excluded Dr. Parisian's expert testimony for similar reasons. *Id.* at *9.

In this case, Dr. Cole's proposed expert testimony contains none of the flaws which doomed Dr. Parisian in the *Kaufman* and prior cases. Rather, as his report establishes, Dr. Cole utilized multiple industry recognized standards. One of the standards cited in his report and affidavit is the National Institute of Standards and Technology ("NIST") of the U.S. Department of Commerce, which includes a Computer Security Resource Center which is described on its website as facilitating a "broad sharing of information security tools and practices, provides a resource for information security standards and guidelines, and identifies key security web resources to support users in industry, government, and academia." (available at: http://csrc.nist.gov/)(last visited April 21, 2015 5:47 p.m.). Dr. Cole also relies upon "Critical Security Controls" authored by The Council on Cybersecurity, "an independent, expert, not-for-profit organization with a global scope committed to the security of the open Internet" (http://www.counciloncybersecurity.org/about-us/) which, according to their website, is made up of "leaders in the cybersecurity field, and many were members of the Commission on Cybersecurity for the 44th Presidency, convened by the Center for Strategic and International Studies in 2008. They came together to form an organization that would lead and coordinate a national response to the cyber security workforce crisis, the National Board of Information Security Examiners, which is the predecessor organization to the Council." (http://www.counciloncybersecurity.org/about-us/board-of-directors)

Dr. Cole also refers to the "PCI Standards Council", which is "an open global forum, launched in 2006, that is responsible for the development, management, education, and awareness of the PCI Security Standards, including the Data Security Standard (PCI DSS),

Payment Application Data Security Standard (PA-DSS), and PIN Transaction Security (PTS) requirements."   In addition, he relied upon his doctoral education and his 25 years of experience working in the field of cybersecurity.  As is obvious, any comparisons between the opinion of Dr. Parisian and those of Dr. Cole are misplaced.

In desperation, Defendant cites another case pertaining to the exclusion of the very same expert from *Kaufman,* Dr. Parisian.  [D.E. 175, p. 15].  The portion of that case which pertains to alleged industry standard violations adopted the decision of a previous court, excluding Dr. Parisian's testimony since she was not qualified to render an opinion on said industry standards. *Taylor v. Novartis Pharmaceuticals Corp*., 2013 WL 5118945, at * 7, No. 06-61337-CIV (S.D. Fla. Apr. 22, 2013).  As stated by the court, "…her background does not reflect that she is generally aware of industry standards surrounding pharmaceutical companies."  *Id.*  at * 7. Additionally, as stated *supra*, there were numerous other deficiencies which underlie the decision to preclude her opinions.  Both *Taylor* and *Kaufmann* concern the same expert witness who was roundly criticized by several previous courts.  Clearly, such is not the case here.

Also distinguishable is Defendant's reliance on *Birge ex rel. Mickens v. Dollar Gen'l Corp.*  [D.E. 175, p.16].   In that case, the proposed expert was not able to identify any recognized security standards with regard to security guards, CCTV, or any of the other security measures which were at issue in that case.  *Birge ex rel. Mickens v. Dollar Gen'l Corp*., 2006 WL 5175758, at *12, No. 04-2531 B/P (W.D. Tenn. Sep. 28, 2006).  Thus, the Court stated: "[h]is inability to cite to any standards in the retail security industry to support his opinion renders Tatalovich's testimony unreliable."  *Id.*  Moreover, the proposed expert testified at the *Daubert* hearing that the standards he purportedly relied upon were only "guidelines and recommendations" and were not really standards at all.   *Id.*  The proposed *Birge* expert also

13

went "well beyond his area of expertise" and offered opinions in areas in which he had no education, training, or experience. *Id.* at *13.

Here, Dr. Cole clearly identified the relevant standards which he applied in the case and explained why he believed they were applicable. No other standards have been identified by the Defendant in their motion, and the Defendant's expert has not identified any other standards which could be supplied. In fact, these same standards were utilized by Dr. Cole when he assessed Eli Lilly's cyber security system and concluded that Eli Lilly had properly implemented network security while TycoIS had not, a subject defendant failed entirely to inquire into during his examination. (**Exhibit 3** Cole Aff. ¶ 14).

TycoIS's other authorities are equally inapplicable. In *Sears Roebuck & Co. v. Midcap*, 893 A.2d 542 (Del. 2006), there was no evidence that the program on which the expert relied was a standard adopted by the gas supply industry as a whole. In that case, it was not clear how the "argued-for standard" could even be defined. *Id.* at 555. The Delaware Supreme Court concluded that neither the proposed expert nor anyone else could reliably testify that his alleged "program" was a gas supply industry standard. *Id.* In this case, Dr. Cole has identified the standards which he applied, and ADT's expert Mr. Jorgensen has agreed that he too would rely on the standards that that Cole applied (Exhibit 3 Cole Aff.,¶¶10-27) thus *Sears Roebuck & Co.* does not apply.

The New York Court of Appeals' holding in *Diaz v. New York Downtown Hosp.*, 99 N.Y.2d 542 (2002) is likewise inapplicable. There, the proposed expert relied upon "guidelines" of professional organizations which merely recommended the presence of female staff during the procedure at issue and one of the set of guidelines clearly states that they "are not rules." *Id.* at 545. *Diaz* does not support Defendant's argument in light of Dr. Cole's identification of the

applicable standards upon which he relies.  These standards are far different from the guidelines in *Diaz.*

Finally, any alleged flaws in Dr. Cole's testimony can be tested through cross-examination and counter-testimony at trial.  *See City of St. Petersburg v. Total Containment, Inc.*, 2009 WL 3335013, at *7-8, No. 06-20953-CIV (S.D Fla. Mar. 19, 2009).  There, the court reasoned that because the proposed expert would testify as to the materials in the pipe product at issue and the industry standards relating to the testing methods of said products, his testimony was admissible.  *Id.*  at *9.  The court denied the motion to exclude his expert opinions because he (like Dr. Cole here) was qualified as an expert on the applicable industry standards.  Since the subject matter of the testimony was complex, the court noted that it would likely aid the fact-finder at trial.  *Id* at * 9.  Any flaws in the testimony would be the subject of cross-examination.  So, too, should be the case here.

TycoIS misinterprets Dr. Cole's testimony insofar as it relates to TycoIS's insufficient document retention and production.  Dr. Cole is correct when he faults TycoIS's inability to locate and produce its cybersecurity-related evidence or to explain what little evidence which TycoIS produced.  As noted by Dr. Cole, ADT / TycoIS did not even satisfy the basic minimum level of security.  (**Exhibit 3** Cole Aff. ¶ 14).  Defendant TycoIS was unable to demonstrate who actually had access to the information at issue here, demonstrating that it had no internal mechanisms for controlled access.  (**Exhibit 3** Cole Aff. ¶¶ 25, 26).  Dr. Cole was not testifying about the legal scope of the litigation hold letter which the Plaintiff served on TycoIS, nor is he seeking to invade the province of the Court.  He is simply opining that TycoIS's inability to produce these documents or to properly understand or explain their meaning evidences the problems which are endemic to TycoIS.  Their network systems were vulnerable to unauthorized

access which is the likely source of the confidential information upon which the burglars relied to break into the Eli Lilly warehouse and the five other locations which they burgled. (**Exhibit 3** Cole Aff 27).

Based on Dr. Cole's reports, affidavit and deposition testimony, his opinions concerning TycoIS's cybersecurity failures are well founded and reliable and should be heard by the jury.

### III.   DR. JOHNSTON'S OPINIONS ARE RELIABLE AND RELATE TO THE INDUSTRY IN ISSUE

As TycoIS attempts to do with Dr. Cole, Defendants argue that Dr. Johnston's opinions are unreliable and unhelpful, and therefore inadmissible.  Again, nothing could be further from fact.

As set forth in his expert disclosure, deposition and accompanying Affidavit, Dr. Johnston's opinions in this matter relate to TycoIS' security culture, effective security practices, security device spoofing, infrastructure security, and the role of inside information in certain burglaries and attempted burglaries.  Relevant to his opinions is the fact that the same group of burglars from Florida travelled to six discrete warehouses in five distant states and attempted or accomplished burglaries that required detailed knowledge of the configuration of the warehouses and particularly the warehouses security systems and their vulnerabilities.  (**Exhibit 5** Johnston Aff ¶6). Also pertinent to his opinion is an understanding of the general nature of the burglaries in regards to the burglar's methods and capabilities. (**Exhibit 5** Johnston Aff ¶6).  While he personally visited only the Eli Lilly Enfield warehouse, he relied upon extensive police and investigative reports (including detailed photographs) and interviews with warehouse owners for his understanding as to what occurred at the other warehouses. **(Exhibit 5** Johnston Aff ¶9). This extensive amount of material allowed Dr. Johnston to determine that a common crew was

involved in the 6 burglaries in distant remote locations, that they used similar attack methods, and that they knew how to reach the security control panels and disable them without sounding an immediate alarm.  Based on his vast experience, Dr. Johnston concluded that the burglars' detailed, specific knowledge required inside information.  His opinions are based upon his many years of experience and exhaustive research. (**Exhibit 5**  Johnston Aff ¶¶ 6, 9.).

The Defendant incorrectly claims that Dr. Johnston did not rely on standards to form his opinions.  Nothing could be further from the truth.  In his report, Dr. Johnston cited and relied upon the 9-volume ASIS "Protection of Assets" Standard and the ASIS "Code of Ethics".  According to its website:

> ASIS International is a global community of more than 38,000 security practitioners, each of whom has a role in the protection of assets - people, property, and/or information.  Our members represent virtually every industry in the public and private sectors, and organizations of all sizes. From entry-level managers to CSOs to CEOs, from security veterans to consultants and those transitioning from law enforcement or the military, the ASIS community is global and diverse.
>
> No other organization possesses the vast array of knowledge, expertise, and experience.
>
> ASIS" is an organization "dedicated to increasing the effectiveness and productivity of security professionals by developing educational programs and materials that address broad security interests, such as the ASIS Annual Seminar and Exhibits, as well as specific security topics. ASIS also advocates the role and value of the security management profession to business, the media, government entities, and the public."   (available at: https://www.asisonline.org)(last visited April 21, 2015 at 5:56 p.m.).

Far from Defendant's characterization, both ASIS standards cited by Dr. Johnston are respected and verifiable standards to which the industry adheres.  As noted in Dr. Johnston's affidavit, the ASIS Code of Ethics is a standard that ADT/Tyco and a number of its employees have pledged to honor as a result of their affiliation or membership in ASIS International.

(**Exhibit 5** Johnston Aff ¶¶18-20).   Also noted in his Affidavit, Dr. Johnston considered standards referenced by the Security Industry Alarm Coalition however, found that the standards were largely inapplicable to the issues raised in this case, save UL827 which ADT failed to meet. Indeed, UL 827 30.1.2 requires that the control panel shall have its cover protected by a tamper switch or the equivalent to <u>prevent its being opened so as to defeat the system</u>."  Obviously, ADT's tamper switch did not meet this standard, and when this became clear, they did nothing to warn Eli Lilly.   (**Exhibit 5** Johnston Aff. ¶20-22). Dr. Johnston actually relied upon nine different sources in evaluating Defendant's due diligence.  (**Exhibit 5** Johnston Aff. ¶ 31).  This broad analysis only strengthens his opinions.

Insofar as the methodology employed by Dr. Johnston in supporting his conclusion that there is a "high degree of improbability that Florida based burglars would choose and attack 6 warehouses in 6 different states, and that all 6 warehouses would randomly utilize ADT/Tyco security products and monitoring services", one need only review  Dr. Johnston's affidavit and the computations included therein.  Sadly, during his deposition no questions were asked on this topic.   Had he been examined on the issues in his report and the other issues identified in TycoIS' motion, perhaps this motion could have been avoided in its entirety. As was the case with all of Plaintiff's experts.

TycoIS relies on the same authorities for the exclusion of Dr. Johnston's opinions as it does for the exclusion of Mr. Cambal's and Dr. Coles' opinions.  None of those cases support the propositions for which they are cited by TycoIS.  And as in the case of Dr. Cole, the Defendant points to no other standard which Dr. Johnston should have relied upon or utilized to render his opinions.  As with the other two experts, TycoIS's motion is without merit.

At best, TycoIS has illustrated the reason why the rules of the court provide for cross examination and contrary experts. In all respects, TycoIS's motion to exclude Dr. Johnston must also be denied.

## CONCLUSION

Based upon the foregoing and the accompanying affidavits of Daniel Cambal, Dr. Eric Cole and Dr. Roger Johnston, TycoIS's Motion to Exclude the Opinions of Mr. Daniel Cambal, Dr. Eric Cole and Dr. Roger Johnston must be denied, and the Plaintiff should be granted such other and further relief as to this court seems just and proper.

Respectfully submitted this 27th day of April 2015.

Eli Lilly and Company By
National Union Fire Insurance Company of
Pittsburgh, as Subrogee
By:

| | |
|---|---|
| */sRyon Little*<br>Ryon L. Little<br>Fla. Bar No. 26402<br>rlittle@dkmaritime.com<br>Damon T. Hartley<br>Fla. Bar No. 41136<br>dhartley@dkmaritime.com<br>Charles G. De Leo<br>Fla. Bar No. 353485<br>cdeleo@dkmaritime.com<br>Jan M. Kuylenstierna<br>Fla. Bar No. 375985<br>jkuylenstierna@dkmaritime.com<br>De Leo & Kuylenstierna P.A.<br>Town Center One<br>8950 SW 74th Court<br>Suite 1710<br>Miami, Florida 33156<br>Phone: 786-332-4909<br>Local Counsel for Plaintiff | Elisa T. Gilbert, Esq.<br>(pro hac vice)<br>egilbert@gilbert-firm.com<br>Brendan R. O'Brien, Esq. (BO 9033)<br>(pro hac vice)<br>bobrien@gilbert-firm.com<br>The Gilbert Firm, P.C.<br>325 East 57TH Street<br>New York, New York 10022<br>Counsel for Plaintiff |

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2015, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/Ryon L. Little*
Ryon L. Little

## SERVICE LIST
## CASE NO.: 13-80371

| | |
|---|---|
| Aaron K. Kirkland<br>Shook, Hardy, & Bacon, LLP<br>2555 Grand Blvd.<br>Kansas City, MO 64108<br>816-474-6550<br>Email: akirkland@shb.com<br>Attorney for ADTs | Jason R. Scott<br>Shook, Hardy & Bacon, LLP<br>2555 Grand Blvd.<br>Kansas City, MO 64108<br>816-474-6550<br>Email: jscott@shb.com<br>Attorney for ADTs |
| Charles C. Eblen<br>Shook, Hardy & Bacon, LLP<br>2555 Grand Boulevard<br>Kansas City, MO 64108<br>816-474-6550<br>Email: ceblen@shb.com<br>Attorney for ADTs | William Patrick Geraghty<br>Shook Hardy & Bacon<br>201 S Biscayne Boulevard<br>Suite 2400<br>Miami, FL 33131-4332<br>305-358-5171<br>Fax: 358-7470<br>Email: wgeraghty@shb.com<br>Attorney for ADTs |
| Jennifer A. McLoone<br>SHOOK, HARDY & BACON LLP<br>MiamiCenter, Ste. 3200<br>201 S. Biscayne Blvd.<br>Miami, FL33131-4332<br>Telephone: 305-358-5171<br>Facsimile: 305-358-7470 | |