UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-80371-CIV-BLOOM/HUNT

ELI LILLY AND COMPANY, by NATIONAL UNION
FIRE INSURANCE COMPANY OF PITTSBURGH,
PENNSYLVANIA, as subrogee.
      Plaintiff,
            -against-

TYCO INTEGRATED SECURITY, LLC., F/K/A
ADT SECURITY SERVICES, INC., A SUBSIDIARY
OF TYCO INTERNATIONAL LTD, CO., AMAURY
VILLA AND AMED VILLA.
      Defendant
_____

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [D.E. 176]

COMES NOW Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, as subrogee of Eli Lilly and Company, (hereinafter referred to as "Plaintiff") by and through its undersigned attorneys, and for its Opposition to Defendant Tyco Integrated Security, LLC., f/k/a ADT Security Services, Inc., a Subsidiary Of Tyco International Ltd. Co., (hereinafter "ADT" or "ADT/Tyco")'s Motion for Summary Judgment [**D.E. 176**] and states that:

### I.    FLORIDA LAW APPLIES TO THE PLAINTIFF'S CLAIMS

ADT/Tyco's choice of law analysis of the "significant relationship" test is incorrect.

In determining which substantive law applies in a case, a federal district court sitting in diversity first applies the choice of law rules of the forum state. *Trumpet Vine Invs., N.V. v. Union Capital Partners I*, 92 F.3d 1110 (11th Cir. 1996); *Trans Caribbean Lines, Inc. v. Tracor Marine, Inc.*, 748 F.2d 568, 570 (11th Cir. 1984); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941).  Under Florida law, a court makes a separate choice of law determination with respect to each particular issue under consideration keeping in mind

that there are two key issues in the choice of law analysis: substantive law regarding the applicable statute of limitations and substantive law regarding damages. *Foster v. United States*, 768 F.2d 1278, 1281 (11th Cir. 1985).  In the matter before this Court, for the reasons set forth *infra*, Florida is the only state with a legitimate interest in its law being applied. The same analysis is also used to determine which sovereign's laws to apply related to ***damages*** for tort claims based on negligence. *Medina v. Am. Airlines, Inc.*, 2005 U.S. Dist. LEXIS 18916 (S.D. Fla. July 5, 2005).

### Significant Relationship

Florida applies the "significant relationship" test delineated in §145 of the Restatement (Second) of Conflict of Laws to its choice of law analysis of torts claims. *Grupo Televisa, S.A. v. Telemundo Communications Group, Inc*., 485 F.3d 1233 at 1240 (11th Cir. 2007), citing *Bishop v. Fla. Specialty Paint Co.,* 389 So.2d 999, at 1001 (Fla.1980); *Pycsa Panama, S.A. v. Tensar Earth Technologies, Inc.* 625 F.Supp.2d 1198 at 1218 (S.D. Fla. 2008). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Pycsa Panama,* 625 F.Supp.2d 1198 at 1219, citing *Telemundo,* 485 F.3d at 1240. Here, the four factors set out in §145(2) favor application of Florida law to Plaintiff's  claims based on the Defendant's: Count I (negligence); Count II (Failure to Safeguard Confidential Information); Count III (Failure to Disclose/Warn). *Section 145* provides:

1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

    a) the place where the injury occurred,
    b) the place where the conduct causing the injury occurred,

    c)  the domicile, residence, nationality, place of incorporation and place of business of the parties, and

    d)  the place where the relationship, if any, between the parties is centered.

In undertaking its §6 analysis the court does not "simply add up the factors delineated in section 145(2) and then apply the law of the sovereign with the greatest numerical total" (*Judge v. American Motors Corp*, 908 F. 2d 1565 at 1569 (11ᵗʰ Cir. 1999)).Rather, it must determine which factors are the most significant for a particular issue. "It is not the state with greatest number of contacts but with the most significant contacts whose law will govern as to that particular issue".  *Foster v. United States*, 768 F.2d 1278, 1281 (11th Cir. 1985). While §6 subsections (a) and (f) are of some importance in tort cases, subsections (d) and (g) are relatively unimportant in tort. *Judge*, 908 F.2d at 1575. Thus, for purposes of Plaintiff's tort claims, damages and applicable statute of limitations, §6 (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; and (e) certainty, predictability and uniformity of result, are most determinative. Accordingly, while the location where an injury occurred may be important to determining the applicable choice of law it may have "little actual significance for the cause of action," and "other factors may combine to outweigh the place of injury as a controlling consideration." *Bishop*, 389 So.2d at 1001.

The first § 145factor, "(a) the place where the injury occurred" favors the application of Florida law, where the Plaintiff's injury was the exposure of Plaintiff's confidential information regarding the vulnerabilities of the Enfield facility by ADT in Florida, which resulted in the burglary.  [PR 55, 56, 60, 63, 64, 84, 85, 87, 88, 95, 97-114, 118-124, 127-137].

The second § 145 factor, "the place where the conduct causing the injury occurred," similarly gives rise to the application of Florida law. [1] Defendants' negligent acts all occurred in the Southern District of Florida: ADT's compilation of the confidential information entrusted to it; ADT's failure to ensure that the confidential information it received was safely stored and not vulnerable to access by unauthorized third parties; ADT's failure to ensure the security of its information in Florida following other ADT secured clients' warehouse burglaries; ADT's failure to warn Plaintiff of and disclose the risks presented by entrusting ADT with Plaintiff's sensitive information[PR 84, 85, 87, 88, 95, 97-114, 118-124, 127-137]; the commission of overt acts in furtherance of the burglary by the indicted Villa Defendants in Florida; the storage and sale of Plaintiff's stolen inventory in Florida [PR 55-58, 63,64]. Similarly, Florida is where the thieves lived and plotted the crime. [PR 55-58, 63, 64] In addition, ADT's records reflect that unauthorized access to applications on its IT computer infrastructure was repeatedly made from Florida using the credentials of the former ADT Miami Area Commercial Sales Manager (himself a resident of the Miami area) [PR 69, 70, 118-122] and that that unauthorized access continued for over a year after his employment terminated [PR 69, 119-122].

The third §145 factor, the "domicile, residence, place of incorporation and place of business of the parties" favors the application of Florida law where both ADT and Tyco Integrated Security at all relevant times maintained headquarters in Boca Raton, Florida [PR 84, 85, 87-89, 90, 95, 115, 124]; it is undisputed that Eli Lilly is an Indiana Corporation, with its principal place of business in Indianapolis, Indiana; and Plaintiff, National Union is a Pennsylvania Insurance Corporation, with its principal place of business in New York [PR 18, 19].

---

[1] ADT/Tyco has conceded that the conduct for which has liability is the disclosure of Plaintiff's confidential information; "conduct which necessarily had to occur before the burglary began." (D.E. 32 p. 8)

Finally, the fourth §145 factor "the place where the relationship between the parties centered" which was at the corporate headquarters Boca Raton, Florida [PR 84, 85, 87-89, 90, 95, 115, 124] extending to twenty-six states across the country[PR 84] ; favors the application of Florida law.

## Application of §6

An analysis of the relevant *Section 6 factors* leads to the conclusion that Florida law should be applied to Florida's corporate residents. Where ADT's Human Resource policies and procedures, and its IT Infrastructure was managed and supervised in Florida [PR 84, 85, 87-89, 90, 95, 115, 124], ADT's Florida based help desk recorded access to its infrastructure by credentials of a *former* Florida based Area Sales Manager submitted through the Ft Lauderdale SSO [PR 69, 119, 120, 122]; where the unauthorized access of a former employee, was "absolutely" considered a security event and "Mission Critical" [PR 121, 123, 124,137]; where the unauthorized access should have been managed by the Florida based CSIRT [PR 124] but was not and where that *former* Florida Area Sales Manager is related to the convicted Florida based burglars [PR 68] who is a close friend and confidant to the ring leader of the Miami based Cargo theft [PR 64,65,68], Florida law should be applied.

### *§6 (b) the relevant policies of the forum*

The State of Florida has a decidedly important interest in ensuring that its substantive law regarding torts, loss-distribution and damages are applied to a Florida corporate resident such as ADT/Tyco. *Judge*, 908 F. 2d at 1570. Applying Florida law satisfies Florida's policies and interest in  maintaining certainty, predictability and uniformity of results, including Florida's policies and interest in ensuring that injured parties are afforded an opportunity to shift the burden of loss to the responsible party for damages related negligence.

*§6 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue*

Although the Enfield burglary occurred in Connecticut, Connecticut has no interest in seeing that Eli Lilly or National Union is properly compensated or that ADT is protected from excessive tort judgments. Similarly, Connecticut lacks a significant interest in the application of its substantive law related to loss distribution and damages issues where those damages were the result of negligent acts occurring in Florida by a Florida domiciled corporation [PR 84, 85, 87-89, 90, 95, 115, 124]. *Estate of Miller* 609 F. Supp. 2d 1235, at 1245 (M.D. Fla., 2009).  While New York and Indiana have some interest in the issues in the instant litigation, those states' interests would lie in favor of the application of Florida's law to ensure that their corporate citizens are properly compensated for the harms caused by a Florida domiciled corporation. Similarly, Connecticut, New York and Indiana have no interest in limiting, by operation of the Connecticut (or New York or Indiana) statute of limitations, a Florida defendant's tort liability for its tortious conduct occurring in Florida. *Estate of Miller* 609 F. Supp. 1235.  Accordingly for the foregoing reasons Florida has the most significant relationships to this dispute.

*§6 (e) certainty, predictability and uniformity of result*

Lastly, the application of Florida law provides certainty, predictability and uniformity of results both to Florida headquartered ADT/Tyco and to those who conduct business with them. The evidence in the instant matter demonstrates that warehouses from six states, Connecticut, Illinois, Texas, Kentucky, Tennessee, as well as Florida were burglarized by the same group of Florida burglars, [PR 63-68]  who the FBI and other investigators believe, used information from ADT/Tyco [PR 63].  Allowing six differing outcomes in six different states for the same negligence would foster neither certainty, nor predictability, nor uniformity of results.

The application of Florida's statute of limitations furthers Florida's interests in certainty, predictability or uniformity of results. The application of Florida's statute of limitations also serves the interests of Indiana and New York  in seeing their corporate citizens compensated for harms resulting from the tortious conduct of a Florida headquarted corporation occurring in Florida. See *Estate of Miller* 609 F. Supp. 1235.

## II.    THE CONTRACT TERMS DO NOT APPLY TO THE PLAINTIFF'S CLAIMS

ADT's argument that contractual waivers apply to Plaintiff's non-contractual tort claims is an attempt to revive arguments that this Court previously and specifically discarded:

> contractual language has no effect upon conduct that is an independent tort. [D.E. 46 at 19]. The Court agrees. The contracts between Eli Lilly and TycoIS relate to the installation of various security equipment and monitoring relative thereto. The allegations in the Amended Complaint relate to Defendant's alleged failure to protect confidential information it acquired in connection with the proposal it prepared to do future work for Eli Lilly; Defendant's alleged failure to warn Eli Lilly about the other invasions; and Defendant's alleged misrepresentations relative thereto.  None of these relate to the contracts containing the anti-subrogation provision. The anti-subrogation clause in the contract does not, therefore, preclude the instant action. [**D.E. 66** at 9-10]

Judge Marra's well considered decision rejected the application of ADT's broad exculpatory language to bar Plaintiff's claims and made clear that *Rose v. ADT Sec. Serv., Inc.*, 989 So.2d 144 (Fla. App. 1 Dist. 2008) was inapposite. This Court acknowledged as persuasive authority *United States Fire Insurance Company v. ADT Sec. Serv., Inc.*,2D12-1956, 2013 WL 5225374 (Fla. App. 2 Dist. September 18, 2013) and noted the consistent authority in Connecticut that separate tort claims survive independent of contract claims. *Greenwich Interiors, LLC v. DCM Systems, LLC*, No. FST-CV-085009200S, 2009 WL 765529 (Conn. Superior Ct., Jud. Dist. Stamford-Norwalk, February 25, 2009).[2]  Thus, Judge Marra recognized the well established rule

---

[2] While ADT admits that Connecticut and Florida law are not in conflict on enforcement of waiver of subrogation provisions and asserts that it will thus rely on Florida law, it nevertheless cites two unreported out-of-state cases one from the 9th Circuit and one from the 4th Circuit, as well as Maine law to support its contentions. The unenforceability of waivers of subrogation outside of their context is supported by the unreported North Carolina

in Florida that even where a contract exists, a tort action will lie for either intentional or negligent acts considered independent from acts that breached the contract. *Ferguson Transp., Inc. v. North Am. Van Lines, Inc.,* Nos. 84,156, 84,167, 687 So.2d 821 (Fla.1996); *AFM Corp. v. Southern Bell Tel. & Tel. Co.,* 515 So.2d 180, 181 (Fla.1987) *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So. 2d 1238, 1239 (Fla. 1997).

Judge Marra's decision is in line with Florida law finding that subrogation clauses do not apply to events temporally outside the time of the relationship between the parties to which the contract applies. *Fairchild v. W. O. Taylor Commercial Refrigeration and Electric Co., Inc, and West American Insurance Company*, 403 So.2d 1119 (Fla. App. 5th Dist 1981). Judge Marra's decision also agrees with the settled New York law whereby "a waiver of subrogation clause cannot be enforced beyond the scope of the specified context in which it appears" (*Continental Insurance Co. v. Faron Engraving Co.,* 179 A.D.2d 360, 361, 577 N.Y.S.2d 835 (N.Y. App. Div. 1992)) and courts will refuse to enforce a broad waiver of subrogation clause when "the dereliction of duty with which the defendant is charged is completely extraneous to any duty or obligation encompassed by the parties' agreement and the relationship created thereunder." *Interested Underwriters at Lloyds v. Ducor's, Inc.,* 103 A.D.2d 76, 77, 478 N.Y.S.2d 285 (N.Y. App. Div.1984).

In holding that the Waiver of Subrogation distinct from the allegations of the complaint, Judge Marra did not reserve judgment pending the outcome of discovery or limit the finding to the a claim of negligence misrepresentation, and as such, ADT's arguments have been settled.

## III.    PLAINTIFF HAS PROPERLY DEMONSTRATED DAMAGES

---

case. *American Home v. Monsanto Enviro*, 16 Fed.Appx. 172, at 176 (4th Cir. 2001). The unreported Arizona case does not apply here, where the 9th Circuit noted that Arizona's courts, unlike Florida's, had not ruled explicitly on whether a subrogation waiver applies to a tort claim. *Travelers Indem. Co. v. Crown Corr Inc.*, 589 Fed.Appx. 828, at 833 (9th Cir. 2014).

**Eli Lilly and Company incurred the loss and National Union is Subrogated To Eli Lilly and Company**

    The evidence and the relevant legal authority support Plaintiff's application of Transfer In Value as the proper measure for quantification of damage to make Eli Lilly whole.

    The evidence demonstrates that pharmaceuticals owned by Eli Lilly and Company were stolen and damaged at Eli Lilly and Company's Enfield distribution warehouse.  Plaintiff's insurer National Union Fire Insurance Company retained C. Lewis and Company to perform an inventory count of stolen and damaged pharmaceutical inventory in accordance with Generally Accepted Auditing Standards (GAAS) detailed in Statements of Standards for Attestation Engagements (Section 50) and a verification of the valuation of Transfer In price of these products in compliance with Generally Accepted Accounting Principles (GAAP). [PR 75] Daniel Cambal, CPA testified that he verified the transfer in value of the property that was stolen from Eli Lilly's Enfield Distribution warehouse at the time of the burglary [PR 75]; the documentation upon which the loss was verified and valued originated from Eli Lilly and Company's books and records [PR 76-83][3]; operating expenses and transfer in values were furnished by Eli Lilly and Company, tax executives and pricing executives, Jeffrey Williams and John Haug [PR 76-83]; the three sworn statements in proof of losses were submitted on behalf of Eli Lilly and Company to National Union by Mark Saltsgaver, Senior Advisor Corporate Risk Management Eli Lilly and Company, for the theft of pharmaceutical products owned by Eli Lilly and stored at Eli Lilly and Company's Enfield Connecticut warehouse [PR 74, 76-83]; payments on the claim were tendered by National Union to Eli Lilly and Company [PR 74].  Each proof of loss contains an express grant of the right of subrogation up to the payment under the policy to

---

[3] Eli Lilly's SAP screen shots appended to the C. Lewis value report itemize the purchase orders for the inventory of damaged and stolen stock and detail for each batch item, the affiliate entities that transferred the items to Eli Lilly and Co's Enfield distribution warehouse.**[PR 76-83]**

National Union for Eli Lilly's losses. [PR 76]

The entirety of ADT's mistaken assertion that Eli Lilly is not the party for whom the loss was valued is based on the testimony of Plaintiff's forensic CPA, who referenced the American affiliate of Eli Lilly as Eli Lilly USA. [PR 48, 76]  Cambal testified this his response to the legal name of the ownership of the Enfield warehouse was a "guess." [PR 48, 76]  Indeed, C. Lewis had not been retained to evaluate the corporate structure of Eli Lilly nor did it need to perfect that expertise to perform its valuation of the inventory. [PR 48, 76]. Similarly, C. Lewis did not need to know the insuring entity that issued payment under the policy of insurance for the stolen pharmaceuticals [PR 76-83] to verify the transfer in value  against the books and records.

**Transfer Price is the Appropriate Measure of Eli Lilly's Damage**

It is undisputed that under Florida law, the objective in calculating the proper measure of damages is "'just compensation in money for the property destroyed;' such an amount as will fully restore the loser to the same property status that he occupied before the destruction." *Jacksonville, T. & K. W. Ry. v. Peninsular Land, Transp. and Mfg. Co.*, 9 So. 661, 679 (1891); *Mercury Motors Express, Inc. v. Smith*, 393 So. 2d 545 (Fla. 1981); *Renuart Lumber Yards v. Levine*, 49 So. 2d 97 (Fla. 1950).  The proper measure of damages for conversion is the fair or reasonable market value at the time and place of the conversion, plus prejudgment interest. *Christopher Advertising Group, Inc. v. R & B Holding Co., Inc.,* 883 So.2d 867, 871 (Fla. 3d DCA 2004); *Gillette v. Stapleton,* 336 So.2d 1226, 1227 (Fla. 2d DCA 1992); *Exxon Corp. v. Ward,* 438 So.2d 1059, 1060 (Fla. 4th DCA 1983).

Transfer Price is the fair market value of the pharmaceutical inventory at the time it arrived at the Enfield facility in the Eli Lilly distribution chain. [PR 76-83].The value of the inventory at its Transfer price is what the cost was to Eli Lilly at an arm's length negotiated price as

documented in Eli Lilly's audited books and records as dictated by the IRC §482. [PR 76-83]. Thus, the use of transfer price as a measure of value is what would be necessary to return Eli Lilly and Company to a position financially equal to that which it would have occupied prior to the loss. [PR 76-83].

Other than the direction to value damages at transfer in as the accounting measure, the contract of insurance contains no formula for arriving at an insured's Transfer In value of a loss. [PR 76-83]. Eli Lilly and C Lewis performed a complete inventory of the missing and damaged inventory in accordance with Generally Accepted Auditing Standards and verified the value of the inventory at its stage in the distribution process by contemplating the value added and costs associated with each stage in the distribution process as an arms length transaction (Transfer In price). [PR 75-83]. Defendant has not contested the methodology utilized by C. Lewis at arriving at the Transfer In Price of the lost and stolen inventory, rather it disputes the measure and suggests that fair market value to Eli Lilly should be pure manufacturing costs and all related intangible values attributed to the various stages of production of the distribution chain should be discarded. **[PR 77]** Florida law does not agree.

The Southern District of Florida has decided the proper measure for quantifying loss to pharmaceutical products in the chain of distribution. Determining that "transfer-in" (plus prejudgment interest) is the "best measure of damages" to make Lilly whole for loss or damage to its stock inventory and has rejected ADT's "theory" of manufacturing costs. *Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 602 F. Supp.2d 1260 (S.D. Fla. 2009), rev'd on other grds 615 F.3d 1305 (11th Cir. 2010). In reaching its decision, the court cited to the testimony of Eli Lilly's Transfer Price Manager, Marty (Martin) Clemens [PR 78] regarding Eli Lilly's transfer price process and provided a detailed analysis of Eli Lilly's transfer price system and its relation to fair

market value, ruling that "transfer price" methodology placed Eli Lilly in a position financially equal to that which it occupied prior to injury to stock inventory. [4] *Eli Lilly & Co.*, 602 F. Supp. 2d at 1279.

On March 25, 2015, Martin (Marty) Clemens furnished a sworn Affidavit in this case that his 2008 transfer price methodology testimony is consistent with the methodology Lilly used to determine the value of the product involved in the March 2010 burglary. [PR 76-83].  Clemens' 2008 testimony mirrors the information utilized by C. Lewis in performing the verification of value of damages sustained by Eli Lilly in 2010.[PR 76-83]  This Court has determined that Clemens' testimony regarding arms length inter-affiliate transfers supports Transfer in value as the proper measure of damages. [PR 76-83].   After evaluating the Eli Lilly and Company supporting data that was analyzed by C. Lewis and produced in case, it is undisputed that its valuation at Eli Lilly's transfer in value was adequate and reasonable. [PR 77].   Indeed relying exclusively on Cambal's work, Defendant's expert Manning merely sought to "look at what alternative measures of cost might be available" to arrive at its manufacturing cost theory. [PR 77] However, where manufacturing cost has already been rejected by this court in favor of transfer in for Eli Lilly's damages, Plaintiff's calculation of its loss to inventory at $44,383,190 is undisputed. [5]

The transfer-value price is also consistent with the valuation of these stolen pharmaceuticals as adjudicated by the Southern District of Florida and in the District of Connecticut. The Presentencing Investigation for Amaury Villa's conspiracy to sell the stolen pharmaceuticals valued the stolen pharmaceuticals in excess of $80,000,000 (*U.S. v. Villa*, 12-20234-cr-DIMITROULEAS)

---

[4] The damages calculation regarding "transfer price" was not addressed by the 11th Circuit Court of Appeals. 615 F.3d 1305, 1312, fn 3
[5] C. Lewis will has valued the entire recoverable loss at $44,547,910 of this $ 44,383,190 represents the transfer in value of lost and damaged inventory.

which the Eleventh Circuit has upheld (*U.S. v. Villa*, 12-16338 (11th Cir. January 21, 2015) [PR 56-59]. The PSI's in the District of Connecticut also valued the pharmaceuticals in excess of $50,000,000 during the sentencing of Amaury Villa, Judge Arterton on behalf of the Federal District Court of Connecticut evaluated both Cambal's analysis and the statements of Eli Lilly's Mark Saltsgaver and the arguments in favor of manufacturing costs and to satisfied the court that the [transfer in] methodology employed by Cambal was the lowest appropriate measure of the fair market value of the loss sustained by Eli Lilly.[6] (*U.S. v. Villa, et al*., 12-cr-40 (JBA)) [PR 61, 62][7].

### The Policy Contains Neither a Formula or Multiplier

The National Union policy contains no "formula" for valuation nor does it contain a "multiplier". ADT either misrepresents or misapprehends the concept of Transfer-In and Plaintiff's calculation.  Defendant's reliance on *National R.R. Passenger Corp.,(Amtrak), CSX Transportation, Inc, v. Rountree Transport and Ridding, Inc.*, 286 F.3d 1233 (11th Cir. 2002) is misplaced where it provides no analogy to the valuation methodology utilized.  The *National RR* court excluded plaintiff's damages evidence for three reasons, none of which exist in this case. First, the proposed damages were calculated to include undamaged independent component parts, no such un-impacted inventory is included in Eli Lilly's claimed loss.[PR 75-76]  Second, the carrier in *National RR* adopted a "declared value" for replacement of insured property which included a retail sales profit component that was not lost.  Here the National Union policy contains no such declaration of value nor does transfer in include retail sales component. [PR 80] Third, the rejected valuation proffered in *National RR* included a contractual 5% across the board

---

[6] The Court sentenced the convicted burglars passed on a value of the loss in excess of $50,000.
[7] National Union gave a sworn statement in support of the value of the damages for the purposes of sentencing the Enfield burglars outlining the value of the damage sustained by Eli Lilly and as well as the damages answerable under the policy of insurance at $42,118,354 [PR74].

mark up to the declared value of any claimed damaged inventory as a "multiplier"[8]. 286 F.3d

1247. The National Union policy contains no similar multiplier.[9] [PR 80] Under Florida law,

Plaintiff's Transfer-In value is the "proper measure of damages is to place the plaintiff in the

same financial position as that occupied before the property was damaged." *Ocean Elec. Co. v.*

*Hughes Labs., Inc.,* 636 So.2d 112, 114 (Fla.Dist.Ct.App.1994).

## IV.    DEFENDANT'S "STACKING" ARGUMENT IS INCORRECT

Plaintiff has set forth "actual evidence," both circumstantial and direct, of ADT's negligence

and its proximate cause to Plaintiff's damages. Defendant's stacking argument also overlooks the

legal rule that in a civil case, a fact may be established by circumstantial evidence as effectively

and as conclusively as it may be proven by direct positive evidence. *Nielsen v. City of Sarasota*,

117 So. 2d 731, 733 (Fla. 1960).  In fact, the Florida Supreme Court has specified:

> Great latitude is to be allowed in the reception of indirect or circumstantial
> evidence. . . . The competency of a collateral fact to be used as the basis of
> legitimate argument is not to be determined by the exclusiveness of the inferences
> it may afford in reference to the litigated fact. It is enough if these may tend, even
> in a slight degree, to elucidate the inquiry or to assist, though remotely, to a
> determination probably founded in truth.*Baugher v. Boley*, 58 So. 980, 982 (Fla.
> 1912)

see also: *Fenster v. Publix Supermarkets, Inc.*, 785 So. 2d 737, 739 (Fla. 4th DCA 2001)

(*quoting Little v. Publix Supermarkets, Inc.*, 234 So. 2d 132, 133-34 (Fla. 4th DCA 1970);

*Lombardi v. Flaming Fountain, Inc.*, 327 So. 2d 39, 40 (Fla. 2d DCA 1976).

It is undisputed that ADT owed Plaintiff and its clients the duty to protect confidential

information about their security systems.  The evidence demonstrates that ADT failed to ensure

that the confidential information in its possession was safeguarded and not available to

unauthorized access; that ADT had no ability to monitor or prevent unauthorized insider access

---

[8]  Other than alleging the existence of a "formula" and "multiplier" defendant has not identified.

[9]  Indeed failing to find any evidentiary support for its arguments, Defendant recites the transfer in measure of
damage and fails even to hint at how Transfer In constitutes a formula or "multiplier."

to its clients information and that the credentials of a former employee who is related to one of

the convicted burglars, is recorded accessing ADT's help desk, months after his employment

terminated. .[PR 118-122,126-132] Plaintiff also proffers unchallenged[10] opinion testimony of its

expert Willie Morales, that the burglary of the Enfield warehouse was executed using inside

information from ADT [PR 63].   Section 90.704, Florida Statutes (2015) specifically provides

that:

> The facts or data upon which an expert bases an opinion or inference may be
> those perceived by, or made known to, the expert at or before the trial. If the facts
> or data are of a type reasonably relied upon by experts in the subject to support
> the opinion expressed, the facts or data need not be admissible in evidence.

Courts applying this statute permit the use of information obtained from numerous sources and

leave the reasonableness of the expert's reliance on this data to be questioned on cross-

examination. *Bender v. State*, 472 So. 2d 1370, 1372 (Fla. 3d DCA 1985); see also *Schwarz v.

State*, 695 So. 2d 452, 454-55 (Fla. 4th DCA 1997) (relying on this Court's analysis in Bender

and holding that section 90.704 "is modeled after Federal Rule of Evidence 703. Under the

federal statute, as well as our statute, experts may testify as to the things on which they rely").

Plaintiff will not have to stack any inferences but instead will use evidence, both direct and

circumstantial, together with expert opinion testimony to prove its case at trial.   Moreover, a jury

question exists when the evidence is susceptible to inference that would allow recovery even

though there are opposing inferences that are equally reasonable. *Owens v. Publix Supermarkets,

Inc.*, 802 So. 2d 315, 323 (Fla. 2001) *citing Thoma v. Cracker Barrel Old Country Store, Inc.*,

649 So. 2d 277, 279 (Fla. 1st DCA 1995).

   The main case cited by ADT illustrates that Plaintiff has met its burden:

---

[10] The opinions of Plaintiff's expert witness Willie Morales have not been challenged by the Defendant on a timely
motion to strike or Daubert motion and therefore will be proffered at trial.

As discussed in the preceding section, defendants owed Knowlton a duty of reasonable care to protect him against the foreseeable zone of risk that the parties do not dispute existed on the Point. Once the jury finds a breach of that duty, i.e., negligence, there is only one inference required of the jury: that Knowlton was killed by conditions on the Point. ***Plaintiff submitted evidence that allowed the jury to find that it was more likely than not that this was the case***: that Knowlton's friends were unable to find him minutes after he walked onto the Point and that the following day his damaged body was found in a cove some distance away. Based on this evidence, the jury was free to infer a causal nexus between the negligence and the harm. Thus, the district court erred in granting to defendants judgment as a matter of law following the trial. *Collins v. Marriott Int'l, Inc*., 749 F.3d 951, 959 (11th Cir. Fla. 2014).(emphasis added)

Contrary to ADT's insistence, there is direct evidence regarding ADT's duty and breach of that duty to the Plaintiff. Therefore if there is any inference to be made at trial it will be a permissible inference related to causation. *Id*.

## V.    FLORIDA DECEPTIVE UNFAIR TRADE PRACTICES ACT

ADT's FDUTPA analysis is incorrect and its reliance on *Progressive American Ins. Co. v. U.S*., 913 F.Supp.2d 1318 (M.D. Fla. 2012); *St. Paul Guardian Ins. Co. v. U.S*., 117 F.Supp.2d 1349 (S.D. Fla. 2000); and *Allstate Insurance Co. v. Metropolitan Dade County,* 436 So.2d 976, 978 (Fla.App.1983) is misplaced.  None of those cases limit National Union's presentation of its own legal theories or evidence.  Thus the assertion that National Union is subject to Eli Lilly's statements regarding ADT's false statements has no foundation in the law [**D.E. 176**, p. 24]. ADT also fails to recognize that "a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *Gold Coast Racing, Inc. v. The Home Depot U.S.A, Inc.,* No. 05–61931–CIV, 2006 WL 4579688, at *2 (S.D.Fla. Feb.6, 2006); *Davis v. Powertel, Inc.,* 776 So.2d 971, 973–94 (Fla. 1st DCA 2000). Here, Plaintiff's FDUPTA claims arise from ADT/Tyco's "failure to diligently assess its ability to safeguard [National Union's] Eli Lilly's information, as well as representations made concerning this ability, is conduct that

16

actually occurred in, or, at a minimum, flowed from business practices occurring within the State of Florida." [**D.E. 147** at pp. 9, 10].

ADT held itself out as an expert in the field of security and routinely markets itself to commercial (and residential) entities as not merely selling electronic security equipment, but as providing an "integration of technology and services." [PR 90-94]. As to Eli Lilly, ADT explicitly held itself out as providing expert security analysis and consultation services that exceed merely the sale of electronic monitoring equipment.[PR 91-94]   Although ADT obtains and retrieves confidential information about its customers and proposed customers security, it does not routinely repeat background checks on its employees [PR 134] and does not consider financial distress, bankruptcy [PR 135] or criminal conduct to bar or impact the employment of those to whom it entrusts client information. [PR 136].   ADT's markets its abilities to provide expert security consultation services from its Boca Raton, Florida headquarters [PR 90] along with ADT's IT security operations [PR 87] and overall business [PR 84, 85]. ADT used these marketing representations to gather sensitive information from and about its clients and potential clients regarding their premises security and weaknesses. This confidential information, in the form of diagrams, Word documents, Excel spreadsheets, Visio, pictures, were transmitted uploaded, stored and accessed by ADT on the ADT Network systems for use in ADT's Network applications including Compass, Mastermind and the ADT email system. [PR 97- 100].

Once ADT had this sensitive information, ADT stored it in its Compass system and other databases to generate maps, diagrams, and other documents which would identify individual system components and their locations as they existed in a customer's premises. [PR 102] Data from Compass generated maps and diagrams that contained client sensitive information, and also populated downstream ADT Applications and databases such as ADT's Mastermind, which stored customer

information such as site address, maintenance plans, inspections, zones, locations of the zones, points, personal ID codes and signaling information in order to receive and respond to signals coming from monitored alarm systems. [PR 101, 109- 112] Compass and Mastermind data – which resided within ADT's firewalls – was accessible remotely from the internet via a "virtual private network" (VPN) which allows users to access remotely any of its applications and network systems, and as long as the user had credentials they could access the information unmonitored in Mastermind. Compass stored information regarding the security in place at the Enfield Warehouse as well as the information about five other warehouses. ADT communicated confidential information and confidential passwords via unencrypted electronic mail. [PR 96-114]

ADT gathered and stored this confidential information on its network without ensuring that this sensitive information was unavailable to unauthorized users including former ADT managers. [PR 129]   ADT was on notice that its Network lacked important application and operating system security updates [PR 128] and that it granted domain administrators excessive privileges to files, file shares and other systems throughout the ADT environment. [PR 126] Ultimately, the ADT/Tyco network contained a multitude of system weaknesses and vulnerabilities that left the ADT/Tyco network insecure and which "increase[d] the likelihood of a successful compromise of the ADT network." [PR 130].

Similarly, the ADT was on Notice that its Network firewalls provided limited or no separation between systems within ADT's networks and did not protect sensitive servers from workstation subnets, or critical assets from each other. [PR 127]. Nonetheless, ADT/Tyco neglected to inform its clients that its network had numerous high risk security vulnerabilities that increased the likelihood of a successful compromise of the ADT network, due to a lack of an effective system patch and

configuration management process throughout the ADT environment and multiple insecure server configurations and missing application patches. [PR 130].

Between 2008 and 2011 ADT third party monthly vulnerability scans revealed that its United States network contained 221 High level Vulnerabilities - 128 of which were PCI non-compliant [PR 125]. Despite warnings that these High Vulnerabilities - had the potential to result in immediate compromise – and were recommended for investigation and validation as soon as possible in order to reduce the risk of successful attack, ADT routinely failed to correct the issues. [PR 125].   The same vulnerability reports of the ADT Network revealed 755 Medium Vulnerabilities that warned of to result in information or system compromise, 471 of these were PCI non-compliant. [PR 125]   Additionally, there were, at this time 10,058 Informational Vulnerabilities regarding among other things, unimplemented maintenance and out of date patching.   Despite having vast resources allocated to IT infrastructure [PR 86, 87] these High Vulnerabilities, were permitted to continue unresolved for years. [PR 125].

ADT neglected to inform its clients that its network had no protections against unauthorized access to privileged information from the internal network or "insider" threat protection, and had no controls to prevent or monitor Inside Threats, relying instead on third party law enforcement to notify them of the presence of both Inside and External threats [PR 131, 132]. Due to the known weaknesses in internal ADT's controls, once an external threat was past the ADT/Tyco barriers, they could act like an insider [PR 133].

ADT also neglected to inform its clients that repeated "Mission Critical" unauthorized access to its Network was made using the credentials of a former employee [PR 118- 121,137]. Credentials belonging to the Area Commercial Sales Manager in South Florida engaged in elaborate and unusual password related activity the month prior to his departure from ADT to make

fourteen password changes, look up user ID's and access ADT's Compass Sales Support [PR 118]. Moreover, these same credentials were used to access to the ADT infrastructure in October 2009, six months after his employment terminated [PR 120] and continued to access the ADT infrastructure until ADT deleted his accounts in December of 2010 - seventeen months after his employment terminated [PR 119].

Not only are ADT's representations, omissions, and practices likely to mislead the consumer acting reasonably in the circumstances, to entrust ADT with confidential information about its security, the actions ADT engages in are in violation of 15 U.S.C. § 45 *et seq*. The Federal Trade Commission has found that where a security company fails to monitor security vulnerabilities delays in correcting vulnerabilities [PR 118-121, 125-133] or transmits user login credentials in clear readable text over the internet [PR 108], they engage in unfair business practices. *In the Matter of TRENDNET, Inc*., Federal Trade Commission Docket No. C-4426 (January 16, 2014). It "is the intent of the Legislature that, in construing section 501.204(1), "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission." *State, Office of Atty. Gen., Dep't of Legal Affairs v. Wyndham Int'l, Inc.,* 869 So.2d 592, 598 (Fla. Dist. Ct. App. 2004). As such, ADT/Tyco's failures to monitor and correct security vulnerabilities [PR 118- 121, 125-133] delays in correcting vulnerabilities [PR 125], and transmission of user login credentials in clear readable text over the internet [PR 106, 108] are unfair trade acts in violation of FDUPTA.

## **FDUPTA Damages**

The standard for determining the damages recoverable under FDUTPA is well-defined in the case law as:

> "[T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value

in the condition in which it should have been delivered according to the contract of the parties. [ ... ] A notable exception to the rule may exist when the product is rendered valueless as a result of the defect-then the purchase price is the appropriate measure of actual damages."

*Rollins, Inc. v. Heller,* 454 So.2d 580, 585 (Fla. 3d DCA 1984) (quoting from *Raye v. Fred Oakley Motors, Inc.,* 646 S.W.2d 288, 290 (Tex.App.1983)). As set forth *supra*, the purchase price for the Lilly pharmaceuticals that were impacted by ADT's failure to protect the information entrusted to it is the transfer-in price of the stolen and damaged stock and the related damages. [PR 76-83].

Respectfully submitted this 27th day of April 2015.

Eli Lilly and Company By
National Union Fire Insurance Company of Pittsburgh, as Subrogee
By:

| | |
|---|---|
| */sRyon Little* | Elisa T. Gilbert, Esq. |
| Ryon L. Little | (pro hac vice) |
| Fla. Bar No. 26402 | egilbert@gilbert-firm.com |
| rlittle@dkmaritime.com | Brendan R. O'Brien, Esq. (BO 9033) |
| Damon T. Hartley | (pro hac vice) |
| Fla. Bar No. 41136 | bobrien@gilbert-firm.com |
| dhartley@dkmaritime.com | The Gilbert Firm, P.C. |
| Charles G. De Leo | 325 East 57TH Street |
| Fla. Bar No. 353485 | New York, New York 10022 |
| cdeleo@dkmaritime.com | Counsel for Plaintiff |
| Jan M. Kuylenstierna | |
| Fla. Bar No. 375985 | |
| jkuylenstierna@dkmaritime.com | |
| De Leo & Kuylenstierna P.A. | |
| Town Center One | |
| 8950 SW 74th Court | |
| Suite 1710 | |
| Miami, Florida 33156 | |
| Phone: 786-332-4909 | |
| Local Counsel for Plaintiff | |

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2015, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/Ryon L. Little
Ryon L. Little

**SERVICE LIST**
**CASE NO.: 13-80371**

| | |
|---|---|
| Aaron K. Kirkland<br>Shook, Hardy, & Bacon, LLP<br>2555 Grand Blvd.<br>Kansas City, MO 64108<br>816-474-6550<br>Email: akirkland@shb.com<br>Attorney for ADTs | Jason R. Scott<br>Shook, Hardy & Bacon, LLP<br>2555 Grand Blvd.<br>Kansas City, MO 64108<br>816-474-6550<br>Email: jscott@shb.com<br>Attorney for ADTs |
| Charles C. Eblen<br>Shook, Hardy & Bacon, LLP<br>2555 Grand Boulevard<br>Kansas City, MO 64108<br>816-474-6550<br>Email: ceblen@shb.com<br>Attorney for ADTs | William Patrick Geraghty<br>Shook Hardy & Bacon<br>201 S Biscayne Boulevard<br>Suite 2400<br>Miami, FL 33131-4332<br>305-358-5171<br>Fax: 358-7470<br>Email: wgeraghty@shb.com<br>Attorney for ADTs |
| Jennifer A. McLoone<br>SHOOK, HARDY & BACON LLP<br>MiamiCenter, Ste. 3200<br>201 S. Biscayne Blvd.<br>Miami, FL33131-4332<br>Telephone: 305-358-5171<br>Facsimile: 305-358-7470 | |