**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-CIV-80371-BLOOM/Valle**

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, as
subrogee Eli Lilly and Company,

       Plaintiff,

v.

TYCO INTEGRATED SECURITY, LLC, *et al.*,

       Defendants.
_____/

## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>

This matter is before the Court upon Defendants, Tyco Integrated Security LLC and ADT

Security Services Inc., a subsidiary of Tyco International Ltd., Co.'s Motion for Summary

Judgment, ECF No. [176] ("Tyco MSJ") and Plaintiff National Union Fire Insurance Company

of Pittsburgh, Pennsylvania, as subrogee of Eli Lilly and Company's Motion for Summary

Judgment, ECF No. [189] ("NU MSJ") (collectively, the "Motions"). The Court has reviewed

the Motions, the parties' submissions in support and opposition thereto, the record in this case,

and is otherwise fully advised. For the reasons that follow, National Union's Motion is denied.

Tyco's Motion is granted with respect to Count VIII of the Amended Complaint but denied in all

other respects.

1

## I. INTRODUCTION

Defendants, Tyco Integrated Security LLC and ADT Security Services Inc., a subsidiary of Tyco International Ltd., Co. (collectively, "Tyco"),[1] provides premises security and monitoring equipment under separate contracts with Eli Lilly and Company (hereinafter, "Eli Lilly") for its sales offices and distribution warehouses.  Amended Complaint, ECF No. [27] at ¶ 18.  On March 14, 2010 at approximately 3:40 a.m., burglars robbed an Eli Lilly warehouse in Enfield, Connecticut (the "Enfield Facility"), stealing pharmaceuticals valued in excess of $60,000,000.  *See id.* at ¶ 51.  According to the Amended Complaint, the burglars avoided detection by utilizing details of the Enfield Facility's layout and vulnerabilities of the surveillance and intrusion detection systems outlined by Tyco in a confidential system proposal generated in 2010 (the "2010 Confidential System Proposal").  *Id.* at ¶ 55.  As a result, Plaintiff National Union Fire Insurance Company of Pittsburgh, Pennsylvania (hereinafter, "National Union"), as subrogee of Eli Lilly, commenced this action on April 16, 2013, asserting claims against Tyco for negligence (Count I), failure to safeguard confidential information (Count II), and failure to disclose/warn (Count III), stemming from Tyco's alleged inability to maintain the security of the confidential information contained in the 2010 Confidential System Proposal.  *See* Amend. Compl., ECF No. [27] at ¶¶ 94-144.  Additionally, National Union contends that Tyco violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") by making false claims of "fidelity and care with regard to safeguarding Eli Lilly's security systems," and made untrue representations regarding the company's nature as "safe, responsible, state of the art, and as possessing specialized knowledge and expertise in security safety equipment and monitoring

---

[1] In October 2012, Tyco split from ADT Security Services, Inc. ("ADT") and the two are now distinct legal entities.  However, for the sake of simplicity, this Order references only "Tyco."

systems capable of safeguarding the confidentiality of Eli Lilly's security infrastructure and existing system" (Count VII). *Id.* at ¶¶ 164-73.[2]

After substantial discovery and pre-trial litigation, the parties now move for summary judgment on issues concerning whether Florida or Connecticut law applies, the application of a contractual subrogation waiver, and the sufficiency of evidence as to causation, damages, and National Union's claim based on FDUTPA. *See* Motions, ECF Nos. [176] and [189]. Following review of the vast record presented, the Court finds that National Union's FDUTPA claim is the only issue susceptible to judgment as a matter of law.

## II. FACTUAL BACKGROUND

At the outset, this Court is obligated to express concern regarding the presentation of evidence in this matter. A summary judgment movant's initial burden consists of a "responsibility [to] inform [ ] the . . . court of the basis for its motion and [to] identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Although the Court has required the parties to submit indices to their submissions in order to aid in the Court's dissection of the voluminous record, the Court has, nonetheless, encountered a variety of challenges in properly reviewing this case. As a representative example, National Union, in its Statement of Facts, asserts that the "IT information produced in this matter was gathered [] 'at the Tyco facility in Boca.'" *See*

---

[2] National Union also pursued claims premised on theories of fraud and negligent misrepresentation. *See* Amend. Compl., ECF No. [27] at ¶¶ 127-163 (Counts IV through VII). On March 4, 2014, Judge Kenneth A. Marra dismissed these for failure to plead them with specificity pursuant to Fed. R. Civ. P. 9(b). *See* ECF No. [66] at 13-14. Dismissal was made without prejudice and Judge Marra granted leave to amend. *Id.* National Union never exercised their option to amend and, as such, those claims have been abandoned.

Plaintiff's Statement of Undisputed Material Facts, ECF No. [190] ("NU SOF") at ¶ 29.  This simple assertion cites three exhibits in support, totaling over three hundred pages of deposition testimony.  *See* ECF Nos. [173-4], [173-5], and [173-6].  The single pincite included with the statement not only references the improper docket entry related to the quotation, but also the incorrect page of the correct docket entry.   ECF No. [173-5] at 122:19-24.  This is but one example of innumerable instances evincing a complete lack of precision that has been encountered by the Court throughout its review of the Motions.   "Judges are not like pigs, hunting for truffles buried in briefs."  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (Posner, J.).  "Likewise, district court judges are not required to ferret out delectable facts buried in a massive record."  *Chavez v. Sec'y Florida Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).  Judge Posner's admonishment applies with equal force here.  On multiple occasions, the parties have frustrated the expeditious resolution of these Motions by failing to specifically cite to *relevant* portions of the record.

Nevertheless, the following material facts have been garnered from the parties' submissions.  The Court hesitates to use the term "undisputed," as the parties contest nearly every shred of evidence presented.  *Compare* NU SOF, ECF No. [190] *and* Tyco's Statement of Undisputed Facts, ECF No. [177] ("Tyco SOF") *with* Tyco's Response to NU SOF, ECF No. [246] ("Tyco Resp. SOF") *and* Plaintiff's Response to Tyco SOF, ECF No. [245] ("NU Resp. SOF").[3]  The Court sets forth the following relevant facts.[4]

---

[3] As indicated, many of these facts are disputed by the parties.  However, for the purposes of several analyses contained in this Order, the dispute is immaterial.  *See, e.g., supra* Section IV.A.  Much of the conflict arises between experts and the testimony of witnesses.  Absent clearly contradictory testimony or blatant inadmissibility, the Court will not discount the various sources of evidence presented herein.  Challenges to the persuasiveness or efficacy of various opinions may be pursued through appropriate motion or by cross-examination.  Unless the aforementioned

### A.    The Parties and Tyco's Related Operations

1.    Eli Lilly is a pharmaceutical company incorporated in the State of Indiana with its principal place of business in Indianapolis, Indiana.  NU SOF, ECF No. [190] at ¶ 19; Tyco Resp. SOF, ECF No. [246] at ¶ 19.

2.    National Union is a Pennsylvania corporation with its principal place of business in New York.  NU SOF, ECF No. [190] at ¶ 20; Tyco Resp. SOF, ECF No. [246] at ¶ 20.

3.    While Tyco is incorporated in Delaware, it maintains its North America headquarters in Boca Raton, Florida.  NU SOF, ECF No. [190] at ¶ 24; Tyco Resp. SOF, ECF No. [246] at ¶ 24.[5]

4.    Accordingly, Tyco's human resources and legal departments are located in Boca Raton, and various high-level employees operate out of the Boca Raton headquarters.  NU SOF, ECF No. [190] at ¶¶ 25, 30; Tyco Resp. SOF, ECF No. [246] at ¶¶ 25, 30.

5.    Tyco maintains central computer servers in Jacksonville, Florida and Aurora, Colorado, and other locations.  *See* Deposition of Tom Dennison, ECF No. [237-5] ("Dennison Deposition") at 58:7-11, 61:14-16 ("Q: Where is the command center?

---

circumstances warrant disregard of the material, for the purposes of summary judgment, the Court will accept the testimony.

[4] Where a fact is undisputed, reference is made to a party's statement of facts and the corresponding paragraph found in the responsive statement of fact.

[5] In reality, during the relevant time period ADT was headquartered in Boca Raton, Florida. ADT later became Tyco, who, according to their website, still maintains its North American headquarters in Boca Raton, Florida.  *See* Tyco Website, Contact, http://www.tyco.com/contact (last visited May 21, 2015).

A: At that period of time the command center was located in Jacksonville, Florida.").

6.      Tyco conducted its information technology operations in Boca Raton and Jacksonville, Florida, including vulnerability scans, audit results and other security tests.  *See* Dennison Deposition, ECF No. [173-15] at 15:10-16:13, 17:3-19:2, 21:2-9, 22:2-15, 31:11-34:10, 40:12-41:25, 58:23-59:7, 100:7-101:11 (discussing the various security operations) (further citations omitted).

7.      Tyco's Jacksonville office contains a data center with "large computer servers" running various software applications for Tyco, including a type of monitoring software.  *See* Deposition of James Mooney, ECF No. [173-26] ("Mooney Deposition") at 66:6-68:8; ECF No. [173-25] at 64:13-18.

**B.      The Contract and the 2010 Confidential System Proposal**

8.      On November 18, 2004, Tyco[6] and Eli Lilly entered into a "Commercial Sales Proposal Agreement" (the "2004 Contract"), wherein Tyco agreed to install various security measures at the Enfield Facility.  *See* 2004 Contract, ECF No. [245-2]. The 2004 Contract was contained in multiple Commercial Sales Proposal/Agreements and riders executed contemporaneously.  *See id.*

9.      The 2004 Contract provided for automatic renewal, *id.* at 3, 6, 10, which states the following:

> In addition for the service(s) to be provided as indicated above, Customer agrees to pay $760 per month ($2,280/quarter or $9,120/year) per annum, annually in advance for a period of five years effective from the date service is operative under this agreement.   After  the  five  years,  this  agreement  shall  be

---

[6] The party to the contract was actually ADT; however, as noted, the Court exclusively references Tyco for simplicity's sake.

automatically renewable yearly unless terminated by either party upon written notice at least 30 days prior to the anniversary date.

10.   Additionally, the 2004 Contract contained an anti-subrogation provision (the

"Subrogation Waiver"), *id.* at 3, 6, 10 (emphasis in original):

> IT IS UNDERSTOOD THAT [TYCO] IS NOT AN INSURER, THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE CUSTOMER AND THAT THE AMOUNTS PAYABLE TO [Tyco] HEREUNDER ARE BASED UPON THE VALUE OF THE SERVICES AND THE SCOPE OF LIABILITY AS HEREIN SET FORTH AND ARE UNRELATED TO THE VALUE OF CUSTOMER'S PROPERTY OR PROPERTY OF OTHERS LOCATED IN THE CUSTOMER'S PREMISES. CUSTOMER AGREES TO LOOK EXCLUSIVELY TO CUSTOMER'S INSURER TO RECOVER FOR INJURIES OR DAMAGE IN THE EVENT OF ANY LOSS OR INJURY AND RELEASES AND WAIVES ALL RIGHT OF RECOVERY AGAINST [TYCO] ARISING BY WAY OF SUBROGATION. [TYCO] MAKES NO GURANTY OR WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS, THAT THE SYSTEM OR SERVICES SUPPLIED WILL AVERT OR PREVENT OCCURRENCES OR THE CONSEQUENCES THEREFROM, WHICH THE SYSTEM OR SERVICE IS DESIGNED TO DETECT, . . . . THE CUSTOMER DOES NOT DESIRE THIS CONTRACT TO PROVIDE FOR FULL LIABILITY OF [TYCO] AND AGREES THAT [TYCO] SHALL BE EXEMPT FROM LIABILITY FOR LOSS, DAMAGE, OR INJURY DUE DIRECTLY OR INDIRECTLY TO OCCURRENCES OR CONSEQUENCES THEREFROM, WHICH THE SERVICE OR SYSTEM IS DESIGNED TO DETECT OR AVERT; THAT IF [TYCO] SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE, OR INJURY DUE TO FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED . . . . THIS PARAGRAPH SHALL APPLY IF LOSS, DAMAGE OR INJURY, IRRESPECTIVE OF CAUSE OR ORIGIN, RESULTS DIRECTLY OR INDIRECTLY TO PERSON OR PROPERTY FROM PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS IMPOSED BY THIS CONTRACT OR FROM NEGLIGENCE, ACTIVE OR OTHERWISE, STRICT LIABILITY, VIOLATION OF ANY

APPLICABLE CONSUMER PROTECTION LAW OR ANY
OTHER ALLEGED FAULT ON THE PARTY OF [Tyco],
ITS AGENTS OR EMPLOYEES . . . .

11.  Eli Lilly's 30(b)(6) representative attested to the fact that in 2010, Eli Lilly was still

paying Tyco for its services and, therefore, the 2004 Contract may have continued

to remain in effect.  *See* Deposition of Fred A. Larsen, ECF No. [185-2] ("Larsen

Deposition") at 146:24-147:20 (noting that he was unaware of any writing

terminating the 2004 Contract).

12.  Between 2004 and 2008, Tyco continued to modify the security system at the

Enfield Facility by adding and removing certain components.  Tyco SOF, ECF No.

[177] at ¶ 5; NU Resp. SOF, ECF No. [245] at ¶ 5.

13.  In 2004, and again in 2009, Tyco conducted a survey of the Enfield Facility.  *See*

Deposition of Nancy Colone, ECF No. [177-2] ("Colone Deposition") at 69:6-

73:18, 113:22-115:13; *see also* Emails, ECF No. [245-4] (containing

communications indicating that Tyco representatives would be conducting a survey

of the Enfield Facility on November 3, 2009).[7]

14.  In conducting the surveys, Tyco utilized diagrams of the Enfield Facility to assess

the warehouse's security systems.  *See* Colone Deposition, ECF No. [177-2] at

72:15-73:12.

15.  In late 2009, or early 2010, another proposal was generated by Tyco based on the

previous surveys, highlighting potential improvements to the Enfield Facility's

---

[7] The parties dispute whether these surveys were conducted at the behest of Eli Lilly.  *See* Tyco
SOF, ECF No. [177] at ¶ 6; NU Resp. SOF, ECF No. [245] at ¶ 6.   Nancy Colone explicitly
states that Eli Lilly initiated the surveys.  *See* Colone Deposition, ECF No. [177-2] at 69:6-73:18,
113:22-115:13.

8

existing security systems (as previously noted, see *supra* p. 2, the "2010 Confidential System Proposal").   *See id.* at 72:15-73:12, 82:2-83:20, 113:22-115:13.

**C.     The Burglary of the Enfield Facility**

16.     On March 14, 2010, at approximately 3:40 a.m., burglars, including Defendants Amaury and Amed Villa, were semi-successful in stealing more than $60 million in pharmaceuticals from the Enfield Facility.   Tyco SOF, ECF No. [177] at ¶ 9; NU Resp. SOF, ECF No. [245] at 1.

17.     At the time of the burglary, Eli Lilly insured its inventory against loss and destruction under a policy of insurance, No. 2637965 (the "Policy"), issued by National Union.   NU SOF, ECF No. [190] at ¶ 20; Tyco Resp. SOF, ECF No. [246] at ¶ 20.

18.     The intruders invaded the physical premises of the Enfield Facility through the roof and bypassed the variety of security sensors.   *See* Confidential Enfield Burglary Report, ECF No. [185-4] ("Confidential Burglary Report") at 3-4, 11.

19.     Once inside, the intruders successfully disabled the intrusion alarm system, again avoiding detection by Tyco's security measures, including motion sensors and alarm triggers.[8]   *See* Confidential Burglary Report, ECF No. [185-4] at 3-4.

---

[8] In disconnecting the fire alarm system, the intruders accidentally generated an administrative alarm to Tyco, logged as a "Communications Fault."   Confidential Burglary Report, ECF No. [185-4] at 5.   Pursuant to the procedure for handling such "Faults," no intruder alarm was triggered. *See id.*

20.   As a result of the burglary, Eli Lilly submitted Sworn Statements of Proof of Loss for the Undisputed Loss of Stolen and Damaged Product to National Union. NU SOF, ECF No. [190] at ¶ 21; Tyco Resp. SOF, ECF No. [246] at ¶ 21.

21.   Consequently, and pursuant to the Policy, National Union paid a sum of $42,118,354.00 to Eli Lilly.  NU SOF, ECF No. [190] at ¶ 21; Tyco Resp. SOF, ECF No. [246] at ¶ 21.

22.   The burglary was executed by a band of five Miami, Florida residents: Defendants Amed Villa and Amaury Villa (collectively the "Villas"), and their associates, Yosmany Nunez ("Nunez"), Alexander Marquez ("Marquez"), and Rafael Lopez ("Lopez").  NU SOF, ECF No. [190] at ¶ 1; Tyco Resp. SOF, ECF No. [246] at ¶ 1.

23.   All five were charged and pled guilty to their crimes in the District of Connecticut (the "Connecticut Criminal Proceedings").  NU SOF, ECF No. [190] at ¶¶ 1, 6; Tyco Resp. SOF, ECF No. [246] at ¶¶ 1, 6.

24.   Specifically, Defendants, Amaury and Amed Villa were indicted in the District of Connecticut for conspiracy to commit theft from interstate shipment and theft from interstate shipment in connection with the March 14, 2010 theft (the "Connecticut Criminal Proceedings").  *See* Amend. Compl., ECF No. [27] at ¶ 65.  On April 10, 2015, after entering a plea of guilty, Amaury Villa was sentenced.  *See* ECF No. [230] at ¶ 4; *see also United States v. Villa*, Case No. 3:12-cr-00040, ECF Nos. [481] and [482] (Dist. Conn. Apr. 10, 15, 2015).

25.   One of National Union's experts, William Morales ("Morales"), was informed by Federal Bureau of Investigation ("FBI") agents in Miami that the criminals "had to have known somebody . . . [i]n the alarm company" in order to carry out the

burglaries in the specific manner in which they occurred. *See* Deposition of William Morales, ECF No. [191-24] ("Morales Deposition") at 188:19-189:18.[9]

26. Utilizing his extensive experience in the field of law enforcement and security, Morales formed his own opinion, concluding that the source of the information utilized to gain entry to the Enfield Facility was someone at the alarm company. *Id.* at 46:3-47:6, 57:18-58:5 ("It is my opinion that the information came from [Tyco].").

27. National Union's physical security expert, Dr. Roger Johnston ("Dr. Johnston"), confirms Morales' assessment, noting that, based on his analysis of the methods used to gain entry to the Facility, the burglars must have been in possession of certain inside information. *See* Deposition of Roger Johnston, ECF No. [177-11] ("Johnston Deposition") at 24:1-26:5, 26:24-29:24.[10]

28. National Union's 30(b)(6) representative, Mark Handy ("Handy") noted that the information at issue was available to Tyco, as well as Eli Lilly itself. *See*

---

[9] Tyco contends that this testimony is inadmissible hearsay that cannot be considered at the summary judgment stage. "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)). However, a district court reviewing a motion for summary judgment may consider the hearsay statement "if the statement *could be* reduced to admissible evidence at trial or reduced to an admissible form," such as, "hav[ing] the hearsay declarant testify directly to the matter at trial." *Id.* (citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)) (emphasis added). Here, Morales specifically identified the individuals he spoke with; therefore, the Court will consider the testimony because it is possible to reduce it to an admissible form at trial. *See* Morales Deposition, ECF No. [191-24] at 188:16-21.

[10] Although Tyco has sought to exclude Dr. Johnston's testimony at trial pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), it nonetheless may be considered at summary judgment.

Deposition of Mark Handy, ECF No. [177-15] ("Handy Deposition") at 63:12-64:24, 112:21-113:20.

29.  Handy was unable to state the extent of the investigator's investigation into Eli Lilly's information storage systems.  *Id.* at 116:21-118:18.[11]

30.  Fred Larsen, Eli Lilly's corporate representative, was able to indicate that Eli Lilly investigated how electronic and hard copy documents were protected physically and electronically.  *See* Larsen Deposition, ECF No. [237-2] at 183:6-18.

31.  Other warehouses throughout the country secured by Tyco were also burglarized by the same group of individuals responsible for the burglary of the Enfield Facility (the "Other Burglaries").  *See* Tyco's Response in Opposition to Motion to Amend, ECF No. [112] at 2 (admitting that Tyco "provided alarm services to [the] burglarized warehouses but denying that this was any indication that a failure to safeguard had occurred); *see also* Amed Villa Criminal Information, ECF No. [191-26] at 3-4 (Eastern District of Virginia), 7-10 (Western District of Kentucky), 13-15 (Middle District of Florida).

32.  Based on the fact that the common denominator was Tyco's security system, as well as additional investigation made in conjunction with law enforcement, National Union concluded that these burglaries were not inside jobs.  *Id.* at 113:21-116:20.

---

[11] Notwithstanding Handy's inability to identify these aspects of the investigation, over objection, Handy stressed that experts were hired to attest to such facts.  *Id.* at 119:13-120:1.

**D.     The Deposition Testimony of Amaury Villa**

33.   On June 11, 2015, the parties obtained the deposition of Defendant Amaury Villa
      ("Amaury") where the following testimony was established.   *See* ECF No. [292]
      (Notice to Court of Amaury Villa's Deposition).

34.   It was Amaury's brother, Defendant Amed Villa ("Amed"), who selected the
      location on the roof where they would enter the Enfield Facility.   *See* ECF No.
      [307-1] ("Amaury Villa Deposition") at 23:17-19.

35.   Once inside, it was again Amed who was responsible for disabling the alarm
      system.   *Id.* at 25:3-19

36.   According to Amaury, there was nothing special about the manner in which they
      entered the Enfield Facility.   *Id.* at 23:23-24:11.   Amed simply peered into the
      warehouse through the hole in the roof and followed the cables to determine where
      the security room was located.   *Id.* at 24:22-25:19, 26:5-18.

37.   In disabling the alarm system, Amed utilized the expertise he had obtained by
      practicing on the alarm system installed on his home.   *Id.* at 14:2-22, 96:18-98:2.

38.   In total contradiction to National Union's assertions, Amaury repeatedly testified
      that no confidential information was utilized in executing the burglary of the
      Enfield Facility.   *See id.* at 8:12-20, 25:25-26:3, 26:13-18, 31:5-11, 100:19-25.

39.   However, Amaury did attest to the fact his cohort and head of the operation, Nunez,
      *may* have had some sort of information:

                 Q:     Did [Nunez] ever tell you that there was an insider
                        who was going to help make this an easy burglary?

                 A:     *Supposedly, because the records of my brother's
                        said that there was a person that was going to give
                        him information from the inside.*

13

*       *       *

Q:     Is it your understanding that [Nunez] may have spoken to your brother about how to break into this warehouse?

A:     It could be.

*       *       *

Q:     And your brother never told you about the information that [Nunez] told him about the insider?

A:     No.

*Id.* at 34:14-20, 35:1-12 (objections omitted and emphasis supplied).[12]

**E.     Mario Santana, the Alleged Informant**

40.     Tyco had a yearly external audit conducted of their security system and it was fully compliant with all Payment Card Industry ("PCI") requirements in the 2009/2010 time frame.  Dennison Deposition, ECF No. [246-8] at 36:12-37:19.

41.     Information regarding Tyco's customer's premises is stored in Tyco's Mastermind Monitoring Application ("Mastermind").  NU SOF, ECF No. [190] at ¶ 51 Tyco Resp. SOF, ECF No. [246] at ¶ 51.

42.     Mastermind could be accessed remotely via laptop and a virtual private network ("VPN") account access.  NU SOF, ECF No. [190] at ¶ 53 Tyco Resp. SOF, ECF No. [246] at ¶ 53.

43.     Until April 30, 2009, the date of his departure from the company, Mario Santana ("Santana"), was a Tyco Area Commercial Sales Manager based in Florida. NU SOF, ECF No. [190] at ¶ 15; Tyco Resp. SOF, ECF No. [246] at ¶ 15.

---

[12] Amaury Villa contradicts this testimony later in the deposition where he notes that he has no knowledge of whether Nunez told his brother that "this was an inside job."  *Id.* at 50:25-51:5.

44.  Santana is related to Marquez, a member of the Miami-based criminal organization responsible for the burglary of the Enfield Facility.   NU SOF, ECF No. [190] at ¶ 14; Tyco Resp. SOF, ECF No. [246] at ¶ 14.

45.  Pursuant to his employment with Tyco, Santana possessed a Tyco issued laptop computer and VPN account access, which permitted him to access Tyco's network from remote locations, including access to various Tyco applications.  NU SOF, ECF No. [190] at ¶ 16; Tyco Resp. SOF, ECF No. [246] at ¶ 16.

46.  According to Santana, upon his departure from Tyco he returned all company-issued materials.  *See* Deposition of Mario Santana, ECF No. [177-17] ("Santana Deposition") at 139:24-140:14.  However, his human resources exit form does not indicate whether Santana returned certain materials, including his laptop and VPN system access token.  *See* Santana Deposition, ECF No. [173-3] at 107:12-108:12.

47.  Generally, during his period of employment, Santana's activity on Tyco's system was nominal; however, in the months leading up to his departure, his activity in the system increased significantly.  *See* Affidavit of Dr. Eric Cole dated March 20, 2015, ECF No. [173-1] ("Mar. 20th Cole Aff.") at ¶¶ 43, 45.[13]

48.  Between March 30, 2009 and April 1, 2009, Tyco's system reflected numerous "reset password" requests for usernames associated with Santana.  *Id.* at ¶¶ 48-60; *see also* Santana Deposition, ECF No. [173-3] at 100:3-19.

---

[13] Tyco contends that the March 20th Cole Affidavit is both untimely and improper.  *See* Tyco Resp. SOF, ECF No. [246] at ¶ 57.  However, while Tyco has sought to strike Cole's April 11, 2015, and April 27, 2015 affidavits, see ECF No. [268], it has not sought to strike the March 20th Affidavit.  Indeed, on May 26, 2015, the Court conducted a hearing with respect to the Cole Affidavits, ultimately holding that Cole's April 11th Affidavit merited striking.  *See* Order, ECF No. [291].

49. On December 11, 2010, after his employment voluntarily terminated, additional "reset password" requests under Santana-affiliated usernames were recorded, presumably indicating that Santana's account remained active well after his departure. Mar. 20th Cole Aff., ECF No. [173-1] at ¶¶ 63-67.

50. Tyco's records reflect a variety of other requests executed by Santana's username. *Id.* at ¶¶ 70, 73. All of the aforementioned entries were submitted from a Tyco identifier of "Fort Lauderdale Florida." *Id.* at ¶ 76.

51. Santana testified that he has no knowledge of these requests and that such requests would be unusual, only occurring as a result of someone repeatedly inputting an incorrect password. Santana Deposition, ECF No. [173-3] at 97:21-100:2, 101:3-102:22.

52. Based on these entries, National Union's expert, Dr. Eric Cole ("Cole"), concluded that Santana continued to access the Tyco network resources "for a considerable time beyond his employment termination." *Id.* at ¶¶ 84-85.

53. Further, Cole opines that any failure to timely delete employee access is "inconsistent with accepted standards of cyber-security." *Id.* at ¶ 87.

54. Notwithstanding Cole's conclusion, Santana testified that he never accessed any information regarding warehouses secured by Tyco and would not have been able to do so in the first place as it was beyond the scope of his territory. Santana Deposition, ECF No. [177-17] at. at 130:2-16, 131:8-134:20.

**F.    Related Litigation**

55. On March 11, 2013, National Union filed a nearly identical action in Connecticut district court, pursuing unfair competition claims under Connecticut law and

16

alleging that the Villas utilized confidential information obtained from Tyco to gain access to the Enfield Facility.   *See National Union Fire Insurance Company of Pittsburgh et al. v. Tyco Integrated Security, LLC*, Case No. 3:13-cv-00329-MPS, ECF No. [1] (D. Conn. Mar. 11, 2013) (the "Connecticut Litigation").

56.   On April 4, 2013, Tyco sought to dismiss the action, asserting, *inter alia*, that National Union's claims were barred under Connecticut's applicable statute of limitations, Conn. Gen. Stat. § 52-584.   *Id.* at ECF No. [19].

57.   Before a responsive memorandum was required, Tyco voluntarily dismissed the Connecticut Litigation, *id.* at ECF No. [28], and filed this action the very same day. *See* Compl., ECF No. [1].

**G.    The Dispute over Damages**

58.   In its Amended Complaint, National Union claims damages in excess of $42,118,354.00 for Counts I (negligence), Count II (failure to safeguard), and Count II (failure to disclose/warn).   *See* Amend. Compl., ECF No. [27] at ¶¶ 111-12, 118-19, 125-26.

59.   In preparation for this litigation, National Union retained Certified Public Accountant and Fraud Examiner Daniel L. Cambal ("Cambal").   *See* Expert Witness Report of Daniel Cambal, ECF No. [183-2] at 7 ("Cambal Report").

60.   In November 2010, Cambal began conferring with Eli Lilly's representatives to discuss the "transfer-in price," or the price to be utilized in calculating the value of the lost inventory.  *See id.* at 15.

17

61. Over the course of many months and after resolving any errors or inconsistencies that arose, Cambal formulated his assessment.  *See* Cambal Depo. Excerpts, ECF No. [245-13] at 132:12-134:1.

62. According to Cambal, Eli Lilly's transfer price system—"a margin for Eli Lilly's products based on the net effective price"—utilizes "advance pricing agreements with each affiliate, local taxing authority and an acceptable profit margin."  Cambal Report, ECF No. [183-2] at 15.

63. The transfer-in price "is the cost to the Enfield [F]acility [] at an arm's length transaction," as verified through Eli Lilly's records and internal accounting systems ("SAP Systems").  *See* Cambal Depo. Excerpts, ECF No. [245-11] at 36:1-23.

64. Based on his review of Eli Lilly's accounting records and other information of Eli Lilly and Company, Cambal calculated a 70.6% net effective price margin, which excluded 24.9% for operating expenses and 4.5% for profit margin.  *See* Cambal Report, ECF No. [183-2] at 15; *see also* Cambal Depo. Excerpts, ECF No. [245-13] at 124:10-12, 124:23-125:25, 126:1-15 (noting that the 29.4% deducted accounts for "the impact of the profit and the cost not associated with the product").

65. In accord with this adjusted value, the transfer-in price, Cambal concluded "that the value of the damage sustained as a result of the burglary of the Enfield distribution warehouse is USD 44,547,910."  *Id.* at 4-6, 8.

66. Cambal's breakdown of the valuation is reproduced below.

| SCHEDULE 1 SUMMARY | |
| --- | --- |
| **DESCRIPTION** | **TOTAL** |
| Stolen Stock | $            41,939,287 |
| Damaged Stock | 2,443,902 |
| **Sub-Total Stock** | **$            44,383,190** |

18

| Building Repairs | $ | 20,097 |
|---|---|---|
| Costs for Physical Inventory | | 2,953 |
| Travel Expense | | 18,590 |
| **Sub-Total Other PD** | **$** | **41,640** |
| **Total Property** | **$** | **44,424,829** |
| Extra Expense | | [Left Blank] |
| Unscheduled Overtime | $ | 14,440 |
| Freight to Customers | | 52,940 |
| Additional Security | | 55,701 |
| **Total Extra Expenses** | **$** | **123,081** |
| **Total** | **$** | **44,547,910** |

67. Based on the transfer-in-price method of valuation, Cambal concludes that the total value of the stolen and damaged inventory is $44,383,190.  *Id.* at 15.

68. Tyco's damages expert, Richard Manning ("Manning"), disagrees with Cambal's valuation, instead concluding that the true replacement cost of the pharmaceuticals is simply the manufacturing cost.  *See* Manning Depo. Excerpts, ECF No. [179-1] at 69:3-19.

69. Manning states that Cambal's valuation improperly includes profit margins and implicitly assumes that the theft resulted in lost sales.  *See* Expert Report of Richard L. Manning, ECF No. [158-4] ("Manning Report") at 5-6, 10-12.   Therefore, according to Manning, the proper valuation is the standard cost of manufacturing the products at issue.  *Id.* at 12.

70. Applying this calculation, Manning surmises that the appropriate economic loss for Eli Lilly totals $4,109,396 for stolen products, and $257,165 for damaged products.  *Id.*  Thus, Manning's total estimated economic damage is $4,366,561.  *Id.*

### III. SUMMARY JUDGMENT STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The parties may support their positions by citation to the record, including inter alia, depositions, documents, affidavits, or declarations.  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).  The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252. Further, the Court does not weigh conflicting evidence.  *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  Accordingly, the non-moving party must produce evidence, going beyond the

pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

In resolving issues presented under Fed. R. Civ. P. 56(c), "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993))).

In particular, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment

21

where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, 2013 WL 5596114, at \*4 (S.D. Fla. Oct.11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

## IV. DISCUSSION

A multitude of issues are presented by the parties' respective Motions and while each individual issue contains a variety of sub-issues, five primary matters are presented for the Court's resolution: (1) whether Connecticut or Florida law governs the claims; (2) whether the claims are barred by the subrogation waiver located in the contract between Eli Lilly and Tyco; (3) whether National Union has properly demonstrated the element of causation with respect to its claims sounding in negligence; (4) whether the "transfer-in price" is the appropriate measure of damages in this case; and (5) whether National Union has presented evidence as to each element of its claim under FDUTPA.  The Court addresses each issue in turn.

### A.      Florida Law Applies to National Union's Claims

"In determining which law applies, a federal district court sitting in diversity must apply the choice of law rules of the forum state."  *Trumpet Vine Investments, N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007)).  This action was commenced in the Southern District of Florida.  As such, Florida's choice-of-law rules apply.

As a preliminary matter, a district court engaged in a choice of law analysis must determine which sovereigns have an interest in the application of their laws.  *Pycsa Panama, S.A. v. Tensar Earth Technologies, Inc.*, 625 F. Supp. 2d 1198, 1218 (S.D. Fla. 2008) *aff'd*, 329 F. App'x 257 (11th Cir. 2009) (citing *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1568 (11th Cir.

1990)).  This inquiry is critical as a comprehensive choice of law analysis is only required if the matter involves a true conflict.  *Id.* (citing *Tune v. Philip Morris, Inc.*, 766 So. 2d 350, 352 (Fla. 2d DCA 2000)).  A true conflict exists where "two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result."  *Id.* (citing *Walker v. Paradise Hotel, Ltd.*, No. 01–3564, 2003 WL 21361662, *2-3 (S.D. Fla. April 25, 2003); *see also Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 (11th Cir. 1995) (noting the principle that "when the laws of the competing states are substantially similar, the court should avoid the conflicts question and simply decide the issue under the law of each of the interested states").  Alternatively, a false conflict is presented "where the laws of the interested jurisdictions are: (1) the same; (2) different but would produce the same outcome under the facts of the case; or (3) when the policies of one jurisdiction would be furthered by the application of its laws while the policies of the other jurisdiction would not be advanced by the application of its laws."  *Pycsa*, 625 F. Supp. 2d at 1218-19 (citing *Tune*, 766 So. 2d at 352).  The interested sovereigns are Florida and Connecticut and, as evidenced by the parties' submissions, a true conflict exists as Connecticut's statute of limitations will bar National Union's claims.  *See* Tyco MSJ, ECF No. [176] at 2, 4, 7-9 (citing Conn. Gen. Stat. § 52-584).[14]

A district court presented with a choice of law dispute characterizes the legal issue before it, determining whether the issue sounds in tort, contracts, property law, etc.  *Telemundo*, 485 F.3d at 1240.  National Union's claims for failure to safeguard undoubtedly sound in tort.  In the

---

[14] If there were any questions as to whether Conn. Gen. Stat. § 52-584 would bar National Union's claims in the Connecticut Litigation, such questions have been resolved here.  While there may have been a dispute over when the statute of limitations clock began to tick, it is undisputed that the latest it could have begun was March 13-14, 2010, i.e. the date of the burglary.  Because National Union commenced this action on April 16, 2013, the limitation period under Conn. Gen. Stat. § 52-584 has expired.

context of tort actions, "Florida resolves conflict-of-laws questions according to the 'most significant relationship' test outlined in the Restatement (Second) of Conflict of Laws." *Id.* (citing *Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980)); *Pycsa*, 625 F. Supp. 2d at 1218 ("In tort cases, Florida applies the 'significant relationship' test delineated in § 145 of the Restatement (Second) of Conflict of Laws."). "The test involves consideration of several factors to determine which state has the most contacts with the action or the greatest interest in the outcome." *Nelson v. Freightliner, LLC*, 154 F. App'x 98, 102 (11th Cir. 2005). The four relevant contacts to be considered are:

> (a)  The place where the injury occurred.
> (b)  The place where the conduct causing the injury occurred.
> (c)  The domicile, residence, nationality, place of incorporation and place of business of the parties.
> (d)  The place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2) (1971). Further, § 145 provides that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* The contacts are then assessed in light of the following policy considerations:

> (a)  The needs of the interstate and international systems.
> (b)  The relevant policies of the forum.
> (c)  The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue.
> (d)  The protection of justified expectations.
> (e)  The basic policies underlying the particular field of law.
> (f)  Certainty, predictability and uniformity of result.
> (g)  Ease in the determination and application of the law to be applied.

*Id.* § 6(2). Florida courts have recognized that the protection of justified expectations and predictability play little role in the choice of law analysis in tort cases. *Pycsa*, 625 F. Supp. 2d at 1219 (citation omitted). Nevertheless, in conducting this analysis, the district court must not "simply add up the factors delineated in section 145(2) and then apply the law of the sovereign

24

with the greatest numerical total." *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1298-99 (11th Cir. 1999) (quoting *Judge*, 908 F.2d at 1569).  "Rather, [the district court] must . . . turn to the factors delineated in [§] 6 to determine which sovereign has the most significant contact." *Id.* (citation omitted).

Generally, in tort cases, the location where the injury occurred is "the decisive consideration in determining the applicable choice of law." *Pycsa*, 625 F. Supp. 2d at 1219-20 (citing *Bishop*, 389 So. 2d at 1001).  "[T]he place of injury is of particular importance in the case of personal injuries and of injuries to tangible things."  Restatement (Second) of Conflict of Laws § 145 cmnt. f (citing Restatement (Second) of Conflict of Laws § 147 (1971) (further citation omitted)).  However, as recognized by the Court in *Pycsa*, "it is equally true that the state where the injury occurred may have little actual significance for the cause of action, and [] other factors may combine to outweigh the place of injury as a controlling consideration." *Id.* (internal quotation, citation, and formatting omitted).  Indeed, "[w]hen the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law."  Restatement (Second) of Conflict of Laws § 145 cmnt. f; *Howard v. Kerzner Int'l Ltd.*, No. 12-22184-CIV, 2014 WL 714787, at *3 (S.D. Fla. Feb. 24, 2014) ("[I] t is equally true that Florida courts do not apply the law of the state where the injury occurred if all parties and several significant events are connected with another state.").

According to Tyco, the injury that was suffered as a result of the alleged negligence was the burglary of the Enfield Facility.  *See* Tyco MSJ, ECF No. [176] at 5.  Tyco further asserts that while National Union's claims are premised upon a failure to safeguard confidential

information, the relief sought exposes National Union's true intentions: to recover the amount of $42,118,354.00 stemming from the theft.  Thus, Tyco contends, National Union does not seek redress for the injury of lost privacy but, rather, seeks damages for the lost property occurring in Connecticut and, therefore, the Court should treat the injury as having occurred in Connecticut. National Union frames the injury differently, instead focusing on the cause of action and the related allegations to determine that the injury was not, in fact, the burglary but, rather, the exposure of confidential information regarding the vulnerabilities of the Enfield Facility.  *See* Nat'l Union Resp., ECF No. [242] at 3; *see also* Nat'l Union MSJ, ECF No. [189] at 7. Consequently, because Tyco is headquartered in Florida, maintains a computer network in Florida, and the purported theft of confidential information was committed by an affiliated group of individuals based in Florida,  National Union asserts that Florida is the appropriate law to be applied.  *See* Nat'l Union Resp. SOF, ECF No. [245] at ¶¶ 55, 63, 64, 95, 97-114.

While Tyco's construction is a reasonable one, it is unpersuasive.  The injury must be examined in the context of National Union's claims.  Although brief in its presentation, National Union's assessment of this issue is persuasive.[15]

National Union's cause of action does not bear a substantial relationship to Connecticut. Rather, the alleged failures and the resulting injury occurred elsewhere.  The Villas and their criminal affiliates operate out of Florida and Tyco's pertinent departments are located in Florida. It is reasonable to assume that any acquisition of confidential information occurred in Florida. The fact that National Union may be unable to discern precisely where and when the confidential information was obtained is of no consequence.  Tyco cannot demonstrate that the injury, to wit,

---

[15] National Union's initial argument contained within its Motion for Summary Judgment and Response in Opposition to Tyco's Motion for Summary Judgment encompasses a mere one and a half pages in addressing this case-dispositive issue.

Tyco's supposed failure to safeguard confidential information, transpired in Connecticut.  Tyco is headquartered in Florida, maintains computer servers in Florida, and a substantial portion of Tyco's IT and cybersecurity operations are based in Florida.  These facts indicate that, more likely than not, Tyco's failure to safeguard the information is an event that took place in Florida. Accordingly, the particular issue tort at issue did not occur in Connecticut.  Although the harm resulting from the injury manifested in Connecticut, the asserted cause of action and theory of liability did not.  As presented in the context of this case, the injury is not the theft of pharmaceuticals but, rather, the lost confidential information.[16]

Continuing to assert that National Union's injury materialized in Connecticut, Tyco directs the Court to various cases throughout the United States involving questions of standing in the context of data privacy breaches.  *See* Reply, ECF No. [265] at 3-4.  Curiously, Tyco maintains that the fact that no injury has occurred without the misuse of the stolen data is "established data privacy law." *Id.*  A quick perusal of the relevant case law on data privacy reveals that courts have differed substantially on their interpretation of whether the mere theft of confidential information can confer standing upon a plaintiff.  For instance, both the Ninth and Seventh Circuits have held that the threat of injury stemming from the release of data may satisfy standing.  *See Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1142-43 (9th Cir. 2010) ("Appellants have alleged a credible threat of real and immediate harm stemming from the theft of a laptop containing their unencrypted personal data. . . .  On these facts, [] Plaintiffs–Appellants have sufficiently alleged an injury-in-fact for purposes of Article III standing."); *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007) ("[T]he injury-in-fact requirement can be satisfied

---

[16] The Court emphasizes that this determination is not premised solely on the fact that Tyco maintains its headquarters in Boca Raton, Florida.  Indeed, situations may arise where the data breach and negligence related thereto arises in a state distinct from the one in which the business is headquartered.  However, such is not the case here.

by a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions.").  On the other hand, certain courts have required actual injury in order to satisfy the constitutional standing requirement.  *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 44-46 (3d Cir. 2011) (criticizing *Pisciotta*'s "skimpy rationale" and finding that "[i]n data breach cases where no misuse is alleged, [] there has been no injury"); *Galaria v. Nationwide Mut. Ins. Co.*, 998 F. Supp. 2d 646, 653-5 (S.D. Ohio 2014) (determining that injury from theft of personally identifiable information such as names and social security numbers was speculative at best); *Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871, 876-77 (N.D. Ill. 2014) (finding that data breach did not satisfy injury-in-fact requirement and could not support a finding of "imminent" risk of harm).  Of note is the Eleventh Circuit's reticence on the issue: the Eleventh Circuit has yet to address whether a plaintiff must specifically articulate an actual, past injury in order to satisfy standing in the context of data breaches or whether the potential for future harm meets this burden.  *See Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1323 n.1 (11th Cir. 2012) (recognizing that the Ninth and Seventh Circuits have found that the threat of future identity theft is sufficient to confer standing but declining to address "the issue of whether speculative identity theft would be sufficient to confer standing"); *Burton v. MAPCO Exp., Inc.*, 47 F. Supp. 3d 1279, 1283 (N.D. Ala. 2014) (noting that "[t]o date, the Eleventh Circuit Court of Appeals has not weighed in on the extent of the injury that a consumer who is a purported victim of a data breach must allege to survive a motion to dismiss based on lack of standing").  Absent guidance from this Court's governing Circuit, it is unclear as to whether Eli Lilly[17] could maintain an action for the purported breach without suffering physical damages.  Given this lack of clarity, the

---

[17] The injury in this hypothetical would be to Eli Lilly, not National Union.

authority requiring actual injury in order to confer standing in the case of a data breach is not determinative of where the injury took place in this litigation.  What is determinative is where the alleged tort occurred.  Here, that place is not Connecticut.[18]

Tyco essentially attempts to have its cake and eat it too.  In asserting that National Union's claims are barred pursuant to the Connecticut statute of limitations, Tyco has repeatedly argued throughout the course of this litigation that the basis of National Union's claims, to wit, the failure to safeguard information, must have occurred prior to the March 13, 2010 burglary.  *See, e.g.,* ECF No. [32] at 8; Tyco MSJ, ECF No. [176] at 8 ("[A]ny alleged failure to warn or the disclosure of confidential information necessarily would have had to occur *before* the burglary on March 14, 2010." (emphasis in original)).  The dissonance between this assertion and the one advanced by Tyco's argument relating to the current inquiry is evident: if the cause of action arose prior to the burglary, then the fact that the burglary occurred in Connecticut is of little consequence; the event giving rise to the claims asserted against Tyco does not stem from the incident occurring in Connecticut but, rather, events, errors and omissions occurring *prior to* the burglary.  Admittedly, it was not until the burglary took place that National Union, as subrogee for Eli Lilly, became aware of the potential breach.  The burglary was the catalyst for National Union to investigate the alleged security breaches.

Given the fact that the Villas' criminal activity and Tyco's cybersecurity operations were based in Florida, and provided that the stolen information was likely obtained in Florida, more

---

[18] Tyco's assertion that National Union would not have commenced this expensive litigation absent the theft of the Enfield Facility is immaterial.  While this assertion certainly holds water— National Union, as the insurer, would have no interest in the confidential information obtained until the release of such confidential information resulted in its obligation to pay for inventory it insured.  It is, nevertheless, irrelevant as the theft did occur and National Union has suffered damages as a result of the alleged breach.

likely than not, Florida is the site of the injury alleged.[19]  National Union has not sued Tyco for the theft of physical inventory but, instead, has elected to pursue this litigation as a result of the purported theft of information and related negligence.  For these reasons, the first factor under § 145 does not weigh in favor of applying Connecticut law.

Even accepting that the injury occurred in Connecticut, the Restatement notes that "[w]hen the injury occurred in two or more states" or "with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law."  *See* Restatement (Second) of Conflict of Laws § 145 cmnt. f; *see generally Pycsa*, 625 F. Supp. 2d at 1220-21 (noting the Eleventh Circuit's emphasis on the commentary to § 145 in *Telemundo*, 485 F.3d at 1240).  None of the purported conduct alleged by National Union occurred in Connecticut.  While Tyco may ultimately dispute the accusations made and conclusions reached by National Union in both its Amended Complaint and present Motion,[20] it has, nonetheless, been demonstrated that Tyco's IT and cybersecurity headquarters are located in Florida.  Any failure involving those departments, therefore, is likely to have occurred in Florida.  Thus, the second factor pertaining to conduct also signifies that Florida is the appropriate law to be

---

[19]  As evidence of this case's connection to Connecticut, Tyco directs the Court to the Connecticut Litigation, asserting that the filing of the present action is indicative of National Union's gamesmanship utilized to avoid the Connecticut statute of limitations.  Undoubtedly, the fact that National Union first pursued this action in the District of Connecticut exposes this matter's relationship to Connecticut.  Further, it is undisputed that this case relates to events that transpired in Connecticut.  However, this fact does not demonstrate that National Union's decision was motivated by a fear of a statute of limitations bar and the Court declines to infer that National Union was engaged in "forum shopping" on such tenuous grounds.

[20]  Tyco disputes the validity of National Union's assertions with respect to any security breach, contending that no record evidence exists indicating that the Villas were able to obtain confidential information from Tyco, let alone from any of Tyco's operations in Florida. Nevertheless, based on the fact that Tyco maintains its IT and cybersecurity presence in Florida, it is more likely that any alleged breach occurred in this state.

applied.   As noted, the Villas and their associates operated out of Florida to effectuate the burglary and were allegedly able to obtain confidential information from Tyco in Florida.   Tyco has failed to introduce any evidence that the conduct giving rise to the tort in this case bears a substantial relationship to Connecticut.   While the physical installation and maintenance of the security system for the Enfield Facility was conducted in Connecticut, any conduct relating to the data was not.

The third factor does not assist the Court in its analysis as the locations of the respective parties are diverse and neither is incorporated in either Florida or Connecticut.   *See Digioia v. H. Koch & Sons, Div. of Wickes Mfg. Co.*, 944 F.2d 809, 813 (11th Cir. 1991) ("[T]he domicil of the parties is inconclusive because both states have interest in the litigation.").   However, Florida maintains an interest in the efficient and just administration of claims against its residents.   Tyco maintains its headquarters and a significant portion of its relevant operations in Florida. Accordingly, this factor favors the application of Florida law, but only slightly.

Unquestionably, the fourth and final factor favors the application of Connecticut law. This factor requires the Court to factor in the location of the parties' relationship.   National Union incorrectly assumes that the central location of the relationship between the parties is Boca Raton, Florida, simply by virtue of the fact that Tyco's relevant business operations are headquartered there.   Under the current record, it is apparent that no negotiations between Tyco and Eli Lilly transpired in Florida.   The Contract was executed by a Connecticut affiliate of Tyco with Eli Lilly in Connecticut, see ECF No. [245-2], and National Union has introduced no evidence indicating that negotiations for said contract took place in Florida.   Moreover, the installation and maintenance of the security equipment, including the survey of the Enfield Facility leading to the creation of the 2010 Confidential System Proposal, was conducted in

Connecticut.   Nevertheless, this single factor is insufficient to overcome the aforementioned contacts with Florida.

As previously noted, consideration of the § 145 contacts must be assessed in light of the competing policy considerations set forth in § 6 of the Restatement.  *See Telemundo*, 485 F.3d at 1240-43.  These "factors are not listed in order of relative importance."  *Id.* at 1243.  Although the robbery occurred in Connecticut, it has no interest in protecting the Plaintiff in this matter as both Eli Lilly and National Union are not citizens of Connecticut.  Florida maintains an interest in claims pursued against its corporate residents stemming from injuries sustained by others within the state.  Yet Connecticut has little to no interest in the administration of claims against non-residents arising out of conduct not occurring in the state.  Tortfeasors are subjected to the laws of the state in which the tort was committed, which, in the present case, is Florida. Accordingly, the policy considerations underlying the choice of law analysis do not favor the application of Connecticut law.   *See* Restatement (Second) of Conflict of Laws § 145 cmnt. b (1971) (noting that "the needs of the interstate and international systems, the relevant policies of the forum, the relevant policies of other interested states and particularly of the state with the dominant interest in the determination of the particular issue, and ease in the determination and application of the law to be applied" are the relevant factors for tort cases).

In sum, analysis of the § 145 contacts indicates that Florida law, not Connecticut law, should be applied to National Union's claims.  After evaluating the four contacts set forth in § 145(2), allocating proper weight to "their relative importance with respect to the particular issue," and in consideration of the factors under § 6(2), the Court finds that Florida bears the most substantial relationship to the issues presented in this case.  *See* Restatement (Second) of Conflict of Laws § 145; *see also Bishop*, 389 So. 2d at 1001 ("In contrast to the inflexible place

32

of injury rule, however, the Restatement rule recognizes that the state where the injury occurred may have little actual significance for the cause of action."). Because the Court has determined that the substantial relationship test does not favor the application of Connecticut law, Fla. Stat. § 95.10 does not preclude this litigation. *See Celotex Corp. v. Meehan*, 523 So. 2d 141, 143-44 (Fla. 1988) (finding that due regard must be given to the significant relationship test under Restatement (Second) of Conflict of Laws § 145).[21]

**B.    The Subrogation Waiver in the 2004 Contract Does Not Bar this Action**

An insurer may pursue recovery from third persons legally responsible to the insured for a loss which the insurer has both insured and paid. *See St. Paul Fire & Marine Ins. Co. v. Lexington Ins. Co*., No. 05-80230-CIV, 2006 WL 1295408, at *6 (S.D. Fla. Apr. 4, 2006) (citing *Phoenix Ins. Co. v Fla. Farm Bureau Mut. Ins. Co.*, 558 So. 2d 1048 (Fla. 2d DCA 1990); *Ranger Ins. Co. v. Travelers Indem. Co.*, 389 So. 2d 272 (Fla. 1st DCA 1980)). However, an insured may waive its right of subrogation through contract, and the scope and application of such waivers, if unambiguous, is properly determined on summary judgment. *See Fairchild for Use & Benefit of State Farm Fire & Cas. Co. v. W. O. Taylor Commercial Refrigeration & Elec. Co.*, 403 So. 2d 1119, 1120 (Fla. 5th DCA 1981) ("It is well established that parties to a contract may mutually agree that one party will obtain insurance as part of the bargain, to shift the risk of loss from both of them to the insurance carrier."); *see also Ben-Yishay v. Mastercraft Dev. LLC*, 553 F. Supp. 2d 1360, 1373 (S.D. Fla. 2008) ("Interpretation of a clear and unambiguous

---

[21] The Florida borrowing statute, § 95.10, Florida Statutes, states that "[w]hen the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state."  The Florida Supreme Court has noted that "[t]he purpose of the statute is to discourage 'forum shopping' and the filing of lawsuits in Florida that have already been barred in the jurisdiction where the cause of action arose." *Celotex*, 523 So. 2d at 143.

contractual provision is a question of law properly decided on summary judgment.").  Here,

Tyco contends that: "[b]ecause there are no claims that would negate the formation of the [2004]

Contract, or evidence supporting a claim that would invalidate the [2004] Contract, and because

the [2004] Contract's waiver of subrogation provision is broad enough to include extra-

contractual claims, the subrogation waiver applies and precludes National Union from pursuing

this lawsuit."  Tyco MSJ, ECF No. [176] at 10-11.

The 2004 Contract's Subrogation Waiver is exceedingly broad, stating that Eli Lilly has

agreed to waive *all* recovery rights for injuries or loss by way of subrogation.  *See* 2004

Contract, ECF No. [245-2] at 3, 6, 10.  In its pertinent part, the Subrogation Waiver reads as

follows:

> IT IS UNDERSTOOD THAT [TYCO] IS NOT AN INSURER,
> THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE
> CUSTOMER AND THAT THE AMOUNTS PAYABLE TO
> [Tyco] HEREUNDER ARE BASED UPON THE VALUE OF
> THE SERVICES AND THE SCOPE OF LIABILITY AS
> HEREIN SET FORTH AND ARE UNRELATED TO THE
> VALUE OF CUSTOMER'S PROPERTY OR PROPERTY OF
> OTHERS LOCATED IN THE CUSTOMER'S PREMISES.
> CUSTOMER AGREES TO LOOK EXCLUSIVELY TO
> CUSTOMER'S INSURER TO RECOVER FOR INJURIES OR
> DAMAGE IN THE EVENT OF ANY LOSS OR INJURY AND
> RELEASES AND WAIVES ALL RIGHT OF RECOVERY
> AGAINST [TYCO] ARISING BY WAY OF SUBROGATION.
> [TYCO]   MAKES   NO   GURANTY   OR   WARRANTY,
> INCLUDING   ANY   IMPLIED   WARRANTY   OF
> MERCHANTABILITY OR FITNESS, THAT THE SYSTEM OR
> SERVICES   SUPPLIED   WILL   AVERT   OR   PREVENT
> OCCURRENCES OR THE CONSEQUENCES THEREFROM,
> WHICH THE SYSTEM OR SERVICE IS DESIGNED TO
> DETECT, . . . .  THE CUSTOMER DOES NOT DESIRE THIS
> CONTRACT TO PROVIDE FOR FULL LIABILITY OF [TYCO]
> AND AGREES THAT [TYCO] SHALL BE EXEMPT FROM
> LIABILITY FOR LOSS, DAMAGE, OR INJURY DUE
> DIRECTLY   OR   INDIRECTLY   TO   OCCURRENCES   OR
> CONSEQUENCES THEREFROM, WHICH THE SERVICE OR
> SYSTEM IS DESIGNED TO DETECT OR AVERT; THAT IF

[TYCO] SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE, OR INJURY DUE TO FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED . . . . THIS PARAGRAPH SHALL APPLY IF LOSS, DAMAGE OR INJURY, IRRESPECTIVE OF CAUSE OR ORIGIN, RESULTS DIRECTLY OR INDIRECTLY TO PERSON OR PROPERTY FROM PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS IMPOSED BY THIS CONTRACT OR FROM NEGLIGENCE, ACTIVE OR OTHERWISE, STRICT LIABILITY, VIOLATION OF ANY APPLICABLE CONSUMER PROTECTION LAW OR ANY OTHER ALLEGED FAULT ON THE PARTY OF [Tyco], ITS AGENTS OR EMPLOYEES . . . .

*Id.* This Waiver, Tyco contends, bars National Union's claims because the 2004 Contract is valid[22] and, more critically, the language of the Subrogation Waiver is broad enough to include National Union's claims predicated on Tyco's purported negligence. *See* Tyco MSJ, ECF No. [176] at 9-12. Yet this is not the first time the scope of this contractual language has been subjected to the Court's interpretation.

On March 4, 2014, the Honorable Kenneth A. Marra, United States District Judge, issued an Opinion and Order ("Opinion") on Tyco's Motion to Dismiss, ECF No. [32] ("Tyco MTD").[23] *Eli Lilly & Co. ex rel. Nat'l. Union Fire Ins. Co. of Pittsburgh, Pa. v. Tyco Integrated Sec., LLC*, No. 13-80371-CIV, 2014 WL 835766 (S.D. Fla. Mar. 4, 2014). Among other issues, Judge Marra addressed an argument similar to the one currently presented, namely, that the Subrogation Waiver applies as a bar to all of National Union's claims. *See* Tyco MTD, ECF No. [32] at 12-13 ("Because the damages National Union seeks to recover in this lawsuit—loss of inventory and property damages resulting from a burglary at the Connecticut Warehouse where

---

[22] National Union disputes whether the 2004 Contract was in effect at the time of the burglary. *See* Amend. Compl., ECF No. [27] at ¶ 54.

[23] This case was transferred to the undersigned on June 30, 2014. *See* Order Reassigning Case, ECF No. [88].

Tyco[] installed and monitored a security alarm system—are precisely those damages agreed to allocate to its insurer, the Court should dismiss National Union's complaint with prejudice."); Tyco MTD Reply, ECF No. [49] at 3-4 (same).  Ultimately, Judge Marra determined that the Subrogation Waiver would not preclude National Union's claims which did not arise from the 2004 Contract.  *Eli Lilly*, 2014 WL 835766 at *5.  Now, Tyco contends, because Judge Marra dismissed National Union's fraud-based claims, application of the Subrogation Waiver is ripe for re-adjudication.  *See* Tyco MSJ, ECF No. [176] at 9.

Tyco puts forth the unpersuasive assertion that Judge Marra's holding was limited as he was required to accept National Union's allegations as true and was otherwise unable to address the evidentiary merit of National Union's claims.  *See id.*  Thus, Tyco contends, because National Union's claims which would potentially invalidate the 2004 Contract, specifically those sounding in fraud, have been dismissed, the Subrogation Waiver is valid and enforceable.  *Id.* This contention misses the mark.  The holding regarding Tyco's Motion to Dismiss was explicit, and while Judge Marra was required to accept all well-pled allegations as true, that acceptance does not negate the fact that his decision found the Subrogation Waiver to be inapplicable to National Union's *extra-contractual claims*:

> Among other arguments in response, [National Union] states that this contractual language has no effect upon conduct that is an independent tort [].  The Court agrees.  The contracts between Eli Lilly and Tyco[] relate to the installation of various security equipment and monitoring relative thereto.  *The allegations in the Amended Complaint relate to [Tyco's] alleged failure to protect confidential information it acquired in connection with the proposal it prepared to do future work for Eli Lilly; [Tyco's] alleged failure to warn Eli Lilly about the other invasions; and [Tyco's] alleged misrepresentations relative thereto.  None of these relate to the contracts containing the anti-subrogation provision.*  The anti-subrogation clause in the contract does not, therefore, preclude the instant action.

36

*Eli Lilly*, 2014 WL 835766 at *5 (emphasis added). Therefore, Judge Marra's decision was not predicated on the 2004 Contract's validity and the decision to dismiss National Union's fraud-based claims was immaterial to the determination regarding the applicability of the Subrogation Waiver. *See id.* at *5, 7. Rather, Judge Marra ascertained that National Union's claims pursued under a theory of negligence existed independent of the 2004 Contract. *See id.*

Nothing in Judge Marra's Opinion indicates that the decision was bound by the fact that National Union's fraud claims may have affected the validity of the 2004 Contract. The decision expresses that National Union's claims sounding in negligence exist independent of the 2004 Contract. *See id.* at *5. Indeed, Judge Marra noted that in light of the fact that National Union's negligence claims were separate and distinct from the 2004 Contract, he declined to address whether the 2004 Contract was in effect at the time of the burglary. *Id.* at *5 n.6. This finding conforms to Florida law, which recognizes that tort claims may exist independently from contractual claims.[24] *See U.S. Fire Ins. Co. v. ADT Sec. Servs., Inc.*, 134 So. 3d 477, 480 (Fla. 2d DCA 2013), *reh'g denied* (Jan. 22, 2014), *review denied*, 151 So. 3d 1223 (Fla. 2014) (citing *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996); *Cowley v. Nero*, 693 So. 2d 120, 121 (Fla. 2d DCA 1997)). Accordingly, Judge Marra's determination soundly applies despite the modified posture of this case. The claims pursued by National Union do not relate to the provision of security services or any related obligations, but instead focus on extra-contractual events, namely, the failure to safeguard confidential information and the failure to disclose prior incidents. These occurrences and alleged failures exist independent of the 2004

---

[24] As noted in Judge Marra's Opinion, Connecticut law recognizes the same. *Eli Lilly*, 2014 WL 835766, at *5 n.5 (citing *Greenwich Interiors, LLC v. DCM Sys., LLC*, No. FSTCV085009200S, 2009 WL 765529 (Conn. Super. Ct. Feb. 25, 2009)). Having determined that Florida law applies, Connecticut's interpretation of the interplay between tort and contract law is inconsequential.

Contract.  *See id.* (finding negligent misrepresentation to be "independent of any breach of contract") (citations omitted).

Irrespective of Judge Marra's persuasion, the Court nonetheless finds that the current action exists independent of the 2004 Contract.  *See Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2014 WL 5474048, at *5 (S.D. Fla. Apr. 10, 2014) (noting that a court, "at its discretion, [] [] has the power to revisit prior decisions of its own" and that the Supreme Court "has described the law of the case doctrine as one that 'applies as much to the decisions of a coordinate court in the same case as to a court's own decisions.'" (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)); *Compania de Elaborados de Cafe v. Cardinal Capital Mgmt., Inc.*, 401 F. Supp. 2d 1270, 1285 (S.D. Fla. 2003) (stating that a district court need not strictly adhere to its earlier rulings).  The 2004 Contract provides for the installation, maintenance, and monitoring of a variety of security measures, including but not limited to, motion sensors, cameras, intercom systems, and other equipment.  The 2004 Contract does not contemplate, however, any obligation on the part of Tyco to provide security updates as contained in the 2010 Confidential System Proposal, nor does it provide for Tyco's obligation or duty to maintain the confidentiality of the information obtained in relation to the 2010 Confidential System Proposal or other related surveys.  "[I]t is [] well established that a limitation of liability for one's negligent acts will not be inferred unless the intention is expressed in unequivocal terms."  *Fairchild*, 403 So. 2d at 1120 (citation omitted).[25]  While the 2004 Contract may have waived any right to pursue a negligence action, such action was limited to negligence within the scope of the 2004 Contract, specifically, negligence related to the

---

[25] Factually, *Fairchild* is inapposite.  The contract language in *Fairchild* was simplistic and failed to explicitly disclaim any potential negligence, simply stating that the '[o]wner [was] to carry fire, tornado, and other necessary insurance."  *Fairchild*, 403 So. 2d at 1120.

38

provision of the specific security services as elucidated in the agreement.  Here, the negligence relates not to the supplying of security equipment or services, but unrelated tortious conduct: the failure to safeguard confidential information obtained by virtue of a separate and distinct system proposal.  Indeed, Tyco implicitly accepts the fact that National Union's claims extend beyond the 2004 Contract by asserting that the Subrogation Waiver applies to actions not based on the 2004 Contract.  *See* Tyco MSJ, ECF No. [176] at 12 ("The waiver is not limited to subrogation actions not based on the Contract; in fact the Contract makes clear that the provision is much broader, applying to: loss, damage or injury . . . from negligence . . . or any other alleged fault on the part of [Tyco].").[26]  The Court finds no reason to extend the provisions of the 2004 Contract to occurrences and events outside the scope of the agreement itself.

Furthermore, it is unclear as to whether the 2010 Confidential System Proposal was intended to be an amendment or rider to the parties' 2004 Contract or an entirely new agreement. If the 2010 Confidential System Proposal was to be a new agreement between the parties, it cannot reasonably be said that the Subrogation Waiver, found within the 2004 Contract, was intended to cover claims arising from a failure related to an entirely separate contract.  This issue of fact presents yet another reason why the Subrogation Waiver must be found inapplicable.

---

[26]  Tyco contends that National Union has conceded an important point, that the 2010 Confidential System Proposal was a product of the 2004 Contract.  *See* Tyco Reply, ECF No. [265] at 6-7.  In their responsive Statement of Facts, National Union notes that "[o]ver the years the equipment and designs were modified, equipment was removed and other proposed equipment was installed."  NU Resp. SOF, ECF No. [245] at ¶ 1.  The Court fails to see how this in any way amounts to a concession that the Subrogation Waiver is applicable.  Certainly an inference may be drawn that the 2010 Confidential System Proposal was a product of Tyco's seemingly continuous modification to the Enfield Facility's security system, but such an inference would be improper at this stage of the litigation.  *See Davis*, 451 F.3d at 763 (district court reviewing summary judgment motion draws all reasonable inferences in the non-moving party's favor).

In continued support of its proposition that the Subrogation Waiver applies to National Union's negligence claims, Tyco cites to a variety of out of circuit precedent where subrogation waivers have been enforced against extra-contractual claims.  *See* Tyco MSJ, ECF No. [176] at 11.  While the Court has no indication as to whether the Eleventh Circuit would deviate from the cited precedent, these cases do not necessarily warrant the conclusion Tyco implores the Court to reach.  For instance, the waiver in *Travelers Indem. Co. v. Crown Corr, Inc.*, 589 Fed. App'x 828 (9th Cir. 2014), much like the one in this matter, was exceedingly broad and was, at first blush, applicable to all loss covered by any relevant insurance policy:

> The Parties waive subrogation against one another, the Design/Builder, Design Consultants, Subcontractors, and their respective agents and employees on all property and consequential loss policies that may be carried by any of them on adjacent properties and under property and consequential loss policies purchased for the Facility.

*Id.* at 830.  Applying Arizona law, the Ninth Circuit held that a valid subrogation waiver will encompass related tort claims.  *See id.* at 832-33.  Not only was the *Travelers* Court applying the law of a distinct state, but Tyco has not presented precedent that Florida shares Arizona's view with respect to the breadth and applicability of subrogation clauses.  Similarly, *Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp.*, 868 A.2d 220 (Me. 2005), involves a Maine court, applying Maine law.  No indication is provided as to whether Florida or the Eleventh Circuit would follow *Reliance* in finding that "public policy favors enforcement of waivers of subrogation even in the face of claims of gross negligence or willful and wanton misconduct." *Id.* at 227.  Indeed, the *Reliance* court acknowledged that courts are divided as to whether waivers of subrogation can bar negligence claims, specifically, gross negligence.  *Id.* at 226 (citing *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 317 F. Supp. 2d 336, 341 (S.D.N.Y. 2004) *aff'd as modified sub nom. St. Paul Fire & Marine Ins. Co. v. Universal*

*Builders Supply*, 409 F.3d 73 (2d Cir. 2005) (subrogation waiver applies to claims of gross

negligence); *Behr v. Hook*, 787 A.2d 499, 504 (2001) (same); *Am. Motorist Ins. Co. v. Morris

Goldman Real Estate Corp.*, 277 F. Supp. 2d 304, 308 (S.D.N.Y. 2003) (subrogation waiver does

not bar claim of gross negligence); *Colonial Properties Realty Ltd. P'ship v. Lowder Const. Co.*,

567 S.E.2d 389, 394 (2002) ("First, [plaintiff] argues that the subrogation clause cannot

exculpate [defendant] for acts of gross negligence.  That is correct.") (further citations omitted)).

Next, akin to the Ninth Circuit's decision in *Travelers*, the Fourth Circuit in *American

Home Ins. Co. v. Monsanto Enviro-Chem Sys., Inc.*, 16 Fed. App'x 172 (4th Cir. 2001), found a

subrogation waiver to be widely applicable to tort claims stemming from an existing contract.  In

*American Home*, the Court noted "that waivers of subrogation should not be enforced outside of

their context," and that "remoteness from the subject matter of the contract will prevent even an

extremely broad subrogation waiver from operating."  *Id.* at 176.  The Fourth Circuit determined

that the plaintiff's negligent failure to warn claim was not outside the context of the contract at

issue where the waiver between the insured and the defendant covered loss or damage to the

subject matter of the contract "however caused."  *Id.* at 175-76.  The Court specifically

acknowledged that the failure to warn claim concerned the operation of a system that was the

subject of the contract.  *Id.* at 176.  Here, in contrast, the operation of the security system at the

Enfield Facility is not at issue.  National Union does not claim that the security equipment

installed by Tyco did not perform properly but, rather, that the alleged negligence allowed for the

simple evasion of the installed security devices.  Thus, the cause of action neither relates to any

failure on the part of Tyco with respect to its obligations under the 2004 Contract nor to the

operation of any of the related security measures.  Accordingly, *American Home* is inapposite.

The Court is cognizant of the fact that under binding, precedent subrogation waivers are not true exculpatory clauses[27] and are, therefore, not violative of public policy. *See In re Johnson*, No. CIV.A. 04-0128-WS-B, 2006 WL 126613, at *3 (S.D. Ala. Jan. 17, 2006) (citing *BASF Wyandotte Corp. v. Tug LEANDER*, 590 F.2d 96, 97 (5th Cir. 1979); *Twenty Grand Offshore, Inc. v. West India Carriers, Inc.*, 492 F.2d 679, 685-86 (5th Cir. 1974)) ("[B]inding precedent beginning with *Fluor Western, Inc. v. G & H Offshore Towing Co.*, 447 F.2d 35, 39-40 (5th Cir. 1970), has repeatedly confirmed that waiver-of-subrogation clauses do not constitute exculpatory clauses and thus are not captured by Bisso [v. Inland Waterways Corp., 349 U.S. 85 (1955)].").[28] National Union does not assert that the Subrogation Waiver is void as violative of public policy or in some manner unconscionable. Rather, National Union asserts that the clause itself can only logically be applied to issues arising from, or at a minimum, related to, the agreement in which it appears. Accordingly, the Court applies the logical principle "that waivers of subrogation should not be enforced outside of their context," *See American Home*, 16 Fed. App'x at 176, and finds that National Union's negligence claims are not precluded.

## C. Causation as it Relates to National Union's Claim of Negligence

Tyco next tests the evidentiary virtues of National Union's negligence claims, contending that National Union, despite having conducted copious amounts of discovery, has failed to locate

---

[27] In general, exculpatory clauses are disfavored by Florida courts. *See Sanislo v. Give Kids the World, Inc.*, 157 So. 3d 256, 272 (Fla. 2015) ("[E]xculpatory clauses that protect a party from his or her own negligence are disfavored."); *Gillette v. All Pro Sports, LLC*, 135 So. 3d 369, 371 (Fla. 5th DCA 2014), *reh'g denied* (Jan. 24, 2014) (noting that "[c]lauses that purport to deny an injured party the right to recover damages from another who negligently causes injury are strictly construed against the party seeking to be relieved of liability," and remanding case because the provision was not clear "that negligence of the sort here was intended to be within the scope of the release").

[28] Decisions of the former Fifth Circuit rendered prior to September 30, 1981, are binding decisions in the Eleventh Circuit. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

one iota of evidence indicating that Tyco's conduct allowed criminals to obtain confidential information about the Enfield Facility. Tyco MSJ, ECF No. [176] at 13-17. An action for negligence requires a plaintiff to prove: "(1) that the defendant owed a duty of reasonable care to the plaintiff; (2) that the defendant breached that duty; (3) that the breach was the proximate cause of the injury to the plaintiff; and (4) that the plaintiff suffered damages." *Hasenfus v. Secord*, 962 F.2d 1556, 1559-60 (11th Cir. 1992) (citing *Rupp v. Bryant*, 417 So. 2d 658, 668 n.27 (Fla. 1982)) (further citations omitted). "Failure to establish any one of these elements is fatal to the plaintiff's case." *Id.* at 1560 (citation omitted); *see also John Morrell & Co. v. Royal Caribbean Cruises, Ltd.*, 534 F. Supp. 2d 1345, 1353 (S.D. Fla. 2008) (granting summary judgment where plaintiff had not proffered any evidence that defendant's failure was the proximate cause of the injuries sustained).

National Union's attempts to demonstrate causation, Tyco asserts, are inadequate and fail as a matter of law because any evidence submitted on behalf of National Union is utterly contradicted by the record evidence, notably, testimony from Eli Lilly's 30(b)(6) representative and documents filed by Amaury Villa in the Connecticut Criminal Proceedings. According to Tyco, any possible evidence of causation is a product of National Union's impermissible stacking of inferences, and, accordingly, insufficient to withstand summary judgment under Florida law. *Id.* The Court addresses these arguments in turn and ultimately finds National Union's evidence on the element of causation to be adequate.

### i. Alleged Concessions

In October 2013, Defendant Amaury Villa sought to dismiss the criminal indictment filed against him in the Connecticut Criminal Proceedings pursuant to Fed. R. Crim. Pro. 12(b)(2) and 12(b)(3)(B). *United States v. Villa*, Case No. 3:12-cr-00040, ECF No. [76] (Dist. Conn. Oct. 2,

2013) ("Motion to Dismiss Indictment").  By way of counsel, Amaury Villa represented the

following to the District of Connecticut:

> Upon arrival at the Enfield warehouse in January, 2010, Mr.
> VILLA and [his co-conspirator] approached the Enfield building
> storing the Lilly pharmaceuticals to look through a window.  At
> this time Mr. VILLA and [his co-conspirator] noticed the location
> of the alarm bell, as well as the entry point for all of the alarm
> wiring in the Enfield warehouse. Mr. VILLA used this openly
> visual information to make an **educated guess** concerning the best
> place to make the hole and/or entry point in the roof of the Enfield
> storage and distribution facility.  This is the **only** information Mr.
> VILLA used in order to literally "guesstimate" where he would
> make an entry point for purposes of executing the burglary.
>
> And, contrary to the urban rumors, conjecture, and speculation
> being spun in the media, Mr. VILLA **did not use or have access
> to any inside information or other classified or trade secret
> information concerning the ADT alarm system in place at the
> Enfield facility, on the night of the robbery.**  Simply stated, Mr.
> VILLA did not avail himself of any trade secret or other inside
> information in order to circumvent the ADT alarm system installed
> at the Enfield storage facility on March 14, 2010.

*United States v. Villa*, Case No. 3:12-cr-00040, ECF No. [76] (Dist. Conn. Oct. 2, 2013) (Mr.

Amaury Villa's First Motion to Dismiss Indictment) (emphasis in original).[29]  Similarly, in a

notice filed with this Court, Amaury Villa again reiterated that neither he, nor Defendant Amed

Villa were in possession of inside information relating to the security systems in place at the

Enfield Facility.  *See* Notice, ECF No. [59-1] at 53.[30]  Finally, on June 11, 2015, Amaury Villa

---

[29] A court may take judicial notice of the court filings.  *See Horne v. Potter*, 392 F. App'x 800,
802 (11th Cir. 2010) ("The district court properly took judicial notice of the documents in
[plaintiff's] first case, which were public records that were 'not subject to reasonable dispute'
because they were 'capable of accurate and ready determination by resort to sources whose
accuracy could not reasonably be questioned.'" (citing Fed. R. Evid. 201(b)); *see also Universal
Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (deeming a complaint filed in
the Southern District of New York to be subject to judicial notice as a public document).

[30] "Amed Villa reported to FBI Agents in Connecticut, as well as Assistant United States
Attorney Anastasia King that no one provided either himself or Mr. VILLA with any inside

once again proclaimed that no confidential information was utilized.   *See* Amaury Villa Depo.,
ECF No. [307-1] at 8:12-20, 25:25-26:3, 26:13-18, 31:5-11, 100:19-25.   Based on these
statements made in court documents signed by counsel, the criminals responsible for the burglary
have openly admitted that no confidential information was ever obtained.   Tyco reasons that
these admissions are catastrophic to National Union's claims.   Clearly, these representations are
critical to Tyco's case; however, they are not issue determinative.

While the Motion to Dismiss Indictment states that Amaury Villa was not in possession
of inside information, this averment does not unequivocally indicate that *no individual* connected
to the burglary was able to access the same.   *See United States v. Villa*, Case No. 3:12-cr-00040,
ECF No. [76] (Dist. Conn. Oct. 2, 2013) ("It is not known why [the co-conspirator] targeted the
Enfield warehouse, but it later became apparent to Mr. VILLA that [the co-conspirator] did not
randomly select the Enfield warehouse as a target for the heist.").   Amaury Villa's own
testimony appears to conjure up additional unanswered questions regarding whether someone
had inside information.   *See* Amaury Villa Depo., ECF No. [307-1] at *Id.* at 34:14-20, 35:1-12
("Q: Did [Nunez] ever tell you that there was an insider      who was going to help make this an
easy burglary?  A: Supposedly, because the records of my brother's said that there was a person
that was going to give him information from the inside.").   Furthermore, to give such great
credence to the statements of the Defendant in this matter, whether made in these proceedings or
related ones, would not only be contrary to the rules governing summary judgment which require
the court to view the record in the light most favorable to the non-moving party, but would
ultimately invade the province of the fact-finder.   Credibility is not to be assessed by the district

---

information about the security systems and equipment in the Eli Lilly warehouse in advance of
the break in."   *Id.*

court on a motion for summary judgment.  *See Mize*, 93 F.3d at 742 ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland*, 692 F.3d at 1154; *Hairston*, 9 F.3d at 919; *Gary*, 2006 WL 3741364, at *16.  Accordingly, these representations do not negate the otherwise hotly disputed issues of fact concerning the confidential information at issue.  More troubling, however, are Eli Lilly's 30(b)(6) representative's statements regarding the break in.

At deposition, Eli Lilly's corporate representative, Fred Larsen ("Larsen"), was questioned regarding Eli Lilly's position on Tyco's ability to maintain the confidentiality of relevant information.   Larsen's testimony clearly indicates that Eli Lilly does not share National Union's belief that the Villa Defendants utilized confidential information in order to gain access to the Enfield Facility:

> Q:    Is it Eli Lilly's belief that [Tyco] exposed Eli Lilly's confidential information regarding the Enfield Warehouse's premises security in Florida?
>
> A:    That is not Eli Lilly's belief.
>
> Q:    Would it be fair to say, then, that Eli Lilly has no information to support the statement that events and activities related to [Tyco's] liability occurred in Boca Raton, Florida?
>
> A:    That would be accurate.
>
> Q:     Is it Eli Lilly's belief that Amaury and Amed Villa obtained confidential information concerning Eli Lilly's security equipment and monitoring system that [Tyco] compiled, maintained, and stored in Boca Raton, Florida, and caused that information to be removed?
>
> A:    That is not our belief.

*See* Larsen Deposition, ECF No. [185-2] at 150:5-151:11.  Much like Amaury Villa's averments in the Motion to Dismiss Indictment, however, Larsen's testimony does not eliminate the plethora of disputed facts surrounding Tyco's ability to maintain the confidentiality of the information it possessed.  While this evidence may be harmful to National Union at trial, this Court is not in a position to weigh evidence and draw conclusions.  Where genuine issues of material fact persist, judgment as a matter of law is inappropriate.  Here, National Union has presented, at a minimum, circumstantial evidence in support of its claims.  For instance, National Union's expert, William Morales, attests to the fact that, more likely than not, information from Tyco was utilized in evading the Enfield Facility's security systems.  Morales Dpo., ECF No. [181-24] at 46:3-47:6, 57:18-58:5.  This conclusion was supported by National Union's physical security expert, Dr. Roger Johnston.  Johnston Depo., ECF No. [177-11] at 24:1-26:5, 26:24-29:24.  Given the conflicting testimony and unresolved issues of fact, summary judgment is inappropriate.

### ii.    "Stacking of Inferences"

According to Tyco, the aforementioned evidence, as well as any other evidence National Union has been able to produce with respect to the element of causation, is entirely circumstantial.  Because there is an absence of direct evidence, National Union must necessarily rely on a "stacking of inferences" in order to demonstrate causation, a method which Florida courts have deemed improper under certain circumstances.  Specifically, Tyco claims that a jury would be obligated to first infer that Tyco leaked confidential information, and then, upon that initial inference, infer that the leaked confidential information was the proximate cause of the successful burglary.  Because National Union fails to establish the initial inference to the

exclusion of all others, Tyco contends that it cannot rely on the stacking of inferences to demonstrate causation.  The Court disagrees.

In general, "a fact may be established by circumstantial evidence as effectively and as conclusively as it may be proved by direct positive evidence." *Cohen v. Arvin*, 878 So. 2d 403, 405 (Fla. 4th DCA 2004) (quoting *Nielsen v. City of Sarasota*, 117 So.2d 731, 733 (Fla. 1960)). This general proclamation is not without limitation.  Florida courts have found that where no direct evidence is presented, a party may not "stack inferences" to establish an essential element of its claim: "if a party to a civil action depends upon the inferences to be drawn from circumstantial evidence as proof of one fact, it cannot construct a further inference upon the initial inference in order to establish a further fact unless it can be found that the original, basic inference was established to the exclusion of all other reasonable inferences." *Id.* (citing *Nielsen*, 117 So. 2d at 733); *Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 959 (11th Cir. 2014) (citing *McCormick Shipping Corp. v. Warner*, 129 So. 2d 448, 449 (Fla. 3d DCA 1961)).  This rule "is designed to protect litigants from verdicts based upon conjecture and speculation." *Stanley v. Marceaux*, 991 So. 2d 938, 940 (Fla. 4th DCA 2008) (citing *Voelker v. Combined Ins. Co. of Am.*, 73 So. 2d 403, 407 (Fla. 1954)).  However, "pyramiding" inferences is permissible when "the initial inference is established to the exclusion of any other reasonable theory." *Id.* (citing *Hurst v. Astudillo*, 631 So.2d 380 (Fla. 3d DCA 1994)).  A plaintiff is not required to directly establish the initial inference where it would be illogical to do so.  Rather, "[w]hen [the] predicate inference is the only reasonable inference that can be made from the evidence, it is no longer an inference but is deemed an established fact." *O'Malley v. Ranger Const. Indus., Inc.*, 133 So. 3d 1053, 1056 (Fla. 4th DCA 2014), *reh'g denied* (Mar. 10, 2014) (citing *Voelker v. Combined Ins. Co. of Am.*, 73 So. 2d 403, 407 (Fla. 1954)).  As logic would dictate, where there

is only one inference and the party does not seek to stack inferences, the party propounding the inference does not have to establish the reasonability of the initial inference to the exclusion of all others. *Id.* (citing *Petruska v. Smartparks–Silver Springs, Inc.*, 914 So. 2d 502, 505-06 (Fla. 5th DCA 2005)).

      Notwithstanding the aforementioned standards, under Florida law "summary judgment should not be granted based on a non-movant's failure to meet its trial burden of proof on the issue of causation." *Id.* (citing *Le v. Lighthouse Assocs., Inc.*, 57 So.3d 283, 286-87 (Fla. 4th DCA 2011)). Furthermore, although this Court sits in diversity[31] and is bound to apply state law to substantive issues, federal law remains applicable to procedural ones. *See Burke v. Smith*, 252 F.3d 1260, 1265 (11th Cir. 2001) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("A federal court sitting in diversity is required to apply state substantive law and federal procedural law."); *see also Hanna v. Plumer*, 380 U.S. 460 (1965). Because the issue presently before the Court is one of summary judgment, that is, the sufficiency of evidence, this Court is bound to adhere to the Federal Rules of Civil Procedure. *See Ward v. Estaleiro Itajai S/A*, 541 F. Supp. 2d 1344, 1348 (S.D. Fla. 2008) ("*Hanna* demands the enforcement of the Federal Rules unless they are not broad enough to cover a situation."). The Eleventh Circuit has affirmed the fact that federal law governs the sufficiency of evidence notwithstanding a state's independent rule on the propriety of pyramiding inferences. *See Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1323-24 (11th Cir. 1982) (determining that Alabama's rule against pyramiding inferences "is no more than a rule concerning the sufficiency of the evidence and therefore is a matter of federal law"). "According to federal law there is no prohibition against pyramiding inferences; instead all inferences are permissible so long as they are reasonable." *Id.* at 1324; *see also Preferred*

---

[31] *See* Amend. Compl., ECF No. [27] at ¶ 9.

*Care Partners Holding Corp. v. Humana, Inc.*, No. 08-20424-CIV, 2009 WL 982433, at *11 (S.D. Fla. Apr. 9, 2009) ("The Eleventh Circuit [] held that inferences are not made impermissible simply because there may be other equally probably inferences.").

National Union admits that there were, in essence, two repositories for the information allegedly utilized in the burglary: (1) Tyco, and (2) Eli Lilly itself.  *See* Handy Deposition, ECF No. [177-15] at 63:12-64:24, 112:21-113:20.  Tyco asserts that National Union has failed to unequivocally demonstrate that it was not Eli Lilly itself who leaked the information and, as a result of this deficiency, cannot rest its theory of causation on the assertion that Tyco was responsible for the leak.  This argument is unpersuasive.

First and foremost, as previously noted, the sufficiency of evidence is governed by federal, not state law.  Even assuming that National Union has not established a base inference to the exclusion of all other theories—to wit, that the criminal defendants did not obtain confidential information from Eli Lilly itself—that determination is irrelevant at this stage, especially in the context of summary judgment where material fact disputes remain.  *Raiford v. Nat'l Hills Exch., LLC*, No. CV 111-152, 2013 WL 1286204, at *25 n.46 (S.D. Ga. Mar. 27, 2013) (rejecting the argument that "too many inferences must be stacked" to reach plaintiff's conclusion and noting that under *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321 (11th Cir. 1982), "there is no prohibition against pyramiding inferences"); *Prickett v. United States*, 111 F. Supp. 2d 1191, 1197 (M.D. Ala. 2000) *aff'd*, 268 F.3d 1066 (11th Cir. 2001) ("[State's] rule against pyramiding inferences concerns the sufficiency of the evidence, is procedural and not substantive, and, therefore, is supplanted by federal law under *Erie*.").  So long as the inferences National Union relies on are reasonable, they may be used as evidence in opposition to Tyco's Motion; indeed, the Court is obligated to draw all inferences in National Union's favor.

50

Although Tyco does not explicitly attempt to portray National Union's inferences as unreasonable, given the nature of this litigation, such a position may be assumed. Notwithstanding Amaury Villa's testimony and Tyco's obvious protest, National Union's inference that confidential information was utilized to gain entry to the Enfield Facility is not unreasonable in light of the facts and circumstances surrounding the break in.  Specifically, National Union's security experts corroborate the assertion that inside knowledge must have been employed in executing the burglary.  Although Amaury Villa, a criminal with a rather lengthy criminal history, has testified that neither he nor his brother made use of confidential information, the conflict between this testimony and National Union's experts is to be resolved by the finder of fact, not by the Court.

Second, National Union's presentation of expert testimony concerning the most critical facts in this matter, whether confidential information was obtained and how it was obtained, constitutes direct evidence.  Where a plaintiff presents direct evidence on an essential element of his or her claim, the rule against stacking of inferences is not implicated.  *See generally Collins*, 749 F.3d at 959.  While Tyco continues to dispute the admissibility of National Union's security experts for purposes of trial pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), it remains a valid consideration at this stage.  Furthermore, in light of the prior paragraph's discussion regarding the appropriate standard to be applied, whether or not National Union's experts have appropriately considered the other possible repositories is not a valid basis for finding a total lack of proper evidence on the element of causation.

Finally, the Court takes issue with Tyco's framing of the matter.  The initial inference, as stated by Tyco, is that Tyco, not Eli Lilly was the cause of the alleged leak.  This inference relates to the element of breach, not the element of causation.  There is only one inference

required of the jury to find causation, namely that the information was utilized to successfully gain entry into the Enfield Facility.  "Where there is only one inference *relating to causation*, the non-movant to the motion for summary judgment does not have to establish that the sole inference is the only reasonable inference."  *See O'Malley*, 133 So. 3d at 1056 (emphasis added). Accordingly, there is no "stacking of inferences" relating to the issue of causation.

For the aforementioned reasons, summary judgment is not warranted on the issue of causation under the theory that National Union has improperly relied on a pyramid of inferences.

**D.**     **The Correct Measure of National Union's Damages**[32]

Having found that the National Union's negligence claims escape summary judgment, the Court now addresses the issue of damages as presented in the parties' respective Motions. National Union's Amended Complaint seeks damages in the amount of $42,118,354.00 for Counts I (negligence), Count II (failure to safeguard), and Count II (failure to disclose/warn). *See* Amend. Compl., ECF No. [27] at ¶¶ 111-12, 118-19, 125-26.  It is indisputable that the damages claimed in National Union's Amended Complaint correspond directly with the amount National Union was required to pay Eli Lilly pursuant to the policy of insurance between the two.  *See id.* at ¶ 111 ("Pursuant to National Union's policy of insurance, National Union paid Eli Lilly an amount in excess of $42,118,354.00 for the damage to real property, loss of inventory and other expenses associated with the harm suffered.").  National Union's damages expert, Daniel Cambal, reaches a different amount.  Utilizing the "transfer-in price," Cambal concludes that value of the stolen and damaged pharmaceuticals should equal $44,383,190.  *See* Cambal Report, ECF No. [183-2] at 4-6, 8.  Tyco challenges Cambal's appraisal on two distinct

---

[32] Tyco contends that "[b]ecause National Union's experts will be unable to opine" on the issue of damages and the relevant standard of care, Tyco is entitled to summary judgment.  *See* Tyco MSJ, ECF No. [176] at 23 n.9.  However, *Daubert* governs admissibility *at trial*, not at summary judgment, and, accordingly, the Court may consider this testimony.

grounds, first asserting that he improperly conducted an analysis with respect to the wrong entity and second, that the measure of damages employed is malapropos.  *See* Tyco MSJ, ECF No. [176] at 17-23.

       **i.**      **National Union's Damages are Proper**

Relying on Cambal's deposition testimony, Tyco's first argues that Dr. Cambal incorrectly calculated damages for a different company, specifically, Eli Lilly's subsidiary, Eli Lilly USA.  *See* Tyco MSJ, ECF No. [176] at 17-18.  Because, according to Tyco, Cambal's valuation is based on the loss to Eli Lilly USA, his estimation bears no relation to the damages suffered in this litigation, if any.  *Id.*  Although Cambal repeatedly states that he communicated with "Eli Lilly USA" representatives and calculated damages incurred by "Eli Lilly USA," see Cambal Depo. Excerpts, ECF No. [175-1] at 66:1-13, his testimony also reveals that Cambal harbored slight confusion regarding Eli Lilly's corporate structure:

> Q:    Do you know what the name of the Eli Lilly entity that suffered a loss as a result of the burglary at the Enfield warehouse?
>
> A:    Eli Lilly USA.
>
> Q:    It's Eli Lilly USA?
>
> A:    Well, that's a guess.  I don't know that for sure.

Cambal Depo. Excerpts, ECF No. [241-2] at 14:4-10.  Later, Cambal's testimony confirms his confusion:

> Q:    I guess I'm confused then with the relationship between the Eli Lilly Enfield facility and the Eli Lilly and Company. How do those two relate to each other?
>
> A:    Well, Eli Lilly and Company Worldwide is the parent company, so all the affiliates.
>
> Q:    And is the Enfield—Eli Lilly Enfield facility an affiliate?

A:      I don't—I don't know.  Is that here in 9.1.1?

                          *        *        *

Q:      Do you know the corporate entity that the Eli Lilly Enfield
        facility operates under?

A:      I don't know.

*Id.* at 38:1-25 (objections omitted).

It is well-settled that "[a] parent corporation and its wholly-owned subsidiary are separate and distinct legal entities."  *Am. Int'l Grp., Inc. v. Cornerstone Businesses, Inc.*, 872 So. 2d 333, 336 (Fla. 2d DCA 2004) (citing *Gladding Corp. v. Register*, 293 So. 2d 729, 732 (Fla. 3d DCA 1974)) (discussing this rule in the context of contract law).  Cambal's Report, nevertheless, clearly indicates that any valuation was conducted with respect to Eli Lilly and the Enfield Facility.  *See* Cambal Report, ECF No. [183-2] at 6 (stating that the report addresses the "costs incurred by Eli Lilly and Company" as a result of the theft and noting that the opinion is based on "certain accounting records and other information of Eli Lilly and Company").  Cambal's disorientation at deposition does not belie this fact.

### ii.      "Transfer-In Price"

A proper damages calculation will "place the plaintiff in the same financial position [] that [it] occupied before the property was damaged."  *Ocean Elec. Co. v. Hughes Labs., Inc.*, 636 So. 2d 112, 114 (Fla. 3d DCA 1994) (citing *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212 (Fla. 1985)).  In the context of lost property, this generally requires damages to be measured "based upon the market value of the property on the date of the loss."  *Id.* (citing *Jacksonville, T. & K.W. Ry. Co. v. Peninsular Land, Transp. & Mfg. Co.*, 9 So. 661, 679 (1891) (further citations omitted)).  Defining a property's "market value" alone is insufficient to properly compensate the plaintiff: "[t]he proper measure of market value 'is dependent upon the choice of the appropriate

54

economic market which will achieve the objective of making the injured party whole, while avoiding any unjust enrichment.'"  *Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc.*, 286 F.3d 1233, 1245-46 (11th Cir. 2002) (citing *Ocean Elec.*, 636 So. 2d at 114).  Stated simply, a proper estimation of damages will compensate plaintiff for the market value as set by the appropriate market while avoiding unjust enrichment.  *See id.*

According to Tyco, the transfer-in price, as calculated by Cambal, runs afoul of the unjust enrichment condition because it wrongly includes a profit component.  *See* Tyco MSJ, ECF No. [176] at 19-20.  National Union responds, asserting that the transfer-in price reflects the market value of the inventory "at the time it arrived at the Enfield [F]acility in the Eli Lilly distribution chain."  Nat'l Union Resp., ECF No. [242] at 10-11.  Although Cambal's Report is terse and unclear in this respect, Cambal's testimony is not; the transfer-in price does not include a profit component that would be realized *after* the inventory was sold down the supply chain.

As an aside, Tyco's contention that the exclusion of National Union's damages theory would necessitate judgment as a matter of law is without merit.  Even if the Court were to exclude Cambal's assessment and utilization of the transfer-in price as fundamentally improper under controlling precedent, summary judgment on National Union's claims would still not be warranted.  The controversy here surrounds *theory* of damages and whether the transfer-in price is a fitting calculation.  Whether damages were sustained at all cannot be disputed.[33]  Eli Lilly has clearly suffered damages as a result of the theft and Tyco's purported negligence and the transfer-in price is an acceptable method of calculating such damages.

---

[33] This is further evidenced by Tyco's retention of a damages expert, Richard Manning, who has opined that National Union's damages would be approximately $4.3 million.  Manning Report, ECF No. [158-4] at 12.

Eli Lilly's transfer price system ("TPS") "details a margin for Eli Lilly's products based on the net effective price." *See* Cambal Report, ECF No. [183-2] at 15.  In his Report, Cambal states that "[t]he transfer price system utilizes advance pricing agreements with each affiliate, local taxing authority *and an acceptable profit margin*." *Id.* (emphasis added).  Reading this language in a vacuum, it appears that the transfer-in price does, in fact, account for profit. However, Cambal's deposition testimony clarifies that this is not the case; Cambal repeatedly and explicitly notes that the transfer-in price does not take into account lost profits, noting that if it did, the valuation would be considerably higher:

> Q:   Does [the transfer-in price] include what it would cost—what Eli Lilly would have earned if they sold that in the open market?
>
> A:   No.  No.
>
> Q:   Did you actually ever evaluate or consider how much that amount—that value of inventory would be worth if Eli Lilly had actually sold it?
>
> A:   I have considered it.
>
> Q:   And is it considerably more than that number?
>
> A:   It should be in the 60 million range.
>
> Q:   So you did not include that number in the value of what the sustained loss was at the time of the burglary?
>
> A:   No, I did not.

Cambal Depo. Excerpts, ECF No. [245-13] at 134:16-135:14 (objections omitted); *see also* Cambal Depo. Excerpts, ECF No. [245-11] at 55:5-24.  In fact, Cambal discounted the transfer-in calculation by 4.5% to account for profit, as well as 24.9% for to account for Eli Lilly's overhead expenses.  Cambal Depo. Excerpts, ECF No. [245-13] at 124:10-12, 124:23-125:25 ("The 29.4 is the impact of the profit and the cost not associated with the product."), 126:1-15

(transfer-in price does not include profit).  Thus, Tyco's contention that the transfer-in price

accounts for lost profits is contravened by Cambal's testimony.

      The proper measure of damages "place[s] the plaintiff in the same financial position []

that [it] occupied before the property was damaged."  *Ocean Elec.*, 636 So. 2d at 114 (citation

omitted).  Cambal's assessment fits the bill:

> Q:     So the transfer-in value, in your estimation, based on the
> research that you did with the company, evaluated what the
> arm's length transaction would be to conduct—to bring the
> inventory that was stolen from the Enfield [F]acility back
> to the Enfield [F]acility?
>
> A:     Yes.
>
> Q:     And is that what the Enfield [F]acility would be like, but
> for the burglary?
>
> A:     Yes.

Cambal Depo. Excerpts, ECF No. [245-12] at 120:24-121:12 (objections removed).  The analysis

was conducted in a "but-for" fashion, that is, it is designed "to determine what would be

necessary to bring Eli Lilly's Enfield, Connecticut facility back to the condition it was in, but for

the burglary that took place."  *See id.* at 116:3-25.  After having myriad meetings with Eli Lilly's

representatives, Cambal determined that the transfer-in price "was the true cost" of the inventory.

*Id.* at 105:6-11.  According to Cambal, he employed a trust-but-verify analysis, relying on Eli

Lilly's representations, but independently confirming that the transfer-in measurement was

correct and otherwise appropriate.  *Id.* at 107:19-109:1.  In so doing, Cambal concluded that a

transfer-in price percentage of 70.6 was appropriate, where the remaining 29.4 represented both

the profit margin and operating expenses.  *Id.* at 110:3-14.  In *Air Express*, a Court in this District

determined that a similar method was an appropriate measure of damages because it

"encompasse[d] all the costs incurred throughout the [Eli] Lilly supply chain up to a given point

and all the profit that [] earned in each step of the supply chain up to that point." *See Eli Lilly & Co. v. Air Exp. Int'l USA, Inc.*, 602 F. Supp. 2d 1260, 1278-79 (S.D. Fla. 2009) *aff'd in part, vacated in part, rev'd in part*, 615 F.3d 1305 (11th Cir. 2010) (concluding that transfer price "represents the real 'economic value'").

Tyco requests that this Court ignore *Air Express* and instead adhere to the binding precedent of *Ocean Electric* and *National Railroad*. The Court agrees that *Ocean Electric* and *National Railroad* must be followed; however, these cases do not dictate the result Tyco seeks.

Concern regarding *Air Express* is expected in light of the Eleventh Circuit's reversal.[34] Tyco's unease with comparing this matter to *Air Express* is equally understandable. *Air Express* appears to conflict with *Ocean Electric* and *National Railroad* to the extent that *Air Express* found mere replacement costs to deprive a manufacturer of expected profit. *See* 602 F. Supp. 2d at 1278 (citing *Polaroid Corp. v. Schuster's Express, Inc.*, 484 F.2d 349, 351 (1st Cir. 1973)). The measure of damages at issue in *Air Express* was the "transfer price," which the Court found to be "the price at which Lilly could sell the insulin products to the next affiliate or third-party in the supply chain." *Id.* This construction, therefore, accounts for profits not realized until *after* the inventory was sold to the next affiliate down the supply chain. *See id.* In contrast, the transfer-*in* price represents the price the Enfield Facility would be required to pay in order to *replace* the inventory. *See* Cambal Depo. Excerpts, ECF No. [245-12] at 120:24-121:12. The transfer-in price, according to Cambal, represents the price the Enfield Facility would be required to pay to replace the goods from its affiliate *up* the supply chain, not down the supply chain as was the case in *Air Express*. In short, the calculation as dictated by Cambal is

---

[34] On appeal, the Eleventh Circuit expressly declined to address whether the district court had erred in calculating damages based upon the transfer price. *Eli Lilly & Co. v. Air Exp. Int'l USA, Inc.*, 615 F.3d 1305, 1312 n.3 (11th Cir. 2010).

distinguishable from the one advanced in *Air Express*, and does not account for profits which would not be realized until the Enfield Facility sold the inventory to an affiliate or third-party. Rather than rely on the reasoning of *Air Express*, the Court finds strict application of *Ocean Electric* and *National Railroad* to be appropriate.

*Ocean Electric* establishes the rule that the proper measure of damages for damage to a stock of goods is the replacement cost and any other associated expenses, not the retail selling price. *See* 636 So. 2d at 115-16 ("The owner of a stock of goods held for sale, which has been damaged or destroyed, is entitled to recover, as damages, the reasonable cost of replacing such goods, which includes the wholesale cost at the time of the loss, plus any other reasonable expenses incurred in the replacement."). Cambal's analysis conforms to this decree. *See* Cambal Depo. Excerpts, ECF No. [245-12] at 120:24-121:12 (stating that the transfer-in price was the cost to bring the inventory that was stolen from the Enfield Facility back to the Enfield Facility). Further, while *National Railroad* provides this Court with instruction on the rule of law governing damages, it is factually dissimilar.

In *National Railroad*, the Eleventh Circuit determined that a subrogee's damages theory was "fundamentally flawed" because it was predicated on the "declared value" of the property under the insurance policy with its insured. *See* 286 F.3d at 1245. Because the insurance valuation included a profit component, the damages calculation unjustly enriched the subrogee, permitting it to recover profits "that were never lost in the first place." *Id.* at 1245-46 (citation omitted and emphasis removed). Even after removing the profit component, the damages calculation still resulted in unjust enrichment where the price dictated by the insurance policy was not reflective of the actual cash value of the damaged product. *Id.* at 1246-47. In fact, the policy included an arbitrary markup that was not reflective of any loss actually sustained by the

insured. *Id.* Thus, the Eleventh Circuit explicitly held that "an insured party whose property has been damaged cannot force a third-party tortfeasor to pay out in damages a negotiated figure between insurer and insured that reflects contract terms that inflate the value of the property." *Id.* at 1247 (affirming district court's exclusion of the damages evidence).

Unlike the attempted calculation in *National Railroad*, Cambal's assessment appears to be independent of any formula required by the contract between National Union and Eli Lilly:

> Q:   Did you change the value of domestic manufactured product from standard cost to transfer-in price because that's what the insurance policy required you to do?
>
> A:   No.
>
> Q:   So why did you change it?
>
> A:   I had meetings with Eli Lilly and their representatives so that we can value the product at the Enfield [F]acility. And we did some tests, we looked at the data that we were provided and what we did was I believe reasonable.

*See* Cambal Depo. Excerpts, ECF No. [245-11] at 77:21-78:9 (objections omitted); *see also* ECF No. [245-12] at 113:15-25 ("[A]t the time of the loss, right, that it was valued at cost for purposes of insurance, but that was done in error."). However, Cambal also testified to the contrary:

> Q:   Who instructed you to use the transfer-in price?
>
> A:   Well, that was—that was how I read the policy.

Cambal Depo. Excerpts, ECF No. [177-20] at 42:12-16 (objections omitted). Thus, it remains unclear as to whether the calculated transfer-in price is simply the value National Union owed Eli Lilly pursuant to the contract between the two.[35]   Nonetheless, Cambal emphasized that his

---

[35] It is interesting to note that Cambal's valuation of the stolen and damaged property is $2,264,836 greater than the amount National Union paid Eli Lilly under the contract.

analysis was conducted with respect to the Enfield Facility, that is, that the cost to replace the goods was determined based on the precise location in the supply chain.  *See* ECF No. [245-11] at 95:10-18 (taking issue with the opposing expert's report because the analysis was not conducted with respect to the specific location but, rather, damages were calculated based on Eli Lilly as a worldwide entity); *see also* ECF No. [245-12] at 117:2-10.

This matter is further plagued by Richard Manning's grossly disparate damages estimate. In his report, Manning concludes that damages in this case should be limited to $4,366,561.00, which represents the pure manufacturing costs of the stolen and damaged pharmaceuticals. Manning Report, ECF No. [158-4] at 12.  Cambal's testimony reveals that the transfer-in price values the lost inventory at the proper point in the supply chain, accounting for certain intangible costs, but excluding other factors such as profit potentially realized post-sale.  Manning, on the other hand, is in strong disagreement with the use of transfer-in price.  Thus, while Cambal's deposition testimony seems to belie Tyco's contention that the transfer-in price improperly includes down-the-line profits, the Court is once again presented with a battle of the experts.

The Court finds that Cambal's testimony supports the conclusion that the transfer-in price represents the cost to replace the inventory stolen and damaged as a consequence of the March 14th burglary.  The transfer-in price values the lost inventory at the proper point in the supply chain, the Enfield Facility, and while it accounts for certain intangible costs, it excludes other factors such as profit which would not be realized after the sale of the inventory.  In sum, the transfer in price is the replacement cost or the price Eli Lilly would be required to pay to place the same inventory back in the Enfield Facility. The mere fact that the insurance contract between Eli Lilly and National Union sets a replacement value in accord with the transfer-in price does not preclude the use of this valuation.  While the Eleventh Circuit's decision in

*National Railroad* precludes a subrogee from forcing the terms of the contract onto the tortfeasor, it did not foreclose the possibility that the insurance contract contains a correct approximation of damages.  Situations may arise where the insurance contract properly sets a "reasonable cost of replacing the goods" including "wholesale cost at the time of the loss, plus any other reasonable expenses incurred in the replacement."  *Ocean Electric*, 636 So. 2d at 115-16.  Accordingly, the Court finds that the transfer-in price is the appropriate measure of damages.  To the extent that Cambal's testimony includes some element of profit or other manner of speculative or unrealized costs, such testimony would, undoubtedly, be inappropriate at trial.

**E.**      **National Union's FDUTPA Claim Fails**

The gravamen of National Union's FDUTPA claim is that Tyco held itself out to Eli Lilly as being "capable of safeguarding the confidentiality of Eli Lilly's security infrastructure and existing [security] system."  *See* Amend. Compl., ECF No. [27] at ¶ 165.  First, Tyco contends that National Union's insured, Eli Lilly, admits that Tyco did not engage in any deceptive or unfair practices.  *Id.* at 23-25.  Second, according to Tyco, National Union fails to demonstrate actual damages.  *Id.* at 25-26.  It is the third element of National Union's FDUTPA claim, actual damages, that supports the grant of summary judgment as this element fails as a matter of law.

FDUTPA was enacted "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.202(2).  "In order to succeed in a claim under the FDUTPA, a plaintiff must prove: '(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'"  *Double AA Int'l Inv. Grp., Inc. v. Swire Pac. Holdings, Inc.*, 674 F. Supp. 2d 1344, 1353 (S.D. Fla. 2009) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006)).  Although FDUTPA does not

explicitly define the term "deception," the provisions of the Act are to be "construed liberally." Fla. Stat. § 501.202.   Nevertheless, courts have determined that a deception under under FDUTPA occurs when there is "a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Group*, 480 F.3d 1281, 1284 (11th Cir. 2007) (citation and quotation omitted); *see also Rollins*, 951 So. 2d at 869 ("A deceptive practice is one that is 'likely to mislead' consumers.").  "This standard requires a showing of 'probable, not possible, deception' that is 'likely to cause injury to a reasonable relying consumer.'" *Zlotnick*, 480 F.3d at 1284 (quoting *Millennium Commc'ns & Fulfillment, Inc. v. Office of the Att'y Gen.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000)).

While some courts have hinted that the causation requirement requires a plaintiff to prove that the consumer actually relied on the deceptive practice, see, e.g., *Kais v. Mansiana Ocean Residences, LLC*, 08–CV–21492–FAM, 2009 WL 825763, at *2 (S.D. Fla. Mar. 25, 2009) (dismissing claim because Plaintiff failed to state that the alleged deceptive act "caused him to enter into the contract . . . or caused him to act differently in any way"), the Eleventh Circuit has plainly resolved this issue, stating that "FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct."  *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009) (quotation omitted); *see also Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. 1st DCA 2000) ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue."); *State, Office of Attorney Gen., Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. 1st DCA 2007) ("A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a

deceptive trade practice claim need not show actual reliance on the representation or omission at

issue." (internal quotation omitted)).  Instead of actual reliance, a plaintiff must simply prove that

"the alleged practice was likely to deceive a consumer acting reasonably in the same

circumstances."  *Cold Stone*, 332 F. App'x at 567.

     **i.**    **Causation**

On March 2, 2015, Fred Larsen was produced as Eli Lilly's 30(b)(6) representative.  *See*

Larsen Deposition, ECF No. [185-2] at 1.  Among other things, Larsen was questioned regarding

Eli Lilly's position on various facts critical to this litigation, including ultimate issues:

> Q:    Is it Eli Lilly's belief that Amaury and Amed Villa obtained
> confidential information concerning Eli Lilly's security
> equipment and monitoring system that [Tyco] compiled,
> maintained, and stored in Boca Raton, Florida, and caused
> that information to be removed?
>
> A:    That is not our belief.

*Id.* at 151:5-11.    Most notably, Larsen openly admits that he was not aware of any false

statements made by Tyco regarding its fidelity:

> Q:    Mr. Larsen, what false statements or inducements did
> [Tyco] make to Eli Lilly regarding [Tyco's] ability to
> safeguard and protect information furnished by Eli Lilly to
> [Tyco]?
>
> A:    I'm not aware of any.

*Id.* at 156:6-11.  Tyco asserts that National Union is subject to these concessions as if they were

its own because "a subrogee 'stands in the shoes' of the subrogor and is entitled to all of the

rights of its subrogor, but also suffers all of the liabilities to which the subrogor would be

subject."  *Progressive Am. Ins. Co. v. United States*, 913 F. Supp. 2d 1318, 1322 (M.D. Fla.

2012) (quoting *Allstate Insurance Co. v. Metropolitan Dade County*, 436 So. 2d 976, 978 (Fla.

3d DCA 1983)); *see also St. Paul Guardian Ins. Co. v. United States*, 117 F. Supp. 2d 1349,

1356 (S.D. Fla. 2000) ("[The subrogee of the insured] stands in the shoes of its insured and can have no greater rights . . . ." (quoting *High v. General American Life Ins. Co.*, 619 So. 2d 459 (Fla. 4th DCA 1993) (alteration in original)).[36]  Other than the bald assertion that Tyco's reliance on *Progressive* and *St. Paul* is "misplaced," National Union makes no effort to discuss the cited cases.   *See* Nat'l Union Resp., ECF No. [242] at 16.  The Court finds that Larsen's concessions do not preclude National Union's FDUTPA claim.

Larsen's statement is not unequivocal, he merely states that he is unaware of any falsities. While this statement is probative of whether Tyco was engaged in a deceptive practice, it is not dispositive.  As noted, "FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct."  *Cold Stone*, 332 F. App'x at 567 (citation omitted).  All that is required of the plaintiff is to prove that the alleged unfair or deceptive practice "was likely to deceive a consumer acting reasonably in the same circumstances."  *Id.*; *Davis*, 776 So. 2d at 974 (noting that the standard "does not require subjective evidence of reliance").  Because the standard is an objective one, the fact that Eli Lilly itself may not have been deceived is not conclusive, although it is indicative of the strength of National Union's claim.  An issue remains as to whether a reasonable consumer is likely to be deceived by Tyco's alleged misrepresentations and, therefore, this element is satisfied for FDUTPA purposes.

---

[36] Although National Union contends that these cases do not apply here, it provides nothing more than a conclusory assertion that they are inapplicable and declines to delve into how or why. Although both *Progressive* and *St. Paul Guardian Ins.* are factually distinguishable, they support the proposition that a subrogee will be bound to the decisions of its subrogor.  *Progressive*, 913 F. Supp. 2d at 1322-23 (subrogee subject to time limits imposed on the subrogor under applicable law); *St. Paul Guardian Ins.*, 117 F. Supp. 2d at 1356 (subrogee subject to contract entered into by the subrogor),

### ii.     Actual Damages

Next, Tyco argues that National Union's FDUTPA claim fails as National Union has presented no evidence of actual damages.  *See* Tyco MSJ, ECF No. [176] at 26-26.  At this point, National Union's FDUTPA claim fails to pass muster.

FDUTPA permits recovery for "actual damages."  *Rollins*, 951 So. 2d at 869.  "Actual damages" does not include consequential damages.  *Id.*; *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999) *aff'd sub nom. Eclipse Med., Inc. v. Am. Hydro-Surgical*, 235 F.3d 1344 (11th Cir. 2000) ("Florida courts specifically reject the recovery of consequential damages under FDUTPA."); *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 824-25 (Fla. 4th DCA 2010) ("[FDUTPA] does not allow the recovery of other damages, such as consequential damages."); *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. 3d DCA 2010) ("[U]nder FDUTPA, the term 'actual damages' does not include special or consequential damages.").  Generally, the standard measurement for actual damages "is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."  *Rollins*, 951 So. 2d at 869 (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984)) (describing this measurement as being "well-defined in the case law").

As a result of Tyco's alleged FDUTPA violation, National Union contends that it has "suffered loss and damages in excess of $60,000,000.00 for the damage to real property, inventory and other expenses associated with their loss."  *See* Amend. Compl., ECF No. [27] at ¶ 171.  These are consequential damages.  Indeed, at no point does National Union's damages expert attest to a difference between the service as provided and the service as it *should have*

*been* provided.  *See Rollins*, 951 So. 2d at 869.  After citing the correct legal standard garnered from *Rollins, Inc. v. Heller*, 454 So. 2d 580 (Fla. 3d DCA 1984), National Union states that "the purchase price for the Lilly pharmaceuticals were [sic] impacted by [Tyco's] failure to protect the information entrusted to it."  Nat'l Union Resp., ECF No. [242] at 21.  National Union reaches this conclusion without any substantive analysis whatsoever.  *See id.*  More critically, this statement reflects National Union's admission that the damages sought are some manner of lost profits or inventory, not, as it would have the Court believe, the difference between the market value of the security services as provided as compared with the security services as they should have been provided.  *See Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir. 1987) (noting that "lost profits may indeed be the quintessential example of 'consequential damages'" under FDUTPA).

Because National Union has failed to provide *any* evidence of actual damages despite a protracted and ample discovery period, National Union cannot maintain an action under FDUTPA and summary judgment on Count VIII of the Amended Complaint, ECF No. [27], is granted.  *See, e.g., Lustig v. Bear Stearns Residential Mortgage Corp.*, 411 F. App'x 224, 225 (11th Cir. 2011) (affirming grant of summary judgment where plaintiff "failed to present any evidence to establish" an element of his FDUTPA claim).

## V. CONCLUSION

Litigation in this matter is undoubtedly complex, involving a variety of issues, clashes between experts, and disagreement on the facts.  Despite the astronomical summary judgment record presented, only one claim is susceptible to resolution in light of the guiding principles of Fed. R. Civ. P. 56 and associated precedent.  For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1.   Defendants, Tyco Integrated Security LLC and ADT Security Services Inc., a subsidiary of Tyco International Ltd., Co.'s Motion for Summary Judgment, **ECF No. [176]**, is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** with respect to Count VIII of the Amended Complaint and **DENIED** in all other respects.

2.    Plaintiff National Union Fire Insurance Company of Pittsburgh, Pennsylvania, as subrogee of Eli Lilly and Company's Motion for Summary Judgment, **ECF No. [189]**, is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 24th day of June, 2015.


_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**


Copies to:
Counsel of Record