**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 13-CIV-80371-BLOOM/Valle**

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, as
subrogee Eli Lilly and Company,

      Plaintiff,

v.

TYCO INTEGRATED SECURITY, LLC, *et al.*,

      Defendants.

_____/

## ORDER ON MOTIONS TO STRIKE

THIS CAUSE is before the Court upon Defendant Tyco Integrated Security LLC's Motion to Exclude the Opinions of National Union's Experts Mr. Daniel Cambal, Dr. Eric Cole, and Dr. Roger Johnston, ECF No. [175] ("Tyco's Motion"), and  Plaintiff National Union Fire Insurance Company of Pittsburgh, Pennsylvania's Motion in Limine to Strike Defendant's Experts Richard Manning, Howard Safir, and Serge Jorgensen, ECF No. [179] ("National Union's Motion") (collectively, the "Motions").  The Motions seek to exclude the opinions of the aforementioned experts pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court has carefully reviewed the Motions, the record, all supporting and opposing filings, and is otherwise fully advised.  For the reasons stated more fully herein, the Motions are granted in part and denied in part.

## I. LEGAL STANDARD UNDER *DAUBERT*

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  When a party proffers the testimony of an expert under Rule 702 of the Federal Rules of Evidence, the

1

party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). In making the determination of whether expert testimony and any report prepared by the expert may be admitted, the Court engages in a three-part inquiry of whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). The Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. *Id.*

An expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, No. 12-21089 CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing Fed. R. Evid. 702)). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id*. (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, Case No. 08–10052–CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009)). "After

the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion*."*  *J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).[1]

In determining whether an expert's testimony is reliability "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (internal formatting, quotation, and citation omitted).  To make this determination, the district court examines "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community."  *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).  "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  Thus, the aforementioned factors are non-exhaustive and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability.  *Id.* (citations omitted).  Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable.  *Id.* at 1262 (citing *Kumho*, 526 U.S. at 152)).

---

[1]  Decisions of the former Fifth Circuit rendered prior to September 30, 1981, are binding decisions in the Eleventh Circuit.  *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262) (formatting omitted).

"[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)).  To be appropriate there must exist a "fit" between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591).  "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of a gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (internal quotations and citations omitted).  Under this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).  "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (internal quotations and citations omitted).  Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293, n.7.  To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).  "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and

credibility.'"  *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d

1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir.

1988)).    Ultimately, as noted, "a district court enjoys 'considerable leeway' in making"

evidentiary determinations such as these.  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe*

*Cnty., Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005) (quoting *Frazier*, 387 F.3d at 1258).

## II. DISCUSSION

### A. TYCO'S *DAUBERT* MOTION

 Tyco seeks to exclude the opinions of Daniel Cambal ("Cambal"), Dr. Eric Cole

("Cole"), and Dr. Roger Johnston ("Johnston'), National Union's damages expert, IT security

expert, and physical security expert, respectively.  *See* Tyco Mot., ECF No. [175].  The Court

addresses each individual in turn.

### 1.    Daniel Cambal, National Union's Damages Expert

Tyco challenges Cambal's testimony based on reliability and helpfulness.  Cambal's

opinion, Tyco contends, is related to the damages suffered by a separate legal entity, Eli Lilly

USA, not Eli Lilly, the subrogee in this matter.  *See* Mot. at 3-4.  Thus, Tyco asserts that because

Cambal valued the stolen goods from the non-party's perspective, his opinion is inappropriate

and, therefore, unhelpful in a lawsuit against a different entity.

At no point does Cambal's report reference Eli Lilly USA; all references are made to "Eli

Lilly and Company."  *See* Expert Witness Report of Daniel Cambal, ECF No. [183-2] ("Cambal

Report").    After determining that Eli Lilly's records were accurate and reliable, Cambal sought

to determine the "transfer-in price" to be utilized in calculating the value of the pharmaceuticals

stolen, conducting numerous discussions with Eli Lilly and Eli Lilly's representatives.  *See id.* at

15.   According to the Cambal Report, "[t]he transfer price system utilizes advance pricing agreements with each affiliate, local taxing authority and an acceptable profit margin." *Id.*

Tyco asserts that Cambal's deposition testimony reveals that his conclusions were not with respect to the corporate entity at issue in this litigation.  At deposition, and in contrast to his report, Cambal testified that he conducted the analysis with respect to Eli Lilly USA.  *See* Cambal Depo. Excerpts, ECF No. [175-1] at 66:1-13 (testifying that the damages calculated were those "incurred by Eli Lilly USA").  Cambal's testimony merely reveals his confusion as to the corporate structure of Eli Lilly, but does not indicate that he conducted an improper analysis.  For instance:

> Q:   Do you know what the name of the Eli Lilly entity that suffered a loss as a result of the burglary at the Enfield warehouse?
>
> A:   Eli Lilly USA.
>
> Q:   It's Eli Lilly USA?
>
> A:   Well, that's a guess.  I don't know that for sure.

Cambal Depo. Excerpts, ECF No. [241-2] at 14:10.  Other testimony also confirms Cambal's disorientation:

> Q:   I guess I'm confused then with the relationship between the Eli Lilly Enfield facility and the Eli Lilly and Company.  How do those two relate to each other?
>
> A:   Well, Eli Lilly and Company Worldwide is the parent company, so all the affiliates.
>
> Q:   And is the Enfield—Eli Lilly Enfield facility an affiliate?
>
> A:   I don't—I don't know.  Is that here in 9.1.1?

> *   *   *

6

Q:      Do you know the corporate entity that the Eli Lilly
        Enfield facility operates under?

A:      I don't know.

*Id.* at 38:1-25 (objections omitted).  Cambal attested to the fact that his calculation was derived

from the value to the Enfield Facility, noting that various local factors contributed to the

valuation.   Cambal Depo. Excerpts, ECF No. [241-2] at 100:11-15.  Furthermore, Tyco's

assertion that Cambal admitted to the legal separateness of Eli Lilly and Company and Eli Lilly

USA mischaracterizes Cambal's testimony.  Cambal merely states that the Enfield Facility must

be treated separately due to locality adjustments such as tax jurisdictions.  *See* Cambal Depo.

Excerpts, ECF No. [175-1] at 37:11-25.   Damages, in general, may be dependent upon the

economic market in which the goods at issue are located.  *See Ocean Elec. Co. v. Hughes Labs.,*

*Inc.*, 636 So. 2d 112, 114 (Fla. 3d DCA 1994) (noting that different prices are paid in different

markets, differentiating between, e.g., wholesalers and retailers, and finding that "the appropriate

economic market to be used in approximating reasonable market value is the usual market where

the property or goods had been purchased").   Here, there is insufficient evidence to conclude

that the Cambal Report was prepared as to the incorrect entity, and, as such, the Court will not

deem it unhelpful.

The reliability inquiry seeks to ensure that an expert's testimony "rests on a reliable

foundation."  *Frazier*, 387 F.3d at 1261 (quoting *Daubert*, 509 U.S. at 597) (internal quotation

marks omitted).  To survive this requirement, proposed expert testimony "must be supported by

appropriate validation—i.e., 'good grounds,' based on what is known."  *Id.* (quoting *Daubert*,

509 U.S. at 590).  Here, Tyco challenges the reliability of Cambal's methods solely based on the

fact that the damage calculation utilized by Cambal—to wit, transfer-in price—is inappropriate

in this case.  *See* Tyco Mot. at 7-11.  Thus, Tyco's argument boils down to a challenge over the

7

correct measure of damages in this case, an issue hotly disputed in the parties' respective motions for summary judgment.  *See* ECF Nos. [176] and [189]; *see also* Tyco Mot. at 10 ("The Court should exclude Cambal's opinion as unreliable because Cambal's methodology . . . does not constitute the proper measure of damages under Florida law.").  As set forth in the Court's Order on Motions for Summary Judgment, ECF No. [323], the transfer-in price is an appropriate measure of damages.  Accordingly, the Court will not exclude Cambal's testimony based on the parties' dispute concerning the proper measure of damages as this issue has already been resolved.

Last, Tyco asserts that even when accepting the transfer-in price as the appropriate method for determining damages, Cambal's opinion is insufficient.  *See* Tyco Mot. at 10-11. According to Cambal's Report, the transfer-in price is predicated on (1) advance pricing agreements with each Eli Lilly affiliate, (2) local taxing authorities, and (3) acceptable profit margins.  Cambal Report, ECF No. [183-2] at 15.  Cambal further testified that the purpose of the transfer-in price is representative of the price for an "arm's length transaction."  Cambal Depo. Excerpts, ECF No. [175-1] at 41:8-11 (stating that the purpose of the transfer-in price is "to treat the cost at an arm's length transaction, and record it as such").  Despite relying on these three elements of transfer-in price in order to divine the purpose, Cambal was unable to identify the specific entities which were a party to the supposed arm's length transactions:

> Q:   [W]ho were the parties involved in this arm's length transaction that you're discussing here?
>
> A:   I guess I don't know. Foreign affiliate, US affiliate.
>
> Q:   What were the proper names of those US and foreign affiliates?
>
> A:   I have no idea.

8

Cambal Depo. Excerpts, ECF No. [175-1] at 41:20-42:4 (objections omitted); *see also id.* at 72:4-73:12.   Cambal was also unable to identify where the stolen pharmaceuticals had originated from.  *Id.* at 81:5-12.  Based on Cambal's failure to identify these purported aspects of the valuation, Tyco contends that Cambal's testimony is unreliable.  Not so.  Cambal's testimony reveals that Cambal had countless meetings with Eli Lilly representatives regarding the valuation of the stolen and damaged stock. Cambal Depo. Excerpts, ECF No. [245-12] at 105:6-11.  Over the course of many months and after resolving any errors or inconsistencies that arose, Cambal formulated his assessment.  See Cambal Depo. Excerpts, ECF No. [245-13] at 132:12-134:1. Further, Cambal's "arm's length transaction" calculation was not pulled from thin air but, rather, derived from Eli Lilly's records:

> Q:     How do you know that the related parties in this circumstance valued it at an arm's length transaction?
> \*          \*          \*
> A:     I verified it through their books and records.

Cambal Depo. Excerpts, ECF No. [175-1] at 36:10-20.  To claim that Cambal was uninformed in his analysis would be erroneous.   "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."   *Daubert*, 509 U.S. at 596 (citation omitted). Accordingly, the Court finds that Cambal does not lack the requisite background information to form a reliable opinion.

**2.      Dr. Eric Cole, National Union's Cyber Security Expert**

Next, Tyco seeks to exclude the testimony of National Union's cyber security expert, Dr. Eric Cole.  *See* Tyco Mot., ECF No. [175] at 12-22.  Dr. Cole was retained in order to assess and evaluate Tyco's IT infrastructure.  *See* Dr. Eric Cole Summary Disclosure, ECF No. [132-3]

("Cole Report") at 1-3.  In short, Dr. Cole concludes that the burglars responsible for the break-ins occurring throughout the United States between 2009 and 2011, including the Enfield Facility, "made use of confidential information held by [Tyco] about the layouts of the warehouses and the details of the [Tyco] security systems at each warehouse." *Id.* at 3.  More to the point, Dr. Cole opines that Tyco's technological infrastructure, as well as the practices, procedures, and controls employed by Tyco to secure client information were "below industry standard." *Id.* at 3.  Additionally, Dr. Cole makes assertions regarding Tyco's data retention policies, especially in light of the litigation hold letter ("Litigation Hold Directive") in this matter, and concludes that these policies, as well, are substandard.  *See id.* at 3-5.

Tyco asserts that these opinions are improper for three general reasons.  First, that Dr. Cole's use of "industry standard" is ambiguous and not properly tailored to alarm services providers such as Tyco, and simply embodies Dr. Cole's own rank speculation as to what industry standard to which Tyco was bound to adhere.  Tyco Mot., ECF No. [175] at 12-17. Second, that any testimony related to the litigation hold in this matter is improper because it exceeds Dr. Cole's expertise, invades the province of this Court, and is speculative.  *Id.* at 17-20. Finally, Tyco contends that Dr. Cole's testimony stating or implying that Tyco was "hacked" or "breached" must be excluded because he openly admitted to lacking the requisite information to assess such issues.  *Id.* at 20-22.  For the reasons that follow the Court finds that Dr. Cole's testimony is generally admissible, but shall be limited in the respects elucidated herein.

i.      *Dr. Cole's "Industry Standard" is Appropriate*

At deposition, Dr. Cole noted that the "industry standard" he referred to in his Report was "organizations in the 2009 to 2011 time period that were in the billion dollar range, that w[ere] protecting critical client information, such as alarm data, alarm systems or anything that could be

sensitive to their customers if compromised." *See* Cole Depo. Excerpts, ECF No. [175-4] at 128:17-24.  Thus, Dr. Cole's assessment was not limited to alarm companies, but also included any other entities "that performs security-related services in which sensitive client information is at their disposal and has to be protected and secured." *Id.* at 128:25-129:16.  This standard, Tyco contends, is far too broad and in no manner conforms to the applicable industry.  *See* Tyco Mot., ECF No. [175] at 12-15.  The Court disagrees.[2]

According to National Union, the fact that Dr. Cole identified standards applicable to other business entities that maintain sensitive client information is of no consequence, primarily because, as explained by Dr. Cole, these standards are no different: "Regardless of the business, any organization that possesses sensitive client information has to provide minimal security standards in order to protect the information that resides on their networks and computers." *See* Affidavit of Dr. Eric Cole dated April 27, 2015, ECF No. [241-6] ("Cole Affidavit") at ¶ 10.[3] Dr. Cole continues, noting that "[i]nformation technology security is a cross industry field and [Tyco's] industry requires a fairly basic paradigm of cyber security; protection of sensitive client information that if improperly disclosed could cause grave harm to their customers." *Id.* at ¶ 12. Furthermore, Dr. Cole states that his opinion is not premised solely upon his experience but, also relevant standards utilized by the cyber security industry such as those used by the National Institute of Standards and Technology ("NIST"), the Council on Cyber Security, and the Payment Card Industry ("PCI").  *Id.* at ¶ 13. Interestingly, Tyco's rebuttal expert, Serge Jorgensen ("Jorgensen"), informs his opinion by reviewing industry information from other

---

[2] At the outset, the Court notes that any assertion that Tyco is somehow at fault for failing to identify an alternative industry standard is improper.  *See, e.g.* NU Resp., ECF No. [241] at 9; Cole Affidavit, ECF No. [241-6] at ¶¶ 15-16.  The burden does not fall on Tyco in this matter.

[3] On May 27, 2015, the Court denied Tyco's request to strike Dr. Cole's April 27th Affidavit, finding it was consistent with Dr. Cole's prior deposition testimony.  *See* Omnibus Order, ECF No. [291].

organizations, including those outside the alarm systems industry. Deposition of Serge Jorgensen, ECF No. [173-6] ("Jorgensen Depo. Excerpts") at 141:3-142:9 (noting that he performed his review based on, among other things, industry standards available from companies that were not themselves alarm companies). Jorgensen also examined a few of the same standards relied on by Dr. Cole, including NIST and PCI. *See id.* at 217:9-17 (stating that for his "Security Methodologies section, he utilized common standards from "ISO, SANS, ISF, NIST," and "PCI").

Thus, it is apparent that the utilization of general cyber security practices is a relevant and appropriate method of determining a base level industry standard for company's handling sensitive client information such as Tyco. In fact, Tyco cites no binding authority for the proclamation that the industry standard an expert seeks to apply must be narrowly tailored to the industry at issue. Contrary to Tyco's contention, the Court in *Kaufman v. Pfizer Pharm., Inc.*, No. 1:02-CV-22692, 2011 WL 7659333 (S.D. Fla. Aug. 4, 2011), a thorough piece of non-binding authority, did not make such a decree. The decision in *Kaufman* was clearly predicated on the fact that the expert at issue had not introduced any semblance of an "industry standard" aside from her own personal belief. *Id.* at *6. The only case cited in support is the Tenth Circuit's decision in *H 30, Inc. v. Marshall*, 597 F.2d 234 (10th Cir. 1979), where it was held that an expert could not extrapolate a standard from one industry to another where the second had not adopted standards akin to those in the first. *Id.* at 234-35. In contrast, Dr. Cole specifically notes that the standards he utilized in assessing Tyco's cyber security protocols were those "that would directly apply to [Tyco]," and are generally applicable to a variety of industries. Cole Affidavit, ECF No. [241-6] at ¶¶ 10, 13 (noting that this "foundational cyber

security" is simply utilized to protect client information, in whatever industry it may be housed in).  Thus, Dr. Cole asserts that there is a consensus amongst industries, unlike in *Marshall*.

As Tyco analogizes heavily to *Kaufman*, further discussion of the case is in order.  In *Kaufman v. Pfizer Pharm., Inc.*, No. 1:02-CV-22692, 2011 WL 7659333 (S.D. Fla. Aug. 4, 2011), the plaintiff pursued a products liability action alleging that she developed breast cancer as a consequence of taking Prempro, a drug manufactured by one of the defendants.  *Id.* at *1.  The plaintiff sought to introduce the testimony of Dr. Suzanne Parisian, a purported medical expert, in order to demonstrate that the defendants, *inter alia*, conducted insufficient testing on the product prior to and after releasing it.  *Id.* at *6.  Challenging this testimony, the defendants argued that Dr. Parisian was unable to identify an industry standard of care that would illustrate what a reasonable pharmaceutical company would have done when testing and marketing a drug akin to the one at issue.  *Id.*  The Court excluded Dr. Parisian's testimony in its entirety, finding the testimony to be unreliable.  *Id.* at *7.  Although an expert may be permitted to rely on her experience in formulating her opinion, this alone is insufficient; *Daubert* requires an explanation as to how the experiences yield the conclusion, why the experiences are sufficient, and how the experiences are reliably applied to the facts.  *Id.* at *7 (citing *Frazier*, 387 F.3d at 1261).  Noting that a Court may not "simply tak[e] the expert's word for it," Dr. Parisian's report was found to be deficient as it had utterly failed to demonstrate how her professional experience led her to conclude that the defendants had breached the standard of care of a "responsible drug manufacturer."  *Id.* (internal quotation and citation omitted).  "[M]ost troubling" to the Court was the fact that Dr. Parisian had not once applied her experience to the actual facts of the case.  *Id.*

The factual circumstances of *Kaufman* are not present here. The deficiency in Dr. Parisian's testimony was her failure to provide any bases whatsoever for her methodology or

conclusions. *Id.* at *6. Such is not the case here. Dr. Cole has provided a basis for his opinions that exceed basic personal knowledge. Dr. Cole's analysis is predicated on numerous standards allegedly applicable to entities responsible for handling sensitive client information and the standards are explicitly applied to the facts of this case. The fact that Dr. Cole was unable to identify the Critical Security Controls for Effective Cyber Defense ("CSC") for 96 of the companies he included in his Report does not doom his testimony. *See* Cole Depo. Excerpts, ECF No. [175-4] at 152:1-153:20. While Dr. Cole's survey of alarm companies was curbed to those four for which he possessed the necessary information, see *id.*, he has adequately elucidated how the remaining standards provide a baseline by which Tyco should have been operating.

This being said, issues remain as to certain standards which Dr. Cole has attempted to employ. Testimony relevant to the banking industry is misleading. While the banking industry may be held to similar standards as it is also "an industry responsible for protecting confidential information which if disclosed could cause foreseeable harm to its clients," Cole Aff., ECF No. [241-6] at ¶ 19, the industry is much more heavily regulated, for instance, by the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801 *et seq.* Although the comparison may be useful, it is unclear which practices and standards result from the mandate of the Gramm-Leach-Bliley Act and those that are a consequence of the industry standards to which Dr. Cole intends to testify. To the extent Dr. Cole seeks to compare Tyco's purported obligations to those of the banking industry, such testimony is precluded. Nonetheless, Dr. Cole's testimony pertaining to the baseline cyber security protocols exercised by large companies exercising control over sensitive information has been supported by relevant standards and practices. Tyco, of course, remains free to challenge

14

Dr. Cole's application of those standards via cross-examination or through the testimony of its rebuttal expert, Jorgensen.

ii.     **Dr. Cole's Commentary on the Litigation Hold Directive is Inappropriate**

Tyco next asserts that Dr. Cole's commentary regarding Tyco's inability to produce certain information technology ("IT") data from 2009 to 2010 is improper.  *See* Tyco Mot., ECF No. [175] at 17-22.  This, according to Tyco, exceeds Dr. Cole's expertise and, more critically, invades the province of this Court.  *See id.*   The Court agrees.

In the beginning of his Report, Dr. Cole speaks to the Litigation Hold Directive, as well as various other discovery issues:

> At the time of the burglary at Eli Lilly's warehouse, ADT/Tyco was served a Litigation Hold Directive letter that placed ADT/Tycoon notice of its obligation to preserve relevant material associated with the Eli Lilly account.  It is my opinion that this notice placed ADT/Tycoon notice that all data associated with the Eli Lilly account including computer related material and metadata of that material was to be preserved.  Over the past two years a series of specific, relevant and directed formal discovery demands were served on Defendant and in my professional expert opinion, the materials sought are encompassed in the litigation hold notice and are of a nature that a reasonably prudent Information Technology Security Officer would reasonably have known required preservation.  Despite formal requests, multiple attempts at meeting and conferring, and specific Orders Compelling production of the requested information Defendant has failed and/or refused to produce a great deal of the integral relevant requested information.   Conversely, [Tyco] has gone to great lengths to furnish volumes of information that is not responsive to the requests made, is not relevant to the case, is strategically incomplete, and is not aligned with the discovery requests made or in the Court's Orders.

Dr. Cole continues to comment on Tyco's discovery practices in the next paragraph:

> In my professional opinion, [Tyco's] inability to provide basic information about its network infrastructure and systems indicates either that: a) Defendant has substandard record retention which is demonstrative of professionally unacceptable infrastructure

> management rendering [Tyco] unaware of the configuration and
> structure of its networks and systems and the associated integrity
> of the security of these systems or b) Defendant is aware that its
> systems cannot withstand scrutiny and is thus motivated to
> willingly withhold information that would explicitly demonstrate
> the flaws in its information technology security and management.

Cole Report, ECF No. [132-3] at 3-4. Dr. Cole comments further on the preservation of certain data; however, the Court need not recite all instances where such matters are discussed. It is simply fit to note that they are included in Dr. Cole's Report. *See, e.g., id.* at 4 (further discussing preservation pertaining to this litigation). While Dr. Cole makes every effort to tie these conclusions to Tyco's cyber security practices, they are, nonetheless, improper opinions.

Undoubtedly, Dr. Cole is unqualified to attest to the scope of the Litigation Hold Directive. *See* Cole Depo. Excerpts, ECF No. [175-4] at 210:3-217:21 (discussing the Litigation Hold Directive). More importantly, any commentary linking Tyco's failure to retain the data at issue with the Litigation Hold Directive improperly relates to discovery disputes, not to Tyco's cyber security.[4] The issue of whether Tyco properly complied with the Litigation Hold Directive has already been resolved by this Court. On March 26, 2015, National Union sought sanctions against Tyco for "failure to preserve and produce relevant and necessary evidence sought in this matter despite service of a timely and relevant Litigation Hold Directive." *See* Motion for Rule 37 Sanctions, ECF No. [173]. On May 11, 2015, the Honorable Patrick M. Hunt, United States Magistrate Judge, properly denied the motion, finding that National Union failed to establish the required elements of spoliation, and further noting that the record failed to establish "willfulness, bad faith or a culpable state of mind." *See* Omnibus Order, ECF No. [272] (Hunt, J.). As Tyco correctly notes, matters relating to discovery, the admissibility of evidence, and spoliation are issues for this Court to decide and are not appropriately submitted to the finder of fact.

---

[4] The Court has excluded any evidence of discovery disputes. *See* Order, ECF No. [335].

National Union's attempts to salvage this testimony are ineffective.  Citing to portions of Dr. Cole's April 27th Affidavit, National Union contends that Dr. Cole's testimony in this regard is limited to whether Tyco had satisfied the basic minimum level of security.  *See* NU Resp., ECF No. [241] at 15.  While National Union may believe that Dr. Cole's testimony in this respect is simply an attempt to evidence the problems "endemic" to Tyco's security systems, *id.*, the Court fails to recognize how Tyco's retention of data with respect to the Litigation Hold Directive is relevant to facts of this case.  The primary concern here, and the matters to which Dr. Cole intends to testify to, are whether Tyco has properly protected against cyber attacks.  Although Dr. Cole does attempt to make the connection National Union now defends, he does so inappropriately, specifically linking Tyco's alleged failure to produce certain evidence with Tyco's purported willful destruction of evidence.  *See* Cole Report, ECF No. [132-3] at 4 ("Defendant is aware that its systems cannot withstand scrutiny and is thus motivated to willingly withhold information that would explicitly demonstrate the flaws in its information technology security and management.").  As noted, such testimony clearly invades the province of the Court as it relates to discovery disputes and spoliation.

For these reasons, evidence relating to the Litigation Hold Directive is imprudent and otherwise outside the scope of Dr. Cole's expertise and is excluded.

### iii.    Testimony Regarding the Use of Confidential Information

Last, Tyco asserts that any opinion from Dr. Cole regarding whether the burglars utilized confidential information lacks foundation or is entirely speculative.  The Court agrees.

Based on his review of numerous materials, Dr. Cole concludes that the "Florida based burglars made use of confidential information held by [Tyco] about the layouts of the warehouses and the details of the [Tyco] security systems."  Cole Report, ECF No. [132-3].  Yet

at deposition, Dr. Cole notes that the information pertaining to the warehouse burglaries was provided simply as background, and instead repeatedly notes that he was not retained for analysis of those matters.  *See* Cole Depo. Excerpts, ECF No. [175-4] at 56:7-17 (stating that "the primary focus is on the cybersecurity of [Tyco], not on the details of the robberies or the specific details of the burglars involved").  Dr. Cole admitted that his opinion in this respect was not based on his own knowledge or assessment.  *See id.* at 57:1-22 (confirming that he did not investigate the underlying facts of the case but was merely "focusing in on cybersecurity").  Indeed, information regarding the burglaries was provided to Dr. Cole by counsel in this action, not by any independent investigation of the facts on his behalf. *See id.* at 96:18-97:9.

Perhaps recognizing this defect, National Union elected not to address this argument.  Nevertheless, it is evident that Dr. Cole lacks the knowledge necessary to opine on how the burglars were able to access the Enfield Facility and any opinion in this regard is speculative and lacks foundation.  Dr. Cole is offered as a cybersecurity expert, not as an investigator with knowledge of the underlying facts.  His testimony is, therefore, limited accordingly.

**3.**      **Dr. Roger Johnston, National Union's Physical Security Expert**

Last, Tyco challenges National Union's physical security expert, Dr. Johnston, asserting four bases for preclusion, Tyco Mot., ECF No. [175] at 22-30: (1) that Dr. Johnston's opinion regarding "due diligence" is unreliable and unhelpful, *id.* at 22-25; (2) that Dr. Johnston's testimony regarding whether the burglars utilized confidential information lacks foundation and is otherwise speculative, *id.* at 25-28; (3) that Dr. Johnston lacks the requisite knowledge with respect to his testimony concerning "security flaw" in the control panel at the Enfield Facility, *id.* at 28-29; and (4) that Johnston's opinion that there was a "high degree of improbability" that the

burglars would hone in on six warehouses in six different states is unreliable, *id.* at 29-30. The Court agrees with the third contention, but disagrees with the remainder.

>    i.    ***Dr. Johnston's Purported Standard is Reliable and Helpful***

Akin to Dr. Cole, Tyco contends that Dr. Johnston fails to establish an industry standard that is properly tailored to the industry at issue - alarm services. In his Report, Dr. Johnston states that there is an industry custom which provides for "best practice," or, at a minimum, "due diligence":

> There is long-standing agreement among security experts and security professionals that constitutes custom in the industry that security practitioners and security providers should strive for "best practice" as appropriate for their security applications), but that they are obligated to at least engage in "due diligence." In the context of security, "due diligence" means providing the care and level of security that is ethical, responsible, can reasonably be expected, and that will prevent unnecessary harm to other people or their property. Due diligence is partially outlined in references (1) through (9), and is similar to the layperson's understanding of the term (27). "Due diligence" is evaluated by one or both of the following measures: (1) inherent reasonableness in terms of the level of care provided and/or (2) a comparison of how far short the actual security practice is from best practice and/or widely recommended security measures.
>
> There is wide-spread agreement among security experts, security practitioners, and security providers (and it is common sense) that security professionals and companies that provide security equipment and services are obligated to engage in due diligence by being truthful, faithful, diligent, and competent in discharging their professional duties. (1-3, 6-8, 21, 27). This includes disclosing all relevant information to those having a need to know; warning customers of security threats, problems, and vulnerabilities; conducting effective and independent vulnerability assessments; and avoiding fraudulent business practices. (1-3, 6-8, 21).

*See* Summary Disclosure of Plaintiff's Testifying Expert Dr. Roger Johnston, ECF No. [183-4] ("Johnston Report") at 4. Much like Dr. Cole, Dr. Johnston contends that the standards he relies on are widely accepted in the security community. Specifically, Dr. Johnston cites numerous

publications, including, but not limited to, the voluminous standards set forth by the American Society for Industrial Security ("ASIS") International, the largest association of security professionals in the world.  *See* Affidavit of Dr. Roger Johnston dated April 27, 2015, ECF No. [241-8] ("Johnston Affidavit") at ¶¶ 18-19.  In fact, Dr. Johnston notes that a number of Tyco employees belong to the organization and, as a result of such membership, "have pledged to honor" the standards Dr. Johnston relies on.  *Id.* at ¶ 18.  Thus, while the standards Dr. Johnston relies upon are not necessarily specific to the alarm services industry, he asserts that they are, nonetheless, accepted by the same.  Accordingly, the Court finds that Dr. Johnston has set forth an appropriate basis for his conclusions and his opinions in this regard are not unreliable.[5]

Furthermore, Dr. Johnston's opinion is helpful.  The helpfulness inquiry is essentially a question of relevance.  *See Quiet Tech.*, 326 F.2d at 1347 (noting that the helpfulness prong "goes primarily to relevance" (quoting *Daubert*, 509 U.S. at 591)).  Dr. Johnston's testimony is undoubtedly relevant and Tyco does not appear to dispute this fact.  Rather, Tyco insists that because the "due diligence" standard Dr. Johnston employs is one that can be understood by the jury without Dr. Johnston's assistance, it should be excluded as unhelpful. *See Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 579 (N.D. Fla. 2009) *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) (stating that the helpfulness inquiry "ensures that expert witnesses will not testify about lay matters which a jury is capable of understanding and deciding without the expert's help" (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 541

_____

[5] Simply because Dr. Johnston was unable to identify the specific practices of other companies within the security industry does not belie his conclusions with respect to his professed standard. The standards Dr. Johnston sets forth are generally relied upon by the security industry. Evidence that other companies have adopted similar standards would further buttress Dr. Johnston's opinion but is ultimately unnecessary for admissibility purposes.  The inquiry concerning *Daubert* is whether the expert's testimony is reliable, grounded in sound principles and methods, i.e. "good grounds."  *Daubert*, 509 U.S. at 590.

(S.D.N.Y. 2004))); *see also City of Tuscaloosa*, 158 F.3d at 565 (determining that an opinion will not assist where the "trier of fact is entirely capable of determining [issues] . . . without any technical assistance").   Although the meaning of "due diligence" "is similar to a layperson's understanding of the term," Johnston Report, ECF No. [183-4] at 4, Dr. Johnston's application of this standard to the facts of this case is not so simplistic and, undoubtedly, the jury benefits from the testimony of an expert in the field of physical security.

> ### ii.      *Testimony Regarding "Inside Information"*

Pursuant to his Report, Dr. Johnston intends to testify that, "to a reasonable degree of professional certainty," the burglars utilized inside information in executing the burglary of the Enfield Facility.   *See* Johnston Report, ECF No. [183-4] at 6-8.   Tyco protests this testimony, asserting that it is purely speculative.   Tyco Mot., ECF No. [175] at 25-27.   In support of this argument, Tyco notes that Dr. Johnston cannot identify various aspects of the burglary that are indicative of the use of inside information.   *Id.*   Notably, Tyco identifies the following four flaws in Dr. Johnston's assessment:

> 1. He cannot identify whether the burglars were privy to the 2010 Confidential System Proposal.  Johnston Depo. Excerpts, ECF No. [175-7] at 46:2-6.
>
> 2. He notes that he has no direct evidence concerning whether the burglars had diagrams of the alarm system or accessed the Tyco databases.  *Id.* at 27:16-30:11.
>
> 3. He never inquired as to whether Eli Lilly believed that the burglars utilized inside information.  *Id.* at 48:21-49:23.
>
> 4. He does not know whether Tyco's practices in handling alarm sales proposals or diagrams are consistent with the top 100 alarm companies.  *Id.* at 32:15-23.

Tyco Mot., ECF No. [175] at 25.  Pointing to these deficiencies, Tyco asserts that Dr. Johnston's opinion regarding the burglar's use of inside information must be excluded as unreliable.[6] *Id.*

While Dr. Johnston clearly lacked direct evidence of the use of confidential information, his opinion is not predicated on such evidence but, rather, the manner in which the burglars accessed the facility.  Dr. Johnston clearly bases his assessment on his knowledge of the Enfield Facility and his own evaluation of the facts surrounding the burglary including facts such as the location of the roof access point, the lack of trial and error regarding the roof breach, and the manner in which the burglars were otherwise able to "spoof the security system."  Johnston Report, ECF No. [183-4] at 6-8.  Accordingly, his failure to identify direct evidence is not fatal to his testimony.

The same can be said of Dr. Johnston's testimony concerning the five other warehouse burglaries.[7]  While Dr. Johnston was unable to identify aspects of each burglary at deposition, his Report clearly sets forth certain details which lead him to the conclusion that inside information was utilized.  *See* Johnston Report, ECF No. [183-4] at 11-14.  Dr. Johnston's Affidavit also clearly states the basis for his opinion, explaining that his opinion in this respect is not mere conjecture but, in fact, based on "an extensive amount of police and investigative reports (including detailed photographs) and accounts of interviews with warehouse owners for understanding what occurred at the other 5 warehouses."  Johnson Affid., ECF No. [241-8] at ¶ 8.  Moreover, the fact that Dr. Johnston is unable to recall who was at each break- in does not render his opinion unreliable; whoever was present at each burglary does not belie his conclusion

---

[6] National Union fails to address this contention.

[7] Unsurprisingly, National Union again provides the Court with no assistance on this matter, failing to address how Dr. Johnston's purported lack of knowledge surrounding the remaining burglaries renders his testimony in this respect inadmissible

that those responsible must have utilized inside information to evade the security systems. Ultimately, Dr. Johnson's impotency regarding the specific details of the burglaries is simply susceptible to cross-examination, affecting the opinion's weight but not its admissibility.

### iii. Dr. Johnston May Not Testify to a "Security Flaw" in the Control Panel

Dr. Johnston's testimony in this regard appears to be related to UL 827 Standard for Central-Station Alarm Services, Section 30.1.2, a security standard that dictates that "the control unit [control panel] shall have its cover protected by a tamper switch or the equivalent to prevent its being opened so as to defeat the system." *See* Johnston Affid., ECF No. [241-8] at ¶ 22; *see also* NU Resp., ECF No. [241] at 18. The Court has previously determined that Dr. Johnston's opinion must be limited in this respect as the inclusion of the UL 827 standard was never previously disclosed in this litigation. *See* Order, ECF No. [291]. Accordingly, any "security flaw" stemming from Tyco's purported failure to comply with the UL 827 standard is similarly inadmissible.[8]

### iv. Dr. Johnston's "High Degree of Statistical Improbability"

Lastly, Tyco asserts that Dr. Johnson's opinion that there was a "high degree of statistical improbability that the Florida-based burglars would choose and attack 6 warehouses in 6 different states" is unreliable. In full, Dr. Johnson states:

> Using reported data and estimates of the market share of [Tyco's] presence in the commercial security market and commercial warehouse market in the United States and in the regions in which these burglaries occurred, I will testify to the high-degree of statistical probability that Florida-based burglars would choose and attack 6 warehouses in 6 different states, and that all 6 warehouses would randomly utilize ADT/Tyco security products and monitoring services. In my opinion to a reasonable degree of

---

[8] Moreover, at no point has National Union put forth the theory that the security system installed by Tyco was defective. Any testimony implying the same would likely be irrelevant under Fed. R. Evid. 402.

> professional certainty, and as I will so testify, these targeted
> locations were selected by virtue of their commonality in that they
> all utilized ADT/Tyco security products and services, and the
> burglars possessed Inside Information about them.

Johnston Report, ECF No. [183-4] at 13.  The Court finds this testimony to be admissible.

As an initial matter, Tyco appears to challenge Dr. Johnson's qualifications with respect to this opinion as well, noting that he is a security expert, not a statistician.  *See* Tyco Mot., ECF No. [175] at 30.  Although Dr. Johnson is indeed a physical security expert, he has obtained a doctorate in physics and claims that he is otherwise qualified to perform elementary statistical analysis. He further notes that he has utilized similar mathematical principles throughout his lengthy technical career.  Johnson Affidavit, ECF No. [241-8] at ¶ 40.  Accordingly, Dr. Johnson is not unqualified to utilize basic probability in his assessment.

More to the point, Dr. Johnson's analysis is not unreliable.  Tyco protests on the basis that Dr. Johnson lacked the requisite data to perform the analysis with respect to Tyco's market share and, as a result, was forced "to rely on numerous assumptions and inferences in order to reach his opinion."  Tyco Mot., ECF No. [175] at 29-30 (citing Johnson Depo. Excerpts, ECF No. [175-7] at 272:21-273:8, 275:23-276:2).  Indeed, Dr. Johnson does admit that his estimates were just that, estimates.  *See* Johnson Depo. Excerpts, ECF No. [175-7] at 272:21-273:8 (stating that he used the information to "gain some kind of estimate . . . to try to get an estimation of the overall market share for commercial security, as well as to try to infer, based on some assumptions, the approximate market share for warehouses"), 275:23-276:2 (confirming that he did not have the "requested market share information").  In short, Tyco challenges the basis of Dr. Johnston's statistical appraisal, arguing that this computation lacks the foundational data. However, Dr. Johnson purportedly utilized Tyco's "own representations of its market share" in formulating his statistical conclusion.  Johnston Affid., ECF No. [241-8] at ¶ 40 (citing Tyco

Business Unit Fact Sheets, http://www.tyco.com/uploads/files/TycoBusiness_FactSheet.pdf (last visited July 1, 2015)).  Even if Dr. Johnston utilized the market share value Tyco asserts, Dr. Johnston's conclusion remains the same.  *See id.*  Thus, this testimony is grounded in verifiable facts and is not unreliable.

### B. NATIONAL UNION'S *DAUBERT* MOTION

National Union seeks to strike the testimony of Tyco's rebuttal damages expert, Richard Manning ("Dr. Manning"), Tyco's physical security expert, Howard Safir ("Safir"), and Tyco's IT security expert, Serge Jorgensen ("Jorgensen").  *See* Nat'l Union Mot., ECF No. [179].  As with Tyco's Motion, the Court addresses these individuals in turn.

**1.**      **Richard Manning, Tyco's Rebuttal Damages Expert**

National Union argues that Dr. Manning's testimony should be excluded for three reasons: (1) because his legal conclusions about the proper measure of damages "usurp[] the role of the Court"; (2) his testimony is unreliable because he uses no methodology to arrive at his conclusions; and  (3) "[h]e performed no independent investigation " and simply "adopted as his interpretations the unexplained and inapplicable estimates of another expert, Mr. Cambal."  *See* Nat'l Union Mot., ECF No. [179] at 4.

The parties' submissions in this respect boil down to continuing disputes over the proper measure of damages in this case.  Having resolved the theory of damages at summary judgment, the Court need not address Dr. Manning in depth.  However, a brief discussion Dr. Manning's "competency" is warranted.

National Union asserts that "Dr. Manning is unfamiliar with and incompetent to testify about what constitutes the transfer price."  Nat'l Union Mot., ECF No. [179] at 7.  When questioned about the appropriateness of Cambal's methodology, "Dr. Manning testified that he

was not an expert on transfer-in pricing and had no expertise in the factors which went into the equation, the tax consequences associated with it, and the tax authority approvals required for its use, etc." *Id.* at 11 (citing Deposition of Richard Manning, ECF No. [179-1] ("Manning Depo. Excerpts")).   Thus, National Union Plaintiff contends that Dr. Manning criticizes Cambal's methodology without any understanding or expertise. *Id.*

As previously noted, an expert is qualified "by knowledge, skill, experience, training, or education," and is not necessarily unqualified merely "because [his] experience does not precisely match the matter at hand." *J.G.*, 2013 WL 752697, at *3 (citations omitted).  If an expert is qualified but lacks a certain expertise, cross examination is the correct vessel for such a challenge. *See Clena Investments*, 280 F.R.D. at 661 ("[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility."); *Maiz*, 253 F.3d at 666 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence.").  It is evident that Dr. Manning has advanced knowledge and experience in both the economic and pharmaceutical fields and is, therefore, qualified to testify in this case.

As Tyco notes, Dr. Manning has achieved a Ph.D. in economics from the University of Chicago in the field of industrial organization, and has served as an economics professor teaching courses in price theory, industrial organization, and economic analysis of law. *See* Expert Report of Richard L. Manning, Ph.D., ECF No. [158-4] ("Manning Report") at 4, 17.  Dr. Manning's professional career further reflects his substantial qualifications.  Dr. Manning has worked for an extensive period of time in the pharmaceutical industry conducting economic analysis and strategy related to pricing and reimbursement and has operated as an executive at a

multinational pharmaceutical company for fourteen years.  *Id.* at 17.  Dr. Manning is also a self-professed specialist the field of "economic and statistical analysis of damages and other matters in litigation."  *Id.* at 4.  Clearly, Dr. Manning is at least minimally qualified to testify as a rebuttal expert on damages.  As a rebuttal expert, Dr. Manning will be able to opine on the purportedly proper and improper calculations used by Cambal within the transfer-in-price methodology.[9]

National Union's challenges to Dr. Manning's reliability are also unpersuasive.  In sum, National Union accuses Dr. Manning of blindly relying and adopting the findings of their expert, Daniel Cambal.  Curiously, the inference drawn from this assertion is that Cambal's figures are unreliable.  Indeed, an expert's hasty adoption of another expert's opinion raises concerns to the extent that the first expert's opinion may be unreliable.  *See Hendrix*, 255 F.R.D. at 607 n.75 (finding that second expert could rely on first expert's opinion because the second expert has a "reasonable belief that [the first expert's] opinion was reliable").  Thus, in order to exclude Dr. Manning's testimony on this basis would require a finding that the underlying report, Cambal's opinion, was unreliable.  *See In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) ("An expert, however, may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." (citing *In re TMI Litig.*, 193 F.3d 613, 715-16 (3d Cir. 1999))).[10]  Certainly National Union does not intend to adopt such a position.  Any disputes over whether Dr. Manning appropriately interpreted Cambal's otherwise reliable opinion can be resolved through examination.

---

[9] Obviously, any opinion that the transfer-in price is an inappropriate measure of damages would run afoul of this Court's Order on the parties' respective motions for summary judgment and would be precluded.

[10] Logically, this issue most commonly arises where the experts are aligned in the litigation, i.e. either both plaintiff's witnesses or both defendant's witnesses, as was the situation in both *Hendrix* and *In re Polypropylene*.

**2.** **Howard Safir, Tyco's Physical Security Expert**

Tyco's physical security expert, Howard Safir, testifies to two basic topics: (1) Eli Lilly's allegedly inadequate physical security measures at the Enfield Facility; and (2) Tyco's adherence to best practices and procedures regarding physical security. *See* Expert Report of Howard Safir, ECF No. [201-1] ("Safir Report") at 4-6. Seeking to exclude this testimony, National Union avers that Safir fails to satisfy all three prongs of the *Daubert* analysis. *See* Nat'l Union Mot., ECF No. [179] at 12-20. For the most part, the Court disagrees.

*i.* ***Safir is Qualified***

In denouncing Safir's qualifications, National Union contends that Safir lacks direct experience and knowledge regarding cargo theft and warehouse burglaries, and has but a single experience with a situation similar to the one underlying this litigation. Nat'l Union Mot., ECF No. [179]. at 13-14. Specifically, Safir has only supervised one theft of a pharmaceutical warehouse. *Id.* As noted with respect to Dr. Manning, an expert's qualifications need not be narrowly tailored to the precise circumstances of the case; merely "because [the expert's] experience does not precisely match the matter at hand," does not render him unqualified. *J.G.*, 2013 WL 752697, at *3 (citations omitted).

Mr. Safir has a fifty-year distinguished career in security and law enforcement, including but not limited to, serving as the 39th Police Commissioner of New York City, the 29th Fire Commissioner of New York City, Associate Director for Operations of the U.S. Marshals Service, Director of the Federal Witness Security Program, and being named to Security Magazine's 2006 List of the "25 Most Influential Security Executives." Safir Report, ECF No. [201-1] at 7-8, 18-20. In *J.G. v. Carnival Corp.*, an expert in law enforcement and private

28

security, although not an expert on cruise ship security, was found to be qualified to testify to matters of "security-related policies and practices" in a case concerning the security practices of a cruise ship. *See* 2013 WL 752697, at *4 ("The extent of [the expert's] unfamiliarity with cruise ships goes, instead, to the weight and credibility of his testimony and is, therefore, appropriately a subject for Plaintiff's vigorous cross examination at trial."). Similarly, here, Safir's extensive background in security and security-related fields qualifies him to be an expert concerning premises security. "[A]n expert must satisfy a relatively low threshold, beyond which qualification becomes a credibility issue for the jury." *J.G.*, 2013 WL 752697, at *3 (citing *Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005)). Safir clearly satisfies this burden.

### ii. Safir's Opinion is "Reliable"

According to National Union, "Safir admits that he has performed no proper investigation of the Enfield facility or the burglars in this instance." Nat'l Union Mot., ECF No. [179] at 14. Rather than perform a full investigation, National Union asserts that Safir's improperly relies on a select few sources compiled mostly by defense counsel in this matter, specifically, "(i) what defense counsel gave to Vigilant Resource International, LLC ("VRI"), the company with whom Mr. Safir is retained to provide consultant services; (ii) what defense counsel told Mr. Safir; and (iii) relatively few brief interviews and investigative work performed by VRI of [Tyco's] employees with whom Mr. Safir could not recall and for which he has no notes." *Id.* at 14-15 (citations omitted). The crux of National Union's argument in this respect is that Safir did not personally conduct the entire investigation but, instead, relied on his employees. *See id.* First, this assertion is partly belied by Safir's deposition testimony where he notes that he himself conducted a number of the interviews that formed the basis of his opinion. *See* Deposition of

Howard Safir, ECF No. [179-3] ("Safir Depo. Excerpts") at 37:24-39:2.  Second, an expert need not have personal knowledge of an issue to give an expert opinion.  *Daubert*, 509 U.S. at 592 ("Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").  In accord with this proposition, "[e]xperts routinely rely on the work of others . . . so long as the facts or data on which they rely is of the type reasonably relied on by experts in the relevant field." *City of St. Petersburg v. Total Containment, Inc.*, No. 06–20953, 2009 WL 3335013, at *4 (S.D. Fla. Mar. 19, 2009).  National Union does not suggest that, in the normal course of conducting a security evaluation, security experts do not regularly rely on the investigations of others, particularly investigations conducted by what would presumably be trusted employees. Ultimately, Safir was free to rely on the materials provided to him by counsel in this litigation and the investigations of his employees.  This aspect of Safir's investigation does not render his testimony with respect to the Enfield Facility unreliable.

Further, Safir is not foreclosed from testifying merely because Safir is unable to produce his notes.  National Union cites no authority to support the proposition that an expert's lack of notes will deem related testimony inadmissible.  Along these lines, National Union appears to operate under the assumption that, in order to be deemed reliable, an expert must possess copious notes and/or a "flawless memory."  Nat'l Union Mot., ECF No. [179] at 15-16.  No such standard exists under *Daubert*, and the argument that Safir's "failing memory" renders him unreliable lacks merit and improperly invades the province of the jury.  *See generally Medina v. United Christian Evangelistic Ass'n*, No. 08-22111-CIV, 2009 WL 4030454, at *4 (S.D. Fla. Nov. 20, 2009) (concluding that an expert was reliable despite the fact that he could not recall certain aspects of his investigation).  Continuing to masquerade this argument as one regarding

Safir's reliability, National Union incredulously notes Safir's supposed lack of credibility, directing the Court to two instances in the Southern District of New York where judges "have [purportedly] found that his testimony is not credible." *Id.* A district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293, n.7.

National Union's remaining assertions with respect to the foundation of Safir's opinion go to the weight of Safir's testimony, not his reliability. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Coquina Investments v. Rothstein*, No. 10-60786-CIV, 2011 WL 4949191, at *8 (S.D. Fla. Oct. 18, 2011) (citation omitted). The aforementioned challenges to the allegedly flimsy foundation for Safir's opinion do not prevent him from testifying where Safir has demonstrated a basis for the same.

Finally, Safir's opinion with respect to the conduct of the burglars themselves, as laid out in his Report, is reliable. Safir intends to testify that no confidential information was required in order to accomplish the burglary of the Enfield Facility. *See* Safir Report, ECF No. [201-1] at 6-7. National Union objects, however, to Safir's testimony regarding whether the burglars were *actually* in possession of confidential information. In this regard, it is clear that Safir lacks the requisite knowledge. In a footnote, Safir notes that he has "neither received nor reviewed any direct evidence that any of the burglars had or used any [Tyco] generated or handled documentation in committing the Burglary."[11] *Id.* at 6. n.13. Indeed, this is outside the scope of Safir's testimony. Safir intends to testify that, based on his knowledge and experience, no

---

[11] Additionally, National Union contends that Safir may not rely on the statements made by Amed and Amaury Villa in the related criminal proceedings. *See id.* (citing documents filed in *United States v. Villa*, Case No. 3:12-cr-00040 (Dist. Conn.)); *see also* Safir Depo. Excerpts, ECF No. [179-3] at 93:8-24. These representations were made in formal pleadings subject to Rule 11. Again, National Union's challenge goes to the weight of the evidence, not its admissibility.

confidential information was required to execute the burglary in the manner it was completed; he does not purport to have knowledge of whether the Villas actually utilized confidential information and seemingly does not intend to testify to that specific fact.  *See* Safir Report, ECF No. [201-1] at 6-7 (noting that he "can only opine based on [his] years of experience in law enforcement and security that the acquisition and use of such information was not necessary to commit the Burglary, would have added an unnecessary level of complexity and risk to the burglars, and is just as unlikely as it is uncommon").[12]  To the extent Safir seeks to confirm the fact that the burglars were not in possession of confidential information, he is unable to do so.  However, Safir's opinion that no confidential information was necessary to accomplish the burglary rests on sufficient grounds and is therefore reliable and admissible.

###### iii.      *Safir's Opinion is Generally Helpful*

According to National Union, Safir's testimony pertaining to the "shortcomings" of the Enfield Facility's physical security are common sense and, therefore, unnecessary.  The Court disagrees; Safir's knowledge concerning premises security will assist the trier of fact.  Although the "more is better" approach that Safir advocates is, undoubtedly, common sense, the additional measures that could have been utilized are not.  Safir's testimony will assist in this respect.

###### iv.      *Opinion's Regarding Tyco's Physical Security of Tyco Locations is Irrelevant and Unhelpful*

On the other hand, Safir's opinion regarding Tyco's brick-and-mortar facilities is irrelevant and, therefore, unhelpful.  By examining Tyco's facilities and scrutinizing Tyco's related physical security, Safir appears to confuse the issues in this case.  *See* Safir Report, ECF No. [201-1] at 6; Safir Depo. Excerpts, ECF No. [179-3] at 50:4-22.  At no point has National

---

[12] Whether Amed and Amaury Villa's defense counsel in the criminal matter is currently being subjected to disciplinary proceedings is entirely irrelevant.

Union asserted that the criminal defendants were able to complete a *physical* breach of Tyco's facility to obtain the confidential information allegedly utilized.  The alleged theft of information in this case occurred digitally, not physically.  Therefore, any evidence related to the physical security Tyco maintains at the facilities where it houses confidential information is irrelevant.

### v.    Safir's Rebuttal Opinions

Last, National Union challenges Safir's Rebuttal Report.  *See* Nat'l Union Mot., ECF No. [179] at 19-20.  The basis for this objection relates to Mario Santana ("Santana"), the alleged "inside man."  According to National Union, Safir is in no position to assess the likelihood that Santana was the informant given a number of holes in his knowledge concerning Santana's personnel file and related documentation.  *See id.*  Again, these arguments relate to the weight of Safir's testimony, not its admissibility.[13]

### 3.    Serge Jorgensen, Tyco's Cyber Security Expert

Tyco has designated Serge Jorgensen as a cyber security expert who will opine about the standard and strength of Tyco's electronic data security practices.  According to National Union, Jorgensen's methodology is unreliable because he "fail[s] to consider or even take note of some of the most damning historical computer data available, that former employee, Mario Santana's computer credentials were utilized repeatedly just before his departure from ADT and, more importantly, these same credentials were used up to 18 months <u>after</u> Mr. Santana left Defendant's employ."  Nat'l Union Mot., ECF No. [179] at 21 (emphasis in original).  The Court rejects this contention.

---

[13] The Court implicitly discards those arguments previously rejected with respect to Safir's original Report, e.g., Safir's reliance on the investigations of employees, Safir's "failing memory," and Safir's general lack of familiarity.  *See* Section III.B.2.ii, *supra*.

Failure to analyze all variables and facts affects the weight and credibility of the testimony; "failure to include variables will affect the analysis' probativeness, not its admissibility." *Quiet Tech*, 326 F.3d. at 1346 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).   "[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation and citation omitted).   *Rosenfeld*, a slip-and-fall on a cruise ship, is instructive.   There, the plaintiff sought to introduce expert testimony to demonstrate that the defendant's choice of flooring on the ship posed a higher danger of slip-and-fall accidents.   *See Rosenfeld*, 654 F.3d at 1192-03. The district court in *Rosenfeld* excluded the expert testimony, determining that the testimony was not helpful.   *Id.* at 1193-94.   The Eleventh Circuit reversed.   *Id.*   After recognizing that the district court abused its discretion with respect to helpfulness, the Eleventh Circuit noted that the defendant's objections with respect to reliability were unfounded.   *Id.* at 1194.   Specifically, the assertion that the expert's methods were unreliable because he failed to test for other possible scenarios and was otherwise imprecise was rejected.   *Id.*   Rather, the Court suggested that the testimony be challenged "through vigorous cross-examination and presentation of contrary evidence." *Id.* (internal quotation omitted); *see also Latele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, No. 12-22539-CIV, 2014 WL 7150626, at *8 (S.D. Fla. Dec. 15, 2014) ("At trial, Defendants will be able to question [the expert] about his less-than-complete review [], and this cross-examination, which the [Court] anticipates will be rigorous, should be sufficient protection.").   Similarly, here, Plaintiff will be able to test Jorgensen's supposed failure to consider other possibilities on cross-examination.

The cited authority does not persuade the Court otherwise.  Courts in this Circuit have recognized that "[a]n expert must at least consider other factors that could have been the sole cause of the plaintiff's injury" and provide a "reasonable explanation as to why he . . . has concluded that any alternative cause suggested by the defense was not the sole cause of the plaintiff's injury." *Seamon v. Remington Arms Co., LLC*, 51 F. Supp. 3d 1198, 1214 (M.D. Ala. 2014) (quoting *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010)). However, as National Union aptly notes, this rule is primarily applicable in the context of "an expert opinion on causation arrived through a differential diagnosis." *Id.* at 1214 (quoting *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 693 n.7 (8th Cir. 2001)).  The Court is unable to discern why the same holds true for Jorgensen's testimony concerning Tyco's electronic data security practices.  As noted, Jorgensen's potential failure to consider alternatives is probative on the weight his testimony is to be afforded, not its admissibility.

### III. CONCLUSION

The parties muddle the distinctions between admissibility, credibility, and weight.  The overwhelming majority of the proffered evidence satisfies Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant Tyco Integrated Security LLC's Motion to Exclude the Opinions of National Union's Experts Mr. Daniel Cambal, Dr. Eric Cole, and Dr. Roger Johnston, **ECF No. [175]**, is **GRANTED IN PART** and **DENIED IN PART**.  As set forth more thoroughly above, the Motion is granted with respect to the following testimony, and denied in all other respects:

      a.  Dr. Cole's commentary on the Litigation Hold Directive and testimony regarding the use confidential information.

      b.  Dr. Johnston's testimony pertaining to a "security flaw" in the control panel and UL 827 Standard for Central-Station Alarm Services.

2.  Plaintiff National Union Fire Insurance Company of Pittsburgh, Pennsylvania's Motion in Limine to Strike Defendant's Experts Richard Manning, Howard Safir, and Serge Jorgensen, **ECF No. [179]**, is **GRANTED IN PART** and **DENIED IN PART**. As set forth more thoroughly above, the Motion is granted with respect to the following testimony, and denied in all other respects:

      a.  To the extent it remains irrelevant, Howard Safir's opinion regarding the Tyco's physical security at its brick-and-mortar facilities.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 2nd day of July, 2015.

 

 

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

36